**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| JERRI E. YOUNG and PATRICIA A. WALSH, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 4:07-CV-00386-RP-CFB |
| v. | ) ) | Hon. Robert W. Pratt |
| PRINCIPAL LIFE INSURANCE COMPANY and PRINCOR FINANCIAL SERVICES CORPORATION, | ) ) ) ) ) | |
| Defendants. | ) | |

**ANSWER TO PLAINTIFFS' AMENDED AND SUBSTITUTED**
**CLASS ACTION COMPLAINT**

Defendants Principal Life Insurance Company and Princor Financial Services Corp.

(collectively, "Defendants"), for their answer and affirmative defenses to Plaintiffs' Amended

and Substituted Class Action Complaint for Violations of the Employee Retirement Income

Security Act ("Amended Complaint"), state as follows:

1.      Plaintiff Jerri E. Young brings this action in her capacity as a former participant in
the Restaurant Concepts, Inc. 401(k) Savings Plan and is a citizen of Iowa who at all times
relevant to this Complaint lived in Polk County, Iowa.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as

to the truth of the allegations in this paragraph.

2.      Plaintiff Patricia A. Walsh brings this action in her capacity as a former
participant in the C and J Management Corporation 401(k) Plan and is a citizen of Iowa who at
all times relevant to this Complaint lived in Polk County, Iowa.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as

to the truth of the allegations in this paragraph.

3. Before retiring, Plaintiffs were participants in retirement plans administered by Defendants.

**ANSWER:** Defendants admit that Plaintiffs were participants in retirement plans to which Principal Life Insurance Company provided services. Except as expressly admitted, Defendants deny the allegations of paragraph 3.

4. During the Class Period, as described below, Plaintiffs Walsh and Young were persuaded by the Defendants to roll over their retirement plans and purchase Principal Individual Retirement Accounts ("IRAs") comprised of Principal Investors J-Shares Class mutual funds, ("J-Shares-IRAs") one of the nine (9) investment products of Defendants which their phone sales counselors sold pursuant to the scheme alleged herein.

**ANSWER:** Defendants admit that Plaintiffs Walsh and Young voluntarily moved certain of their retirement plan assets from their respective 401(k) plans into IRAs with a Principal company. Defendants deny the remaining allegations of this paragraph.

5. As described below, on or about June 6, 2006, at the solicitation and recommendation of a Principal Connection phone sales counselor, Plaintiff Jerri E. Young purchased 5,684.593 J-Shares at a cost of $68,887.52.

**ANSWER:** Defendants admit that, on or about June 12, 2006, Plaintiff Jerri E. Young purchased 5,684.593 J-Shares at a cost of $68,887.52. Defendants deny the remaining allegations of this paragraph.

6. As described below, on or about September 7, 2006, at the solicitation and recommendation of a Principal Connection phone sales counselor, Plaintiff Patricia A. Walsh purchased 3,024.243 J-Shares at a cost of $38,727.80.

**ANSWER:** Defendants admit that, on or about September 7, 2006, Plaintiff Patricia A. Walsh purchased 3,054.243 J-Shares at a cost of $38,727.80. Defendants deny the remaining allegations of this paragraph.

7. Defendant Principal Life Insurance Company ("Principal") is an Iowa corporation with its principal place of business in Des Moines, Iowa. Defendant administers and services defined contribution, defined benefit, and other retirement plans, including but not limited to 401(k), money purchase, cash balance, 403(b), employee stock option, KEOGH, SEP and other plans throughout the country, including in the Southern District of Iowa.

**ANSWER:** Defendants admit that Defendant Principal Life Insurance Company is

an Iowa corporation with its principal place of business in Des Moines, Iowa.  Defendants

admit that Principal Life Insurance Company serves various types of retirement plans

throughout the country, including in the Southern District of Iowa.  Except as expressly

admitted herein, Defendants deny the allegations of paragraph 7.

8.      Defendant Princor Financial Services Corporation ("Princor") is an Iowa corporation and wholly owned subsidiary of Principal, with its principal place of business in Des Moines, Iowa.  Defendant Princor sells securities throughout the country, including in the Southern District of Iowa.  Princor was at all relevant times a member of the National Association of Securities Dealers ("NASD"), now known as the Financial Industry Regulatory Authority ("FINRA").

**ANSWER:** Admitted.

9.      This complaint alleges violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Ch. 18.

**ANSWER:** Defendants admit that the Amended Complaint alleges violations of

ERISA, but deny that they committed any such violations.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(I), 29 U.S.C. § 1132(e)(1).

**ANSWER:** Admitted.

11.      Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Defendants do business in this district, the ERISA-protected retirement plans at issue were administered in this district, and some or all of the fiduciary breaches for which relief is sought occurred in this district.

**ANSWER:** Defendants admit that venue is proper in this district, but deny that they

served as ERISA fiduciaries or that they breached any fiduciary duty.

12.      Plaintiffs have standing under ERISA because they suffered injury in fact caused by Defendants' breaches of their fiduciary duties to the Plaintiffs.

**ANSWER:** Denied.

13.      Plaintiffs have standing under ERISA because, as former plan participants, they have colorable claims to benefits that Defendants deprived them of through Defendants'

breaches of fiduciary duty, omissions and misrepresentations, and self-dealing committed while Plaintiffs were still participants in their employers' plans.

      **ANSWER:**  Denied.

      14.     Because of the nature of the Defendants' violations and Plaintiffs' harm, no plan or administrative remedies were available or sufficient for Plaintiffs to exhaust.

      **ANSWER:**  Defendants admit that, because Plaintiffs voluntarily left their respective 401(k) plans, no plan or administrative remedies were available to Plaintiffs.  Defendants deny the remaining allegations of paragraph 14.

      15.     This is a class action brought pursuant to §§ 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3), against the Defendants.  Defendants are fiduciaries whose obligations to the Plaintiffs and Class members are enumerated in ERISA.

      **ANSWER:**  Defendants admit that Plaintiffs have brought this as a putative class action pursuant to §§ 502(a)(2) and 502(a)(3) of ERISA.  Defendants deny the remaining allegations of paragraph 15.

      16.     The Class Period is August 28, 2001 to the present.

      **ANSWER:**  Defendants admit that Plaintiffs have defined the Class Period to run from August 28, 2001 to the present, but deny that such a Class Period is appropriate for this action or that any class can be properly certified in this case.

      17.     Plaintiffs and Class members were participants in retirement plans administered by and/or serviced by Defendants.

      **ANSWER:**  Defendants admit that Principal Life Insurance Company serves various types of retirement plans throughout the country, including in the Southern District of Iowa.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 17.

      18.     Defendants, as fiduciaries of the participants and their plans, breached their duties to them and other participants in the Class in violation of ERISA.

      **ANSWER:**  Denied.

19.     Specifically, Defendants failed to provide complete and accurate information to participants, deceived and misled them, and failed to act solely in the interests of the participants and their plans, but instead engaged in blatant and massive self-dealing - all in violation of ERISA.

**ANSWER:** Denied.

20.     Defendants are liable under ERISA to disgorge profits made with Plaintiffs' money, to restore losses sustained by the Plaintiffs and Class members, and for other relief as a result of their breaches of their fiduciary obligations.

**ANSWER:** Denied.

21.     Principal represents to employers and their employees that it "is a leader in offering businesses [and] individuals ... a wide range of financial products and services, including retirement and investment services ... through its diverse family of financial services companies," Principal Life Insurance Company, *About the Principal Financial Group*, http://www.principal.com/about/news/documents/about.pdf.

**ANSWER:** Defendants admit that there is a document on principal.com that contains

the quoted language.

22.     Principal represents to employers and their employees that "[r]etirement services have been a core business of The Principal for more than 60 years.  As a total retirement solutions innovator, The Principal manages more than $143 billion in retirement funds, representing more than 47,000 plan sponsors and more than 3 million participants."  Plan sponsors are employers and others.  Participants are their employees who have individual retirement accounts under their employers' plans. Principal Life Insurance Company, *About the Principal Financial Group*, http://www.principal.com/about/news/documents/about.pdf.

**ANSWER:** Defendants admit that there is a document on principal.com that contains

the quoted language.

23.     Principal represents to employers and their employees that it is "the nation's 401(k) leader" providing 401(k) plans to "47,000 employers with 3.1 million pension plan participants," it "ranks number one in total plans for all asset sizes among fully bundled 401(k) providers," it has "143.8 billion dollars in assets under management," and it is "ranked among the 100 largest mutual fund managers, serving nearly 890,000 shareholder accounts."  Principal Life Insurance Company, http://www.principal.com/about/news/documents/about.pdf.

**ANSWER:** Defendants admit that there is a document on principal.com that contains

the quoted language.

24.     Principal claims that it gives retirement plan sponsors "outstanding guaranteed service and local support, investment strategies backed by over a century of financial expertise, and some of the lowest plan fees around. You get:

- Nearly 60 years of experience servicing retirement plans.
- A commitment to leading edge technology.
- A variety of plan sponsor services to help you manage your plan. . Help communicating and educating your employees.
- A diversified package of competitive investment options."

http://www.principal.com/retirement/biz/pen_corp.htm.

**ANSWER:** Defendants admit that there is a document on principal.com that contains

the quoted language.

25.     Defendant Principal provides extensive retirement plan services to employers, and administers those plans on behalf of employers for the benefit of the individual employee participants.  On information and belief, Principal was the "plan administrator" as that term is used in ERISA, or the delegated surrogate of the plan administrator, for most if not all of the plans in which the plaintiff class members participated, and therefore was a fiduciary to the participants.  Principal's actions and duties with respect to all the plans and their participants were not limited to "ministerial" functions, but instead permeated the participants' retirement plan activities, from initial enrollment to asset allocation to termination and distribution.

**ANSWER:** Denied.

26.     Throughout their years of participation in the plans, virtually all of the communication between participants and Principal was through Principal's pension administration department.

**ANSWER:** Denied.

27.     Principal emphasizes its services of communicating with and educating employee plan participants.  "The Principal Financial Group® makes it easy with communication and education designed to get maximum plan participation. ... Communication doesn't stop after employees are enrolled in your plan."  Most importantly for this lawsuit, Principal claims to provide "benefit counselors" who directly advise terminating employees, particularly about retirement plan distributions and rollovers:

> "**Post employment**. Our benefit counselors reduce your involvement by working directly with your former employees. (We have numerous options available for your employees to keep their money working tax deferred when they retire or leave your company.)"

**ANSWER:**  As to the first sentence, Defendants admit that Principal Life Insurance Company provides communication and education services to certain plan participants.  As to the second sentence and the block quote, Defendants admit that there is a document on principal.com that contains the quoted language.  As to the third sentence, Defendants deny that benefit counselors "directly advise" participants about retirement plan distributions and rollovers.

28.    Principal tells plan participants that those "benefit counselors" are "[k]nowledgeable retirement experts [who] are at your service to answer questions and offer guidance on any aspect of your retirement savings."

**ANSWER:**  Defendants admit that there is a document on principal.com that contains the quoted language.

29.    Principal tells plan participants that those "benefit counselors" are "committed to providing you with accurate, timely information so you can make informed decisions regarding your retirement savings following your change in employment."

**ANSWER:**  Defendants admit that there is a document on principal.com that contains the quoted language.

30.    Deceptively, Principal nowhere discloses that those "benefit counselors" are not knowledgeable, qualified, retirement counselors, but instead are minimally trained salespersons working in a boiler-room sales operation.  Principal nowhere discloses that those salespersons do not act "solely in the interest of the plan participants and beneficiaries."  Instead, they act primarily for the benefit of Principal at the expense of the participants and beneficiaries.  Their primary purpose is to retain the employees' retirement assets at Principal by rolling over exiting retirement plan accounts into Principal's proprietary retail products, so that Principal can continue to receive lucrative asset management fees from that money.

**ANSWER:**  Denied.

31.    Contrary to Principal's express representations that the "benefit counselors" will provide "accurate, timely information so you can make informed decisions," Principal forbids its salespersons from providing accurate objective information, strictly limits what they can say and the advice they can offer, and instead gives them a pre-prepared sales script containing false, deceptive, and misleading information.

**ANSWER:**  Denied.

32.     Principal's representations to plan sponsors about the advice it would give to participants about their "post-employment" investment decisions were misleading and deceitful. Contrary to its representation that it had "numerous options available for your employees to keep their money working tax deferred when they retire or leave your company," Principal did not disclose that it would <u>not</u> offer numerous favorable options to the employees so they could make objective informed decisions.   Principal did not disclose that instead, it would offer only a limited list of high-fee proprietary products and would vigorously push the participants to buy only those investments that benefited Principal.

**ANSWER:** Denied.

33.     Throughout the Class Period, Princor was a securities broker-dealer registered with the Securities and Exchange Commission, NASD/FINRA, the State of Iowa, and the 49 other states and District of Columbia.   Princor is licensed to sell a broad range of securities, including stocks, bonds, mutual funds, variable annuities, CDs, and other investments.   Princor's representatives are not inherently limited to selling Principal's proprietary products.

**ANSWER:** Admitted.

34.     In 1998, Principal established Principal Connection as an in-house sales department of Princor.   Principal Connection is a call center in Des Moines, Iowa, staffed by dozens of Registered Representatives who purport to give retirement plan investment advice over the telephone to plan participants, who call in response to letters that Principal sends to those participants urging them to call.

**ANSWER:** Defendants deny the first sentence of paragraph 34.   As to the second

sentence, Defendants admit that Principal Connection is located in Des Moines and has

dozens of benefit consultants, and that some people who call Principal Connection do so in

response to letters.   Defendants deny the remaining allegations of paragraph 34.

35.     Throughout the Class Period, Principal Connection "benefit counselors" provided IRA rollover and investment advice to plan participants for Principal's benefit.   They sold exclusively a restricted list of Principal's proprietary investment and annuity products to participants in retirement plans that Principal serviced.

**ANSWER:** Denied.

36.     Principal advises and directs retirement plan participants to telephone its Principal Connection "counselors" with "forced call" letters at different times during their employment. Following the requirements imposed by Principal, Principal Connection salespersons give uniform advice to every participant who calls in response to those "forced call" letters to roll over their retirement assets and to buy Principal IRA and annuity investment products.

**ANSWER:**  As to the first sentence, Defendants admit that Principal Connection

sends letters to 401(k) plan participants who have experienced a benefit event; otherwise

denied.  Defendants deny the second sentence of paragraph 36.

37.     Their clearly defined sales priority is Principal J-Shares in IRA rollovers.  If a phone "counselor" is unable to push a telephoning participant into J-Shares, Principal requires that they attempt to sell them instead the following products from the sales tree menu of the nine (9) Principal products that "counselors" were required to recommend:  Principal variable annuities, Principal fixed annuities, Principal indexed annuities, Principal bank CD IRAs, Principal bank savings account IRAs, Principal brokerage account IRAs, Principal WRAP brokerage account IRAs, and Principal Income IRAs.

**ANSWER:**  Denied.

38.     Regardless of the Principal product that the phone sales "counselors" lured plan participants into buying, Defendants flagrantly breached their statutory ERISA fiduciary duties by self-dealing and not acting solely in the best interests of plan participants.

**ANSWER:**  Denied.

39.     Defendants required their phone sales "counselors" to sell more J-Shares IRAs than any of the other eight products.  "Counselors'" salaries depended on it, and their jobs depended on it.  Selling J-Shares was in the best interests of phone "counselors" and the Defendants.  The Defendants made it so. But J-Shares were not in the best interests of plan participants who were pushed into buying them.

**ANSWER:**  Denied.

40.     Principal created its J-Shares class of mutual funds in 2001 for the purpose of offering them to retirement plan participants.  There are more than thirty Principal mutual funds within the J-Shares fund class.  J-Shares are the only mutual funds which Principal Connection sells to retirement plan participants who roll over their assets, although Principal has several classes of less expensive mutual funds that it sells everyone else.  Of all the Principal mutual funds, J-Shares were the most expensive from 2001 through 2006 - they had the highest internal expenses of any Principal mutual fund class. J-Shares' internal expenses far exceed the internal and annual expenses the participants would pay if they left their retirement money in their retirement plans.

**ANSWER:**  Defendants admit the allegations of the first and second sentences of

paragraph 40.  Defendants deny the remaining allegations in paragraph 40.

41.     Defendants pay commissions and bonuses to their sales agents only in the first year, but continue to charge approximately 150 basis points for internal expenses every year afterward, reaping for themselves all the expenses and never converting J-Share accounts to

lower cost A-Shares even after the bonuses and commissions are paid by investors.  This practice has the effect of keeping the expenses of J-Shares high and increasing Defendants' revenues to the detriment of their clients.

**ANSWER:**  As to the first sentence, Defendants admit that each mutual fund charges

an expense ratio.  Defendants deny the remaining allegations of paragraph 41.

42.    Principal trained its phone sales "counselors" to make J-Shares sound like no-load funds, even though they were not.  No-load mutual funds are mutual funds that have no front or back loads or sales commissions.

**ANSWER:**  Defendants deny the allegations of the first sentence of paragraph 42.

As to the second sentence, Defendants admit that one common definition of no-load mutual

funds are ones which have no front-end or back-end load; otherwise denied.

43.    Principal Connection phone sales "counselors" do not disclose over the telephone to retirement plan participants the internal expenses of J-Shares or the comparison of J-Shares' internal expenses to those of the participants' retirement plan.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as

to the truth of the allegations of this paragraph because numerous benefit counselors have

numerous different conversations with participants.

44.    By using misleading, scripted investment advice, Principal Connection sales "counselors" made J-Shares sound less expensive to investors than leaving their money in their retirement accounts.

**ANSWER:**  Denied.

45.    Concealed from investors both in telephone sales recommendations and J-Shares Prospectuses is Principal's secret payments to its sales agents of commissions out of the J-Shares' internal expenses that investors pay.

**ANSWER:**  Denied.

46.    Principal sets goals for its sales "counselors" to dislodge retirement plan assets into J-Shares.  For meeting or exceeding their J-Shares sales goals, phone "counselors" are paid a quarterly bonus out of the internal expenses Principal charges investors who buy those funds. Those bonuses are never disclosed to participants in their telephone conversations with them, in the "forced call" letters, or by Principal in its J-Shares Prospectuses during the Class Period.

**ANSWER:**  As to the first sentence, Defendants admit that sales counselors have

both team and individual sales goals, but those goals do not depend entirely on participants

moving assets out of 401(k) plans.  As to the second sentence, Defendants admit that sales

counselors are paid bonuses based on their team and individual goals.  As to the third

sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth

of these allegations because numerous benefit counselors have numerous different

conversations with participants.  Except as expressly admitted herein, Defendants deny the

allegations of paragraph 46.

47.     Moreover, sales "counselors" are trained to tell 401(k) participants who call:  "If
you've got five minutes, let me ask you a few questions to see if we can provide you IRA options
<u>and you're not paying me a commission</u>." (emphasis added)

**ANSWER:**  Denied.

48.     Principal makes the sale of J-Shares its top priority for its phone sales
"counselors".  High recognition and prizes are given to agents who successfully move money out
of companies' retirement plan accounts and into Principal's proprietary products.  Defendants
conducted contests in which phone sales "counselors" could win prizes for moving participants'
assets out of their 401(k) accounts and into Defendants' nine investment products offered them.

**ANSWER:**  Defendants deny the first sentence of paragraph 48.  Defendants admit

that there is a recognition program for sales of retail investment products, but deny that the

program applies solely to movement of money out of a 401(k) plan and into proprietary

Principal products.  Defendants deny the remaining allegations of paragraph 48.

49.     Principal management conducts monthly performance reviews of all phone sales
"counselors."  Written sales goals for selling Principal's J-shares and other proprietary products
are the whip and lash in the Defendants' clandestine scheme to dislodge retirement plan money
into its own internal fee-fattened special mutual fund.  Agents who do not meet the sales goals
receive negative written reports and are told to get their numbers up.  If the agents continue to
fall below their sales goals, their employment is terminated.

**ANSWER:**  As to the first sentence, Defendants admit that managers in Principal

Connection conduct monthly performance reviews of all sales counselors.  As to the second

sentence, denied.  As to the third and fourth sentences, Defendants admit that sales

counselors have team and individual sales goals, that Principal Connection employs a

progressive discipline system if sales counselors consistently and without good reason fail to

meet their goals, and that the final step in the progressive discipline system (one rarely taken)

is termination of the counselor.  Defendants deny the remaining allegations of paragraph 49.

50.     In the "forced call" letters Principal sends participants at or before retirement,
participants are told to call Principal to receive advice about their retirement and their retirement
plan account.  The phone number given in the letter is that of Principal Connection sales
counselors-not the Principal pension administration department.  The letters mislead participants
into believing that they are calling and talking to true pension administration counselors.

**ANSWER:**  Defendants admit that letters sent to participants at or before retirement

invite participants to call Principal Connection to discuss their retirement plan account, and

that the phone number given in the letter is that of Principal Connection sales counselors.

Defendants deny the remaining allegations of paragraph 50.

51.     Reflective of this scheme, the person who signed Plaintiff Young's "forced call"
letter and Plaintiff Walsh's "forced call" letter, D.N. Schmitz, whose title was listed under his
name as "Retirement Planning Division," was not connected at all with Principal's 401(k)
pension administration department - he was in truth the manager of the Defendants' sales boiler
room. [Exhibits 1 and 2, attached] Other boiler room sales managers signed similar "forced call"
letters that were sent by the thousands to pre-retirees whose retirement accounts Principal
administered.

**ANSWER:**  Defendants admit that the letter sent to plaintiff Young was signed by

D.N. Schmitz.  Defendants deny the remaining allegations of this paragraph.

52.     With those letters, Defendants manipulated unsuspecting pre-retirees into buying
J-Shares mutual funds and, failing that, the other eight Principal products phone "counselors"
sold.

**ANSWER:**  Denied.

53.     Because of the high fees and internal expenses of J-Shares, retirement plan
participants who roll over their accounts and invest in J-Shares pay significantly more to
Principal in fees and expenses than they would have if they left their money in their plan
accounts.

**ANSWER:** Denied.

54.     Principal does not reduce the fees for participants regardless of the amount of money that they roll out of their retirement plan into a J-share mutual fund, even if it is a million dollars or half a million dollars.  Yet Principal offers Class A mutual funds shares to its other clients and the general public.  A-shares have significantly lower ongoing fees than J-shares, and investor who buy large amounts of A-shares can invest with small or zero commissions or costs.

**ANSWER:**  As to the first sentence, Defendants admit that the expense ratios of the J-share mutual funds (like nearly all mutual funds) do not change depending on the amount being invested in them.  Defendants admit that Principal Class A mutual funds are sold to various clients, including, at times, clients who call Principal Connection, and the general public.  As to the third sentence, the term "ongoing fees" is vague; as a result, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this sentence.

55.     Principal has a general company policy that new investors who invest more than $250,000 in Principal mutual funds are required to be given A-Shares because of the low internal expenses and low front-end sales charges of those funds.  However, Principal also has a specific company policy that retirement plan participants-like members of the plaintiff class here-who roll over $250,000 or more are not allowed to purchase A-shares with the corresponding low internal expenses and low front-end sales charges.  Instead, Defendants require their employees to sell only self-dealing J-Shares to that protected class of clients.

**ANSWER:** Denied.

56.     Defendants' "forced call" letters misled, deceived and manipulated retirement plan participants into believing the sales "counselors" who took their calls were fiduciaries looking out for the best interests of those individual callers, as they had an established trust relationship with Defendants' pension administration benefits counselors.

**ANSWER:** Denied.

57.     Instead of offering fair, honest and unbiased recommendations to the plaintiff class members, Principal Connection phone sales "counselors" gave pre-determined recommendations of only one mutual fund class to participants so that Defendants could reap millions of dollars in fees and internal expenses from those investors who bought those costly mutual funds, contrary to the best financial interests of the participant.

**ANSWER:** Denied.

58.     Defendants herded their retirement plan participant clients into Defendants' J-Shares mutual funds through the described secret scheme in order to enjoy the profits generated by the higher fees and expenses in the J-Shares mutual funds.  Those revenues were significantly more than they would have received had those participants left their retirement assets in their companies' plans.  Revenues were obviously much higher through Defendants' scheme than they would have been if Defendants had provided truly objective advice in the best interests of the plaintiff class.

**ANSWER:**  Denied.

59.     Defendants' scheme and sales practices created insurmountable conflicts of interest between Defendants and their retirement plan participant clients.  Defendants provided substantial monetary and non-monetary incentives to its boiler room sales agents to sell J-shares and, as a fall-back, the other proprietary products on the restricted product list.  Defendants prohibited its registered representatives from offering, recommending, or selling other investments, and forbade them from advising plan participants on non-Principal alternatives.

**ANSWER:**  Denied.

60.     Realizing that the disclosure of this scheme and the inherent conflicts of interest it created would threaten the scheme's success, Defendants did not disclose their improper conduct to Plaintiffs and Class members, including incentives paid to sales agents and kickbacks to employees, thereby concealing information that would be material to a reasonable person deciding how to invest his or her money.

**ANSWER:**  Denied.

61.     By concealing material information that prevented plaintiffs from making informed decisions for themselves, Defendants dominated plaintiffs' decision-making and exercised control and authority over plan assets.

**ANSWER:**  Denied.

62.     Plaintiffs and other class members paid fees and expenses that they would not have paid had the Defendants not engaged in the sales incentive scheme, and, as a result, plaintiffs received lower returns from their investments.

**ANSWER:**  Denied.

63.     The retirement plans in which plaintiffs participated are employee benefit plans within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and are therefore subject to the provisions and obligations of Title I of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a).

**ANSWER:**  Admitted.

64.     At all relevant times, Defendants were fiduciaries as defined by ERISA.

**ANSWER:** Denied.

65.     ERISA's fiduciary duties are "the highest known to law."  The responsibilities of an ERISA fiduciary are strict and exacting.  The duty of utmost loyalty is omnipresent.  The fiduciary's decisions ''must be made with an eye single to the interests of the participants and beneficiaries."

**ANSWER:** Defendants admit that fiduciary duties under ERISA are among the

highest known to law, and that there is authority for the legal conclusions alleged by

Plaintiffs.  Defendants deny that Plaintiffs' allegations provide a complete description of the

law of fiduciary duty under ERISA.

66.     Named fiduciaries, such as trustee and plan administrator, are inescapably fiduciaries to the plans and their participants.  But fiduciary status under ERISA is not limited to formal titles; it is found also in functional terms of control and authority, or in a course of providing investment advice for compensation.

**ANSWER:** Admitted, except that Defendants deny that Plaintiffs' allegations

provide a complete description of the law of fiduciary duty under ERISA.

67.     ERISA defines a fiduciary of an employee benefit plan as follows:

"A person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A), 29 U.S.C. & 1002(21)(A).

**ANSWER:** Admitted.

68.     ERISA thus treats as fiduciaries not only persons named as fiduciaries under § 402(a)(1) or those who are expressly designated as fiduciaries by plan documents, but also any other persons who act in fact as fiduciaries, i.e., who perform fiduciary functions.

**ANSWER:** Admitted, except that Defendants deny that Plaintiffs' allegations

provide a complete description of the law of fiduciary duty under ERISA.

69.     Whether or not a person is an ERISA fiduciary is determined by the functions performed by that person.

**ANSWER:**  Admitted, except that Defendants deny that Plaintiffs' allegations

provide a complete description of the law of fiduciary duty under ERISA.

70.     Defendants themselves acknowledge these standards.  Principal agrees, "Under ERISA, a plan fiduciary must operate a plan solely in the interests of its participants."  Principal admits, "A functional fiduciary is a person who exercises control over the plan or its investments or gives investment advice, but who was not formally appointed to perform those roles."  Principal further admits, "Providing specific investment recommendations to plan participants constitutes investment advice."   Principal Life Insurance Company, UNDERSTATING & MANAGING FIDUCIARY RESPONSIBILITY:   A GUIDE FOR PLAN SPONSORS, http://www.principal.com/allweb/docs/ris/marketing_materials/pq/pq_5656.pdf.

**ANSWER:**  Defendants admit that there is a document on principal.com that contains

the quoted language.

71.     During the Class Period, Defendants performed fiduciary functions described in ERISA § 3(21)(A) and thereby were fiduciaries.

**ANSWER:**  Denied.

72.     Satisfying ERISA § 3(21)(A)(i) and (iii), Principal possesses or exercises discretionary authority or discretionary control respecting management of plans by providing complete plan management services in its "full service" plan packages it sells employers so that employers can "spend time managing [their] business, not [their] plans" and possessing or exercising discretionary management functions in providing plan administration services.

**ANSWER:**  Denied.

73.     Satisfying § 3(21)(A)(ii), Defendants rendered investment advice for a fee or other compensation to participants and plans as described in this Complaint.  Specifically, Principal agreed with the plan sponsors that Principal, not the employers, would be responsible for providing investment advice to plan participants, especially regarding the highly important post-employment investment decisions for plan assets.

**ANSWER:**  Denied.

74.     Upon learning that a participant was about to retire or had terminated employment, Defendants used plaintiffs' confidential information and its position of trust with them to give them investment advice regarding their plan distribution options.

**ANSWER:**  Denied.

75.     Through misleading information and material omissions, Defendants dominated the plaintiffs' decision-making and served as their primary source of investment information on those crucial choices.  Plaintiffs expected that Defendants' advice would be objective and individualized, though in fact it was not.  Defendants' misleading investment advice was repeated tens of thousands of times.

**ANSWER:** Denied.

76.     Defendants' purpose of their "forced call" letter scheme which channels participants to their sales "counselors" is to render investment advice to those participants, to roll over their retirement accounts into Principal J-Share mutual funds, or one of the other eight Principal investment products listed above.

**ANSWER:** Denied.

77.     Defendants also render investment advice to participants and plans by pre-selecting the mutual funds it considers to be appropriate investments for plans and participants to choose from, by Principal's unilateral control over which mutual funds will remain available to the retirement plans it administers, through the investment advice they provide employees in matching specific mutual funds to employees' risk tolerance through Principal's "Investor Profile Quiz," and by recommending to plans specific pre-selected mutual funds based on Principal's analysis of a plan's previous investments.

**ANSWER:** Denied.

78.     Satisfying ERISA § 3(21)(A)(i) regarding plan assets, Principal exercised "authority or control respecting management or disposition of [plan] assets" by dominating plaintiffs' decision-making about their plan accumulations when they terminated employment, particularly through its deceit, outright lies, and misleading information and material omissions.

**ANSWER:** Denied.

79.     Defendants also possess the discretion to communicate with participants about the future of plan costs and benefits, and compare those to the costs and benefits of other Principal investments.  Defendants exercise that discretion through their "forced call" letter scheme and the actions they require phone sales "counselors" take with every participant who calls.

**ANSWER:** Denied.

80.     Reasonable participants, including Plaintiffs and class members, receiving Principal's "forced call" letters and calling the telephone number in those letters and reaching Principal Connection sales "counselors," would have thought that those "counselors" were communicating in Principal's capacity as plan administrator, because the "forced call" letters referenced their retirement plans and utilized confidential information about their retirement plans that Principal knew only because of its functions as plan administrator.  Reasonable participants would also have understood that Principal's "benefits counselors" had expert knowledge regarding their plans and individual accounts.

**ANSWER:** Denied.

81.     When recommending that participants roll over their retirement accounts and invest in Principal J-Shares or other Principal investment products in response to the "forced call" letter scheme that brought participants to the Principal Connection sales office, those sales "counselors" were giving investment advice, which is a fiduciary act under ERISA.

**ANSWER:** Denied.

82.     Defendants were acting as fiduciaries when they funneled participants' calls to their Principal Connection call center and gave investment advice to them, deceptively comparing their retirement accounts to J-Shares and other Principal investment products, and providing false information about their plan accounts and their distribution alternatives.

**ANSWER:** Denied.

83.     Defendants engaged in plan-related activities in all the ways detailed above, including deceiving and misleading participants to roll over their retirement accounts out of their plans and purchase J-Shares and other Principal investment products.

**ANSWER:** Denied.

84.     Defendants gave their sales "counselors" the authority to communicate as fiduciaries in these ways with participants, and by the express language used in the "forced call" letters communicated to participants that those "counselors" had the authority to talk to them about their retirement accounts.

**ANSWER:** Denied.

85.     By making representations about the future of costs and benefits of J-Shares and those of the other Principal investment products, sales "counselors" engaged in fiduciary acts of rendering investment advice.

**ANSWER:** Denied.

86.     ERISA § 404(a)(1)(A) and (6), 29 U.S.C. § 1104(a)(1)(A) and (6), require in pertinent part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

**ANSWER:** Defendants admit that this paragraph accurately quotes a section of

ERISA.

87.    "Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA."

**ANSWER:**  Admitted.

88.    Deceiving a plan's participants in order to increase your own profits at the participants' expense is not acting "solely in the interest of the participants and beneficiaries."

**ANSWER:**  Admitted.

89.    As plan administrator, record-keeper, and provider of investment vehicles to the plans, Principal had privileged access to each participant's confidential, personal, private financial information.  Principal knew their names, ages, social security numbers, addresses, phone numbers, retirement plan balances, vesting status, present and historical investment choices, as well as their wages and salaries, hiring date, termination date, savings habits, marital status, and preferred beneficiaries in case of death.

**ANSWER:**  Defendants admit that, as recordkeeper for the plans, Principal Life

Insurance Company had certain financial information about present and former participants

in 401(k) plans, including some, but not all, of the information mentioned in this paragraph.

Defendants deny the remaining allegations of paragraph 89.

90.    Principal stood in a position of trust to all participants.

**ANSWER:**  Denied.

91.    Principal abused its knowledge of plaintiffs' confidential personal information and its relationship of trust with plaintiffs for its own self interests.

**ANSWER:**  Denied.

92.    Undisclosed conflicts of interest on the part of every Principal Connection phone sales "counselor" are the life blood of the "forced call" letter sales scheme described in this Complaint.  Defendants' sales "counselors" were influenced by those conflicts of interest when recommending investments to retirement plan participants who called them trusting their advice.  The Defendants' phone sales pitches, which "counselors" were required to use, dictated the advice those "counselors" would give to every single pre-retiree who called - roll over your retirement plan and buy Principal IRA or annuity investment products.

**ANSWER:**  Denied.

93.    The Defendants designed their scheme and scripted investment advice specifically to persuade retirement plan participants whose accounts Defendants administered to roll over their retirement plan assets and purchase Defendants' investment products.

**ANSWER:** Denied.

94.     Defendants concealed that they paid their own in-house boiler room registered representatives bonuses, commissions and other incentives from the J-Shares mutual funds for pushing retirement plan participants into said J-Share funds, which created an insurmountable conflict of interest in advising client investors thus violating their legal duty and deceiving and defrauding investors.

**ANSWER:** Denied.

95.     Defendants developed their scheme to dislodge plan participants' retirement assets from their companies' plans and push them into Principal's J-Shares or other proprietary products, using manipulative, improper, deceptive, and fraudulent means, in order to seize substantial financial gains for themselves.   Defendants actively and successfully sought to prevent plan participants from (a) learning about other options, including leaving their money with their employer's plan, (b) choosing other investments that would not provide as much profit to Principal, or (c) moving their money away from Principal's asset management altogether. Defendants accomplished this by breaching the trust of the plan participants who relied on Principal for honest, unbiased advice concerning their retirement assets.

**ANSWER:** Denied.

96.     Defendants knew or should have known that their practices were illegal or unethical, violated their duties under ERISA, violated NASD rules established for the protection of the public, abused confidential relationships of trust, and profited from conflicts of interest.

**ANSWER:** Denied.

97.     Defendants' failure to disclose the secret commissions and bonuses they paid to their in-house agents for pushing J-Shares, their intimidation of their own employees to push J-Shares, and the inherent conflicts of interest created by those practices is so obviously materially deceptive to Class Members that Defendants knew or should have known that the practices presented a danger of misleading plan participants.

**ANSWER:** Denied.

98.     Defendants' senior management was actively involved in creating and implementing the manipulative and deceptive sales program described in this Complaint. Defendants' management prepared and required distribution to plan participants of letters, brochures, and fund prospectuses that were materially deceptive, and prepared and insisted on compliance with manipulative and deceptive scripted investment advice which they required every registered representative to use when answering calls from plan participants.

**ANSWER:** Denied.

99.     Defendants' senior management calculated the financial effect of the programs they created and deliberately implemented it to benefit Principal at the expense of the plan

participants. Defendants' management estimated the outflow of participants' account balances if they were offered free choice and objective accurate information, projected the loss of revenue and profits to Principal if those outflows occurred, and calculated the benefits to Principal of retaining plan participants' assets through this scheme. The scheme described in this Complaint is no accident, no happenstance of a "rogue" department or individuals. Rather, it is part of a deliberate business plan by Principal to capture plan participants' assets and funnel them into high-fee proprietary investments. Principal was determined to retain and profit from plaintiffs' retirement savings, by hook or by crook.

**ANSWER:** As to the first sentence, Defendants admit that members of senior management are responsible for the financial affairs of Defendants. Defendants deny the remaining allegations of this paragraph.

100. Throughout the Class Period, Defendants mailed thousands of "forced call" letters to plan participants throughout the country whose retirement accounts Principal administered on behalf of those participants. The "forced call" letters urged account holders to call Principal about their account.

**ANSWER:** Defendants admit that Principal Connection has sent thousands of letters to participants in 401(k) plans served by Principal Life Insurance Company and that some of those letters recommended that participants call Principal Connection.

101. On or about February 28, 2006, Plaintiff, Jerri E. Young, whose retirement account was administered by Principal, received such a "forced call" letter. [Exhibit 1]

**ANSWER:** Defendants admit that Principal Connection sent a letter to Plaintiff Jerri E. Young on or about February 28, 2006. Defendants deny the remaining allegations of paragraph 101.

102. On or about June 1, 2006, Plaintiff, Patricia A. Walsh, whose retirement account was administered by Principal, received such a "forced call" letter. [Exhibit 2]

**ANSWER:** Defendants admit that Principal Connection sent a letter to Plaintiff Patricia Walsh on or about June 1, 2006. Defendants deny the remaining allegations of paragraph 102.

103. In response to the letter from Principal, Plaintiff Young telephoned the number on the letter within a few days of receiving it and spoke with a "benefit counselor." The "counselor", who we now know was an employee and registered representative of Defendant

Princor, advised Ms. Young that she should not leave her money in her retirement plan account with her company and that she should roll over her retirement plan into a Principal IRA and to purchase eight specific Principal J-Shares mutual funds that he recommended that she buy.  Ms. Young accepted those recommendations and was mailed by the Defendants a J-Shares Fund Prospectus and accompanying purchase agreements for the J-Shares.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as the allegations of the first sentence of paragraph 103.  Defendants deny the allegations of the second sentence of paragraph 103.  As to the third sentence, Defendants admit that Principal Connection mailed Ms. Young a J-share prospectus and certain related documents.  Defendants deny the remaining allegations of this paragraph.

104.    In response to her letter from Defendant Principal, Plaintiff Walsh telephoned the number on the letter within a few days of receiving it and spoke with Joshua C. Saboe, another "benefit counselor."   We now know that Mr. Saboe was an employee and registered representative of Defendant Princor.  He advised Ms. Walsh that she should not leave her money in her retirement plan account with her company, that she should not transfer her assets to another investment company as she had expressed she was considering, and that she should roll over her retirement plan into a Principal IRA and to purchase a specific Principal J –Shares mutual fund that the "counselor" recommended that she buy.   Ms. Walsh accepted those recommendations and was mailed by the Defendants a J-Shares Fund Prospectus and accompanying purchase agreements for formal purchase of said J -Shares.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as the allegations of the first sentence of paragraph 104.  As to the second sentence, Defendants admit that Mr. Saboe was employed by Principal Connection.  As to the third sentence, denied.  As to the fourth sentence, Defendants admit that Principal Connection mailed Ms. Walsh a J-share prospectus and certain related documents.  Defendants deny the remaining allegations of this paragraph.

105.    On or about June 6, 2006, Plaintiff Young purchased 5,684.593 shares of J-Shares mutual funds.  On or about September 7, 2006, Plaintiff Walsh purchased 3,024.243 shares of J-Shares mutual funds.

**ANSWER:**  Defendants admit that on June 12, 2006, Plaintiff Young purchased

5,684.593 shares of J-Shares mutual funds.  Defendants admit the second sentence of

paragraph 105.

106.    Throughout the Class Period, Plaintiffs have held their J-Shares investments.

**ANSWER:**  Denied.

107.    Plaintiffs bring this action as a class action pursuant to Rules 23(b)(2) and
23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class
of persons similarly situated (the "Class"):

> All persons who were participants in retirement plans in which
> Principal Life Insurance Company and Princor Financial Services
> Corporation were fiduciaries or acted as fiduciaries and who rolled
> over their retirement accounts to Principal Individual Retirement
> Accounts comprised of Principal Investors Funds J-Shares class
> mutual funds, Principal Bank Certificates of Deposit, Principal
> Bank savings accounts, Principal brokerage accounts, Principal
> WRAP brokerage accounts, and/or Principal income accounts;
> and/or Principal variable, fixed or indexed annuities in response to
> letter and interrelated telephone solicitations by Defendants to do
> so at any time from August 28, 2001 to the present (the "Class
> Period").

**ANSWER:**  Defendants admit that Plaintiffs purport to bring this case as a class

action on behalf of the putative class defined above.  Defendants deny that there is any basis

in fact or law for the certification of any class, and deny the remaining allegations of this

paragraph.

108.    Common questions of law and fact exist as to all members of the Class and
predominate over any questions affecting solely individual members of the Class.   Among
questions of law and fact common to the Class are:

(a)   Whether Defendants were fiduciaries to the Plaintiffs, members of the Class and
their plans;

(b)   Whether Defendants owed fiduciary duties to the Plaintiffs, members of the Class
and their plans;

(c)   Whether Defendants breached fiduciary duties to the Plaintiffs, members of the Class
and their plans by failing to act solely in the interest of the plans' participants; .

(d)   Whether Defendants violated ERISA;

(e)   Whether the Plaintiffs and members of the Class have sustained damages and, if so, what is the proper measure of damages;

(f)   Whether Defendants profited improperly from the J-Shares and other proprietary products they sold to Plaintiffs and members of the Class, and whether Plaintiffs and members of the Class are entitled to restitution of those ill-gotten gains;

(g)   Whether Plaintiffs and members of the Class or their former plans are entitled to other legal or equitable relief, such as disgorgement of profits that Defendants made through the improper use of plan assets; and

(h)   Whether Defendants should be subjected to injunctive and prohibitory orders, such as orders to stop Defendants from continuing the scheme described in this Complaint and prevent Defendants from developing any other improper technique of retaining the assets of departing plan participants.

**ANSWER:**  Denied.

109.   Plaintiffs' claims are typical of the claims of the members of the Class because:

(a)   Plaintiffs and the other members of the Class each sustained damages arising out of the same wrongful conduct o(the Defendants in violation of federal law;

(b)   Plaintiffs and other members of the Class were owed the same fiduciary duty and other ERISA-based obligations by the Defendants;

(c)   The Defendants' breaches of these obligations constitutes a breach to each plaintiff and each member of the Class; and

(d)   To the extent that there are any differences among class members' damages such differences would be a product of simple arithmetic based on the Defendants' account records - such minimal and formulaic differences are no impediment to class certification.

**ANSWER:**  Denied.

110.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of the Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are tens of thousands of members of the Class who were participants in Principal retirement plans and who cashed in and rolled over their retirement savings into Principal J-Shares mutual funds and the other eight products upon inducement of Principal during the Class Period.  Record owners of those nine products will be readily identified from records maintained by Principal, and they may be notified of the pendency of this action by mail, using a form of notice similarly to that customarily used in ERISA class actions.

**ANSWER:** Denied.

111.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of ERISA.

**ANSWER:** Denied.

112.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Prosecution of thousands or hundreds of thousands of separate actions would create substantial and unnecessary burdens for the courts.  A trial of this case as a class action would be manageable because the claims and defenses would be subject to class-wide proof.  The calculation of damages - both in terms of investors' costs and expenses, and Principal's profits - will be a key stroke away as all are retained by Principal.

**ANSWER:** Denied.

113.   Plaintiffs are Class Members and will fairly and adequately protect the interests of the members of the Class and have retained experienced counsel, competent in complex litigation, class action and ERISA.  Plaintiffs have no interest antagonistic to or in conflict with those of the Class, nor do they have any unique claims or defenses that might undermine the efficient resolution of the classes' claims.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 113.

114.   Class action status is also warranted under the other subsections of Rule 23(b) because the Defendants acted on grounds generally applicable to the Class as a whole, and their actions complained of were the same with respect to each member of the Class, which thereby makes fitting and appropriate the relief sought with respect to the Class as a whole.

**ANSWER:** Denied.

### COUNT ONE - ERISA

115.    Defendants owed duties of loyalty under ERISA § 404, 29 U.S.C. § 1104 to Participants to disclose and inform, which included but were not limited to:

(a)    The duty to speak truthfully to participants;

(b)    The duty to never lie to participants;

(c)    The duty to never mislead or deceive participants;

(d)    The duty to provide complete and accurate information to participants material to the circumstances;

(e)    The duty to inform participants when knowing that silence could be . harmful to their interests or when silence could lead to uninformed investment decisions by participants;

(f)    The duty to never misinform participants;

(g)    The duty to refrain from providing incomplete information or concealing information regarding investment options available to participants.

**ANSWER:**  Defendants deny that they acted as fiduciaries under ERISA and

therefore deny the allegations of paragraph 115.  Because this complaint is brought solely

under ERISA, Defendants do not address what duties they may have to clients under other

state or federal laws.

116.    Defendants breached their duties to inform and disclose by not disclosing, or by not adequately disclosing, to the Plaintiffs:

(a)    that the person who signed Plaintiffs' "forced call" letters, whose title was listed under his name as "Retirement Planning Division", was not connected with Defendants' 40l(k) retirement accounts or pension administration departments - he was in truth the manager of the Defendants' sales boiler room;

(b)    that the goal of Defendants' phone sales "counselors" is to get terminating employees to move their money out of their retirement plans and into Principal J-Shares IRAs and the other eight Principal investment products sold through the boiler room;

(c)    that Plaintiffs could leave their money in their retirement accounts;

(d)    that Plaintiffs could take their retirement plan money away from Principal and roll it over into investment accounts with lower fees and commissions and, therefore, higher investment returns;

(e)    that J-Shares are the only mutual funds which Principal Connection sales "counselors" can sell to retirement plan participants who roll over their accounts even though Principal has several classes of less expensive mutual funds it sells everyone else;

(f)    that J-Shares are not no-load funds even though phone sales "counselors" are trained to make them sound as such;

(g)    that J -Shares internal expenses far exceed the internal and annual expenses that the participant would pay if they leave their retirement money in their plan;

(h)    that Defendants pay its phone sales "counselors" quarterly bonuses for selling J-Shares out of the internal expenses that Defendants charge plan participants who invest in J-Shares;

(i)    that those quarterly bonuses are effectively commissions because they're tied to each individual sale;

(j)    that regardless of the amount of money a retirement plan participant rolls over into J-Shares, Defendants will not give that investor "break points" even though other investors are required to be given "break points;"

(k)    and that because of the high fees and internal expenses of J-Shares, retirement plan participants who roll over their accounts and invest in J-Shares always pay significantly more to Defendants in fees than they would have if they left their money in their plans.

**ANSWER:** Denied.

117.    Defendants breached their fiduciary duties in making misrepresentations and omissions material to those investment decisions by plan participants. Defendants' statements, acts and omissions constituted misrepresentations and omissions that were fundamentally deceptive concerning participants' decisions to roll over their accounts and invest in Principal J-Shares and other Principal investment products sold pursuant to the "forced call" letter and interrelated telephone solicitation scheme detailed in this Complaint, and were material to any reasonable participant's decision about whether or not to stay in their plans or invest in those or other IRA rollover vehicles during the Class Period.

**ANSWER:** Denied.

118.    Plaintiffs and class members sustained and continued to sustain harm as a direct and proximate result of Principal's breaches of fiduciary duty, including the fees and expenses Principal charged and is charging them, and loss of investment capital due to the higher fees and expenses charged which reduced the corpus of each account.

**ANSWER:** Denied.

119.    Pursuant to ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3), Defendants are liable to restore to each participant all the ill-gotten fees and profits they realized as a result of each such breach, and are subject to other equitable and remedial relief as the court deems appropriate.

**ANSWER:** Denied.

120.    Defendants owed duties of loyalty under ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and 1106(b), to advise participants and administer plans with an "eye single" to the interests of participants regardless of the interests of Defendants themselves, which included:

(a)     The duty to act solely in the interests of plan participants;

(b)     The duty never to act to harm the interests of participants or their plan;

(c)     The duty to never self-deal and to never enrich themselves beyond defraying reasonable expenses of administering the plan;

(d)     The duty to never induce participants to withdraw from their plans by making misrepresentations about plan benefits or costs.

**ANSWER:** Defendants deny that they acted as fiduciaries under ERISA and

therefore deny the allegations of paragraph 120.  Because this complaint is brought solely

under ERISA, Defendants do not address what duties they may have to clients under other

state or federal laws.

121.    Defendants breached their fiduciary duties to Plaintiffs:

(a)     by using the private confidential information of employees nearing retirement whose plans Principal administered for purposes of persuading them to buy high-fee Principal IRA products;

(b)     by sending pre-retirees "forced call" letters misleading them to believe that they were dealing with their "benefit counselor" who was looking out for their interests by providing accurate investment advice to them before they retired;

(c)     by not disclosing that the telephone number in the "forced call" letters routed participants to the Defendants' sales boiler room rather than Defendants' pension administration department;

(d)     by aggressively and persistently pushing plaintiffs to buy J-Shares and the other eight Principal investment products on their restricted list regardless of the individual circumstances of the participant;

(e)     by putting them in Principal's most expensive mutual fund from 2001 through 2006 with internal fees and expenses far in excess of any other fund class which Principal offered;

(f)     by not giving "break points" to them regardless of the size of their account balances even though company policy requires that "break points" be given to other investors who have more than $50,000 in account balances;

(g)     by manipulating participants into rolling over their accounts and buying J-Shares which Defendants knew but did not disclose were laden with costs and expenses far exceeding those of the participants' plans; and

(h)     by seizing for themselves, contrary to the interests of both participants and their plans, higher fees and expenses by persuading them to roll over their accounts into the nine Principal investment products Principal's "counselors" sold.

**ANSWER:** Denied.

122.    Plaintiffs and class members sustained and continued to sustain damages as a direct and proximate result of Principal's breaches of fiduciary duty, including the loss of their retirement accounts, the fees and expenses Defendants charged and are charging them, and loss of investment capital due to the higher fees and expenses charged which. reduced the corpus of each account.

**ANSWER:** Denied.

123.    As a direct and proximate result of the Defendants' actions, statements and omissions enumerated in this Complaint, the Plaintiffs and Class members were deceived concerning the prudence of cashing out their accounts and investing in J -Shares and other eight Principal products; the actions of Defendants were material to their decisions to do so; the Plaintiffs and Class members acted reasonably; and they relied to their detriment on Defendants actions.

**ANSWER:** Denied.

124.    Pursuant to ERISA § 502(a)(3), Defendants are liable to restore to each participant all the ill-gotten fees and profits they realized as a result of each such breach, and are subject to other equitable and remedial relief as the court deems appropriate.

**ANSWER:** Denied.

125.    Pursuant to ERISA §§ 502(a)(2) and 409, 29 U.S.C. §§ 1132(a)(2) and 1109, Defendants in this count are liable to Plaintiffs' former plans for damages, including all profits Defendants realized as a result of each such breach, and are subject to other legal, equitable and remedial relief as the court deems appropriate.  [footnote omitted]

**ANSWER:**  The Court has dismissed claims under ERISA § 502(a)(2) for lack of

standing, so the allegations in paragraph 125 of the Amended Complaint are no longer at

issue and no answer is required.  To the extent that any answer is required, Defendants deny

the allegations of paragraph 125.

126.    Plaintiffs and class members seek relief under ERISA § 502(a)(2) in a
representative capacity for their plans for money to be restored to their plans.  They are not
seeking relief for themselves individually, but rather for their plans arising from what Defendants
did to them and other plan participants.

**ANSWER:**  The Court has dismissed claims under ERISA § 502(a)(2) for lack of

standing, so the allegations in paragraph 126 of the Amended Complaint are no longer at

issue and no answer is required.  To the extent that any answer is required, Defendants deny

the allegations of paragraph 126.

## SEPARATE OR AFFIRMATIVE DEFENSES

### First Affirmative Defense

Some of the claims asserted by Plaintiffs or on behalf of the putative class are barred in whole or in part by waiver.

### Second Affirmative Defense

Some or all of The Principal's conduct may be statutorily exempt under ERISA.

### Third Affirmative Defense

Some or all of the putative class members' causes of action are time-barred under the applicable statutes of limitations and/or statutes of repose.

### Fourth Affirmative Defense

Some or all of Plaintiffs' or the putative class members' claims may be barred for lack of standing.

### Fifth Affirmative Defense

Some or all of Plaintiffs' or the putative class members' claims may be barred in whole or in part by estoppel.

Respectfully submitted,

PRINCIPAL LIFE INSURANCE COMPANY and
PRINCOR FINANCIAL SERVICES CORPORATION

By:   /s/ Eric S. Mattson_____
      One of their attorneys

Brian L. Campbell
Whitfield & Eddy, PLC
317 Sixth Ave., #1200
Des Moines, IA 50309
Email:  campbell@whitfieldlaw.com
Phone: (515) 246-5503

Joel S. Feldman
Mark B. Blocker
Eric S. Mattson
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Email: jfeldman@sidley.com
          mblocker@sidley.com
          emattson@sidley.com
Phone: (312) 853-7000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing Defendants' Answer to

Plaintiffs' Amended and Substituted Class Action Complaint was served upon the attorneys

listed below through the Court's CM/ECF electronic filing system on July 8, 2008.


       Brian P. Galligan
       Richard H. Doyle, IV
       Timm W. Reid
       James A. Albert
       Galligan, Doyle, Reid & Galligan, P.C.
       300 Walnut Street, Suite 5
       Des Moines, IA 50309-2239

                             /s/ Eric S. Mattson