IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PATRICIA A. WALSH, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Civil Action No. 4:07-cv-00386-RP-CFB |
| vs. | Hon. Robert W. Pratt |
| PRINCIPAL LIFE INSURANCE COMPANY and PRINCOR FINANCIAL SERVICES CORPORATION, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**DEFENDANTS' RESPONSE IN OPPOSITION
TO MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

Introduction...................................................................................................... 1

Statement of Facts............................................................................................ 2

    A.    Defined Contribution Plans and Job Changes ...................................... 2

    B.    Principal Life's Role in 401(k) Plans................................................... 2

    C.    Principal Connection's Involvement in the Decision-Making Process of Each Caller Varies From Call to Call .................................. 3

    D.    The content of the calls and overall process for moving 401(k) funds varies from caller to caller ...................................................... 5

    E.    Plaintiff's Interaction With Principal Connection ................................ 6

    F.    Whether Defendants Earn Higher or Lower Profits When a Participant Moves to a Principal IRA Varies From Participant to Participant......................... 7

    G.    Principal Life's Rollover Experience Compared to the Industry........................... 8

Legal Standard ................................................................................................. 9

    A.    Plaintiff Bears the Burden Establishing All the Requirements for Maintaining a Class Action............................................................. 9

    B.    No Class Can Be Maintained Unless Plaintiff Proves That Common Issues Predominate Over Individual Issues ...................................... 9

    C.    The Court Must Consider What Type of Evidence Would Be Presented at Trial................................................................................ 10

Argument ....................................................................................................... 11

    A.    Individual Hearings Would Have to Determine Which Class Members, If Any, Had a Fiduciary Relationship With Principal Life....................................... 11

        1.    Plaintiff's "exercise of control over plan assets" theory ........................... 12

        2.    Plaintiff's "investment advice" theory. ..................................................... 13

        3.    Individualized inquiries to determine fiduciary status cannot be avoided .................................................................................. 15

4.   Plaintiff's legal arguments attempting to establish fiduciary status as a matter of law are red herrings ........................................................... 16

B.   Individual Questions of Causation Also Make Each Class Member's Claim a Fact-Intensive Inquiry ........................................................................... 17

C.   Whether and the Extent to Which Principal Life Was "Unjustly Enriched" Cannot Be Determined Without Individual Hearings.......................................... 20

1.   The legal standard for disgorgement......................................................... 21

2.   Determining whether there is any unjust enrichment subject to disgorgement and, if so, how much would require complex individualized inquiries........................................................................... 22

D.   Plaintiff Has Also Failed to Satisfy the "Typicality" Requirement of Rule 23.................................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ahlberg v. Chrysler Corp.*,
    481 F.3d 630 (8th Cir. 2007) ..................................................................................................9

*Alpern v. UtiliCorp United, Inc.*,
    84 F.3d 1525 (8th Cir. 1996) .................................................................................................9

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................................................9

*Andrews v. Chevy Chase Bank*,
    545 F.3d 570 (7th Cir. 2008) ...............................................................................................22

*Beddall v. State St. Bank & Trust Co.*,
    137 F.3d 12 (1st Cir. 1998)...................................................................................................13

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ...............................................................................................21

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ...................................................................................10, 11, 21

*Coleman v. Nationwide Life Ins. Co.*,
    969 F.2d 54 (4th Cir. 1992) .................................................................................................12

*Cotton v. Massachusetts Mut. Life Ins. Co.*,
    402 F.3d 1267 (11th Cir. 2005) ...........................................................................................12

*Duchardt v. Midland Nat'l Life Ins. Co.*,
    No. 4:07-cv-00351, 2009 WL 3824332 (S.D. Iowa July 23, 2009) ...........................9, 10, 25

*Estate of Mahoney v. R.J. Reynolds Tobacco Co.*,
    204 F.R.D. 150 (S.D. Iowa 2001) ........................................................................................10

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982)..........................................................................................................9, 10

*Grove v. Principal Mutual Life Insurance Co.*,
    200 F.R.D. 434 (S.D. Iowa 2001) ........................................................................................24

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ..........................................................................................12, 13

*Holdeman v. Devine*,
    474 F.3d 770 (10th Cir. 2007) ........................................................................12

*Holdeman v. Devine*,
    572 F.3d 1190 (10th Cir. 2009) ......................................................................18

*Hudson v. Delta Air Lines, Inc.*,
    90 F.3d 451 (11th Cir. 1996) ..........................................................................19

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2009)............................................................................11

*Kerr v. Charles F. Vatterott & Co.*,
    184 F.3d 938 (8th Cir. 1999) ..........................................................................21

*Kesco v. Meredith Corp.*,
    480 F.3d 849 (8th Cir. 2007) ..........................................................................18

*Leigh v. Engle*,
    727 F.2d 113, 138 (7th Cir. 1984) ..................................................................22

*Liles v. Am. Corrective Counseling Servs., Inc.*,
    231 F.R.D. 565 (S.D. Iowa 2005) ..................................................................10

*McLaughlin v. American Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)......................................................................19, 20

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993)........................................................................................11

*Olson v. E.F. Hutton & Co.*,
    957 F.2d 622 (8th Cir. 1992) ..........................................................................14

*Owen v. Regence Bluecross Blueshield*,
    388 F. Supp. 2d 1335 (D. Utah 2005)............................................................19

*Owner-Operator Indep. Drivers Ass'n v. New Prime Inc.*,
    339 F.3d 1001 (8th Cir. 2003) ..................................................................21, 24

*Parke v. First Reliance Standard Life Ins. Co.*,
    368 F.3d 999 (8th Cir. 2004) ..........................................................................24

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)........................................................................................11

*Rios v. State Farm Fire & Cas. Co.*,
    469 F. Supp. 2d 727 (S.D. Iowa 2007) ..........................................................10

*Roth v. Sawyer-Cleator Lumber Co.*,
    16 F.3d 915 (8th Cir. 1994) ...................................................................................20

*Ruppert v. Principal Life Ins. Co.*,
    252 F.R.D. 488 (S.D. Iowa 2008) ...........................................................................2

*Teamsters v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)...................................................................................11

*Wsol v. Fiduciary Mgmt. Assocs., Inc.*,
    266 F.3d 654 (7th Cir. 2001) ............................................................................ 21-22

## STATUTES

26 U.S.C. § 401(k) ........................................................................................................2

29 U.S.C. § 1002(21)(A)................................................................................11, 12, 16, 17

29 U.S.C. § 1002(34) .....................................................................................................2

29 U.S.C. § 1132(a)(3)..................................................................................................21

## OTHER AUTHORITIES

29 C.F.R. § 2509.75-8..................................................................................................16

61 Fed. Reg. 29586 (June 11, 1996) ........................................................................13, 14

Dep't of Labor Advisory Opinion 97-16A (May 22, 1997) 1997 WL 277979 ............................12

Fed. R. Civ. P. 23......................................................................................9, 10, 11, 24

Fed. R. Civ. P. 23(a) .....................................................................................................9

Fed. R. Civ. P. 23(a)(3)...........................................................................................11, 25

Fed. R. Civ. P. 23(b) .....................................................................................................9

Fed. R. Civ. P. 23(b)(2)..................................................................................................9

Fed. R. Civ. P. 23(b)(3).........................................................................................9, 11, 20, 24

**Introduction**

At its core, class certification concerns whether the evidence that will decide the named plaintiff's claim can also fairly resolve the claims of all other class members.  If one set of uniform evidence can resolve the claim of each and every class member, then class certification may be granted.  On the other hand, if the evidence necessary to resolve the claims varies from class member to class member, certification should be denied.

Plaintiff's class certification brief ignores the individualized evidence that must be examined to resolve the claims of each member of the proposed class.  While Plaintiff points to some issues that she believes are uniform, she ignores the fundamental, individualized evidence that would have to be presented to resolve each class member's claims.  But ignoring the individualized evidence does not make it go away.

Individualized evidence on just one element of a claim can be enough to defeat class certification, as the Court would have to consider the evidence that applies to that element with respect to each individual class member – a process that would take years.  In this case, individualized evidence would have to be considered with respect to *three separate elements* of Plaintiff's claim:  (1) whether Defendant Principal Life Insurance Company ("Principal Life") acted as an ERISA fiduciary when taking the actions that Plaintiff is challenging, (2) whether Principal Life's alleged breach of fiduciary duty caused class members to take their money out of their 401(k) plans, and (3) whether Defendants should be required to disgorge any profits (and if so, how much) they earned from the investments of any particular class member.  Class certification should accordingly be denied.

## Statement of Facts

### A.    Defined Contribution Plans and Job Changes

One of the most common ways to save for retirement is through a "defined contribution" plan, typically a 401(k) plan.  *See generally* 29 U.S.C. § 1002(34); 26 U.S.C. § 401(k). Employers and employees set money aside in individual accounts assigned to each employee, and that money, together with any investment gains, remains tax-free until withdrawn.

When employees leave their jobs – due to retirement, job loss or a job change – they generally have a choice about what to do with their 401(k) money:  They can leave it in their former employer's plan; they can withdraw it altogether, which requires them to incur tax liability and leaves them with less money for retirement; or they can roll it over into a qualified individual retirement account, or "IRA," which allows them to continue investing their money on a tax-advantaged basis and save for retirement.  *See generally* Panis Report at 2 (Ex. M); Panis Dep. at 5 (Ex. G).[1]

### B.    Principal Life's Role in 401(k) Plans

Principal Life is a leading provider of retirement plan services.  Schmitz Decl. ¶ 2 (Ex. D).  Among other things, it offers recordkeeping and other ministerial services to employers that sponsor retirement plans.  The nature and extent of Principal Life's services vary from plan to plan depending on the size, needs, and sophistication of the plan sponsor.  *See generally Ruppert v. Principal Life Ins. Co.*, 252 F.R.D. 488 (S.D. Iowa 2008).

This case involves the process that unfolds when 401(k) plan participants leave their jobs. After the employer notifies Principal Life of the participant's departure, Principal Life, through an office known as "Principal Connection," sends the participant a letter.  Schmitz Dep. at 50-52

---

[1] Throughout this brief, citations to Defendants' exhibits include in parentheses at the end of the citation a reference to the tab where the specific exhibit may be found.

(Ex. H).  The letter is referred to as a "benefit event" letter because it is sent upon a "benefit

event" like a job change.  The content of the letter has changed over time (*see* Pl. Exhibits 92,

127, 129-32), but has always explained that the people who answer the phone at Principal

Connection are selling Principal products: "Counselors are sales representatives for the members

of the Principal Financial Group®.  Except under certain circumstances they do not represent,

offer or compare products and services of other financial services organizations."  *See id.*

### C.       Principal Connection's Involvement in the Decision-Making Process of Each Caller Varies From Call to Call

The main purpose of the calls is to allow Principal Connection to "[e]ducate

[participants] on the different options that they would have available" when they retire or change

jobs.  *See* Schmitz Dep. at 10 (Ex. H).  But Principal Connection's involvement in each caller's

decision-making process varies markedly from caller to caller.  *See id.* at 236-39.

Calls to Principal Connection are recorded, and 24 representative examples of those

recordings are being submitted with this brief.[2]  These calls illustrate the breadth of Principal

Connection's involvement (or lack thereof) in callers' decision-making process.  For example:

- Robert (Track 18) was actively involved in the decision-making process.  He stated that he had decided – prior to any conversation with Principal Connection – to move his funds into a Principal IRA.  Principal Connection's involvement in the decision-making process was limited to discussing which particular funds he might consider.

- Robert (Track 8) also was actively involved.  He said he wanted to roll his retirement funds to a Principal IRA or another company's IRA.  He also discussed fees and expenses associated with various funds.

- Timothy (Track 17) actively participated in the decision-making process.  He asked probing questions about fees for a variety of investment options, and he articulated firm ideas about certain types of funds he did not want to invest in.

---

[2] Personally identifying information, such as last names, Social Security numbers, and home addresses, have been redacted from the tapes.  Defendants will submit unredacted versions of the calls for *in camera* review upon request.

Timothy said he intended to research each of the options he tentatively selected before finalizing his decisions.

- John (Track 2) was also very active in the decision making process.  He articulated specific ideas about what he was planning to do with his account and asked specific questions about the options presented to him.

- Wendy (Track 19) said she decided not to leave her funds in her former employer's account, but her conversations reflect a collaborative process in determining which funds she would choose.

- John (Track 4) also reflects a more collaborative decision-making process.  He ultimately chose funds that represented a hybrid among two possibilities described by the Principal Connection counselor.

- William (Track 11) took a more passive role.  He articulated his desire for security and ultimately purchased a CD.

- Jerry (Track 20) also took a relatively passive role.  He said he needed his assets to be liquid, and based upon discussions with the Principal Connection counselor, he decided to leave his money in his former employer's 401(k) plan.

PFG00068128 (Ex. N).

Adding to the variability of the decision-making process is the fact that many callers ask third parties to help them make their choices.  Dorothy's (Track 22) daughter-in-law actively participated in her discussions with Principal Connection; John (Track 13) referred to advice from his tax advisor; Erin (Track 9) referred to communications with an advisor at Merrill Lynch; Daphne (Track 6) had her husband on the phone; and Elsie (Track 1) spoke with a financial planner at her local bank.

These conversations demonstrate that in some instances the caller takes charge of the decision-making process, with little if any input from Principal Connection; in other instances a caller relies on an outside consultant (not Principal Connection) to direct the process; in other instances the process is a collaboration between the caller and Principal Connection; and in still other instances the Principal Connection representative offers specific suggestions that the caller accepts, with few questions asked.

4

**D.     The content of the calls and overall process for moving 401(k) funds varies
        from caller to caller**

The degree of Principal Connection's involvement is just one of several variables that

change from call to call.  For example, some participants have a single call with Principal

Connection and decide to leave their retirement funds in their former employer's 401(k) plan

(Jerry, Track 20; John, Track 14); others have one call and decide to move their money into a

Principal IRA (William, Track 11; Timothy, Track 17); others have multiple conversations with

Principal Connection before deciding whether to move their money (John, Track 4; Jerry, Track

5; Erin, Track 9; Joann, Track 10; Miguel, Track 12); and for others it is unclear whether it is

their first call, second, or one of a longer series of calls (Sharon, Track 3; Robert, Track 18).

There is also tremendous variation in the content of the calls.  Some plan participants

start the call with little idea of what they want to do and ask for descriptions of their investment

alternatives (William, Track 11).  In these situations, the nature of the options presented varies;

sometimes they include certificates of deposit or other fixed or guaranteed options (Elsie, Track

1; John, Track 4; William, Track 11; Dorothy, Track 22) and sometimes not.  Other callers start

with a clearer plan in mind and tell the Principal Connection counselor what they want to do with

their money (Patricia, Track 10; John, Track 14; Timothy, Track 17).  Many calls fall in between

(Richard, Track 24; Erica, Track 21; Wendy, Track 19).  In addition, callers are regularly told

that they are free to leave their money in their employer's 401(k) plan (Harold, Track 23;

Dorothy, Track 22; Jerry, Track 20; Wendy, Track 19; William, Track 11; Patricia, Track 10;

Robert, Track 8).

Some participants – including Plaintiff here – say they are looking to others, such as

accountants, investment advisors or family members, to advise them about how and where to

invest their money, while others speak only with Principal Connection.  Schmitz Dep. at 239-40

(Ex. H); Walsh Dep. Ex. 1 at 1 (Ex. J); Schmitz Decl. ¶ 6 (Ex. D) .  Callers are "all over the board" with respect to their financial sophistication, with some being "very savvy" and others less so.  Schmitz Dep. at 239 (Ex. H).  As noted by Dean Schmitz, "Every situation – the customer's situation is unique."  *Id.* at 237; *see also id.* at 84-85.  Callers vary in age, income, sophistication, net worth, job status, risk tolerance and personal preferences – and those differences translate into variations in the calls.  "The only constant is that every call is different."  Schmitz Decl. ¶ 6 (Ex. D).

      **E.**      **Plaintiff's Interaction With Principal Connection**

      The calls from Plaintiff Patricia Walsh to Principal Connection further illustrate the uniqueness of each call.  When Plaintiff retired in 2005, she initially left her 401(k) money in her former employer's plan.  When she called Principal Connection a few months later, she was told that she could continue to leave her money where it was and that there was no hurry to make decisions.  Specifically, Plaintiff was told that "the first option you always have is that you can continue to leave funds as is under [your former employer's] plan as long as you need to." Walsh Dep. Ex. 2 at 2 (Ex. K).  The counselor continued, "We just want to make sure you know what options you do have available.  Whether that is 'no, I don't want to do anything, I want to leave it as is,' well, that's great."  *Id.*  The counselor offered Plaintiff the option of rolling over her money into an IRA and said, "If we can help you with that, let us know.  Or, you can do that about anywhere."  *Id.* at 4.  Plaintiff said she did not want to decide what to do without consulting her attorney and accountant.  *Id.*  Far from giving Plaintiff a "hard sell," the counselor encouraged her to talk with her accountant to help her decide "what's the best way to keep this money invested for you."  *Id.*

      After the call, Plaintiff did not speak with her attorney or accountant, but instead decided to "make [her] own decision."  Walsh Dep. at 92 (Ex. I).  She did speak with a sales

representative at Schwab, a Principal competitor (*see* Schmitz Dep. at 61 (Ex. H)), about transferring her 401(k) money to Schwab.  Walsh Dep. at 44-45 (Ex. I).  And Plaintiff understood that she was free to move her 401(k) money to Schwab or any other financial institution.  *Id.* at 41.  Nevertheless, when she called Principal Connection again a few months later, Plaintiff chose to roll over her money into a Principal "Lifetime 2010" fund.  *Id.* at 54-55, 71-74; Walsh Dep. Exhibit 3 at 10-11 (Ex. L).

Although she claims that she was misled into investing in Principal products, Plaintiff has not taken her money out of her Principal IRA.  Walsh Dep. at 79-80 (Ex. I).  She became dissatisfied with her investment after responding to an advertisement in the Des Moines Register that invited people who had invested 401(k) money with Principal to contact Plaintiff's counsel.  *Id.* at 64-68.  After meeting with Plaintiff's counsel, Plaintiff filed this lawsuit.  *Id.*

### F.    Whether Defendants Earn Higher or Lower Profits When a Participant Moves to a Principal IRA Varies From Participant to Participant

Plaintiff appears to assume that Defendants are always better off when participants roll over their 401(k) money to a Principal IRA.  *See* Pl. Br. at 14-16.  But that is not the case.  The members of the putative class previously invested their money in a 401(k) plan served by Principal Life, and Principal Life generally earned profits as a result of that service.  Whether Defendants earned higher or lower profits after a rollover varies from class member to class member and from transaction to transaction.

For example, a comparison of fees for 17 participants shows that for 12 of the 17, Principal companies received *less* in fees after the participants' rollover to J shares in a Principal IRA.  *See* Bollin Decl. ¶¶ 11-12 (Ex. A) and Ex. B thereto, PFG 00068137 at 3-12, 16-17 (Ex. C).  In other words, in most of those cases Principal companies received more in fees when

participants were enrolled in their 401(k) plans than when they transferred their funds into J

shares in a Principal IRA.  *Id.*

      The same holds true for the total expenses paid by putative class members.  In eight of

the 17 examples, people who moved from a 401(k) plan served by Principal Life to a Principal

IRA incurred *lower* fees after their move.  Bollin Decl. ¶¶ 6-10 (Ex. A) and Ex. A thereto, PFG

00068134 at 1-3, 5-8, 10 (Ex. B).  In some instances, the savings were significant; in others, the

savings were minimal.  In other situations the fees were about the same, and in still others

(roughly half) the fees were higher after the rollover.  As noted by Defendants' expert, Stan

Panis, "[M]any departing participants in Principal-serviced 401(k) plans may gain from rolling

their balance over into a Principal IRA invested in J-shares funds" – one of the primary targets of

Plaintiff's complaint – because the fees are lower than they were paying in their 401(k) plan.

Panis Report at 9 (Ex. M).

      **G.**    **Principal Life's Rollover Experience Compared to the Industry**

      National studies confirm that Defendants' experience in retaining assets after benefit

events are in line with the experience of their competitors.  One study showed that approximately

40 percent of plan participants left their assets in their old 401(k) plan upon retirement or job

change, while another study put that figure at 26 percent.  *Id.* at 4, 6.  Principal Life's experience

has been similar: Approximately 30 percent of participants in Principal-serviced 401(k) plans

leave their money where it is when they quit or retire.  *Id.* at 6.  In other words, "the fraction of

assets of Principal-serviced 401(k) plans that departing employees left with their previous

employers was comparable to and within the range found in two national sources."  *Id.* at 7.

      Industry studies also show that, upon a benefit event, a material percentage of employees

transfer their money to an IRA offered by their 401(k) plan's service provider – in this case,

Principal Life.  *See* LIMRA Study at 29 (Ex. P); LIMRA study, Tech. Suppl. at 26 (Ex. O).

**Legal Standard**

**A.     Plaintiff Bears the Burden Establishing All the Requirements for Maintaining a Class Action**

Certifying a case as a class action is "an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982) (citation and quotation marks omitted).  To justify class treatment, Plaintiff must show that all requirements of Rule 23(a) have been satisfied and that, in addition, the requirements of at least one subsection of Rule 23(b) have been satisfied.  *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1539 (8th Cir. 1996); *Duchardt v. Midland Nat'l Life Ins. Co.*, No. 4:07-cv-00351, 2009 WL 3824332, at *4, 13  (S.D. Iowa July 23, 2009).  The Court is obliged to conduct a "rigorous analysis" of whether the requirements of Rule 23 have been met.  *Falcon*, 457 U.S. at 161.

**B.     No Class Can Be Maintained Unless Plaintiff Proves That Common Issues Predominate Over Individual Issues**

Plaintiff seeks to certify a class under Rule 23(b)(3), which requires her to prove that common, classwide issues predominate over individualized issues.[3]  The predominance requirement of Rule 23(b)(3) is "far more demanding" than simply establishing the existence of common questions of law or fact.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).  "If, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual

---

[3] Plaintiff also purports to seek to certify a class under Rule 23(b)(2), *see* Pl. Br. at 6, but never develops that argument and has therefore waived it.  *See id.* at 7 n.29 ("Plaintiff analyzes here only 23(b)(3)"); *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 634 (8th Cir. 2007) ("points not meaningfully argued in an opening brief are waived").  Moreover, Plaintiff's putative expert on class certification has admitted that, under Eighth Circuit law, Rule 23(b)(2) certification "generally requires even greater cohesiveness than (b)(3)."  *See* Klonoff Report at 19 n.22 (citing *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1121-22 (8th Cir. 2005)).

9

question.  If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).  In other words, if "every member" of the proposed class "can prove with common evidence" that they are entitled to relief, then common issues may predominate. *Id.* at 571.  But if the elements of the claims "cannot be shown on a class-wide basis with common proof," thereby requiring "consideration of factors unique to each potential class member," then class certification must be denied. *Id.*; *see also Midland*, 2009 WL 3824332, at \*29; *Estate of Mahoney v. R.J. Reynolds Tobacco Co.*, 204 F.R.D. 150, 156 (S.D. Iowa 2001).

In addition to showing that common issues predominate, Plaintiff must demonstrate that class treatment is superior to other methods "for the fair and efficient adjudication of the controversy." *Rios v. State Farm Fire & Cas. Co.*, 469 F. Supp. 2d 727, 742 (S.D. Iowa 2007) (citation and quotation marks omitted).  The "superiority" requirement focuses on whether, as a practical matter, a class action would be manageable. *See Liles v. Am. Corrective Counseling Servs., Inc.*, 231 F.R.D. 565, 575 (S.D. Iowa 2005).

### C.   The Court Must Consider What Type of Evidence Would Be Presented at Trial

Finally, in analyzing a motion for class certification, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.  As noted by this Court in its recent class certification ruling in *Duchardt*:  "The district court's review of the evidence under Rule 23 may require it to 'resolve disputes going to the factual setting of the case and such disputes may overlap the merits of the case.'"  2009 WL 3824332, at \*4 (quoting *Blades,* 400 F.3d at 567, in turn citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001)).

The Second and Third Circuits recently clarified what it means to "resolve disputes going to the factual setting of the case."  At the class certification stage, courts must look at the evidence material to all Rule 23 elements and deny class certification unless the party seeking certification has satisfied her burden with respect to each requirement by a preponderance of the evidence.  *Teamsters v. Bombardier, Inc.,* 546 F.3d 196, 202 (2d Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 320 (3d Cir. 2009).  While the Eighth Circuit has not yet used the foregoing language, it has found that courts must decide what sort of evidence they would need to consider if the case were tried on a classwide basis.  *Blades*, 400 F.3d at 569.

<u>**Argument**</u>

Plaintiff's request for class certification should be denied because she has failed to satisfy the "predominance" and "superiority" requirements of Rule 23(b)(3), as well as the typicality requirement of Rule 23(a)(3).

**A.      Individual Hearings Would Have to Determine Which Class Members, If Any, Had a Fiduciary Relationship With Principal Life.**

If this case were certified as a class action, Plaintiff and all other class members would first have to address the "threshold question" of whether Principal Life served as an ERISA fiduciary with respect to their rollovers.  *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). ERISA defines fiduciary "in *functional* terms of control and authority over the plan."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original).[4]  The Department of Labor, the

---

[4] Specifically, ERISA provides as follows (29 U.S.C. § 1002(21)(A)):

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

agency responsible for enforcing ERISA, has observed that whether a service provider like Principal Life is a fiduciary is "inherently factual and will depend on the particular actions or functions [the provider] performs on behalf of the Plans." Dep't of Labor Advisory Opinion 97-16A (May 22, 1997) 1997 WL 277979, at *5. Similarly, this Court has observed that "the question of whether a fiduciary relationship did exist is inherently a factual one." Order on Mot. to Dismiss at 11 (Dkt. 42); *see also id.* at 14; *accord Holdeman v. Devine*, 474 F.3d 770, 777 (10th Cir. 2007) (fiduciary status depends on "the facts presented by the parties").

The inherently individualized nature of fiduciary status stems from two specific legal and factual inquiries: (1) whether Principal Life exercised control over plan assets, and (2) whether Principal Life gave participants "investment advice," as that term is defined under ERISA.

### 1.    Plaintiff's "exercise of control over plan assets" theory

Plaintiff claims that Principal Life exercised control over plan assets by tricking participants into calling Principal Connection and putting them in touch with counselors "'who then had the mission to persuade them to move their assets out of the plans and into Principal proprietary products.'" *See* Pl. Br. at 13 (quoting testimony of Plaintiff's putative expert). But notwithstanding Plaintiff's rhetoric (*see id.*), there is no way to prove on a classwide basis that Principal Life exercised control over plan assets.

Principal Life can be considered a fiduciary only "to the extent" it exercised control over plan assets. 29 U.S.C. § 1002(21)(A); *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992). And "control" in this context is taken literally – a service provider is not exercising control if a participant retains "the final say on which investment options will be included," even if the participant "discussed this decision, or negotiated about it," with the service provider. *See Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (addressing "control" in context of a

12

plan's dealings with a service provider).  Moreover, "the mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status."  *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998).

Whether Principal Life ever exercised "control" that could give rise to fiduciary status with respect to any particular rollover can only be determined on an individualized basis. Plaintiff would need to prove that Principal Life – not the plan participant – had the "final say" over whether to move money from the former employer's 401(k) plan to a Principal IRA.  *See Hecker*, 556 F.3d at 583.  And who had the "final say" over this decision cannot be determined without listening to the taped conversations, one class member at a time – a task that would literally take years.  Schmitz Decl. ¶ 8 (Ex. D).  Moreover, to the extent that the tapes are unclear about who exercised control over plan assets, the participant – and potentially the Principal Connection counselor – would have to testify about that issue under oath.

## 2. Plaintiff's "investment advice" theory

Plaintiff claims that Principal Life became a fiduciary by giving her "investment advice." *See* Pl. Br. at 13-14; Am. Compl. ¶ 71 (Dkt. 15).  She correctly notes that "investment advice is not limited to advising plans – it's participants too."  Pl. Br. at 13.  Surprisingly, however, Plaintiff never mentions the Department of Labor's authoritative guidance on how advising a participant can lead to fiduciary status.  *See* Participant Investment Education, 61 Fed. Reg. 29586 (June 11, 1996).  Whether investment advice has been given to a participant, the Department said, "generally can be determined only by reference to the facts and circumstances of the particular case with respect to the individual plan participant or beneficiary."  *Id.* at 29589. In addition to showing that the defendant gave "recommendations as to the advisability of investing in" particular securities, a participant must show one of two things: (a) that the defendant "has discretionary authority or control" to buy or sell securities for the participant, or

(b) that the defendant "renders the advice on a regular basis to the participant or beneficiary, pursuant to a mutual agreement . . . (written or otherwise) with the participant or beneficiary that the advice will serve as a primary basis for the participant's or beneficiary's investment decisions with respect to plan assets and that [the defendant] will render individualized advice based on the particular needs of the participant or beneficiary." *Id.* (citing 29 C.F.R. § 2510.3-21(c)(1)(ii)(B)).

Plaintiff does not assert that she actually gave Principal Life control over the decision to buy a Principal financial product. Indeed, Plaintiff has admitted that she, not Principal Connection, decided to put her money into a Principal IRA. Walsh Dep. at 57 (Ex. I). Thus, Plaintiff would have to rely on prong (b) above – and that would require participant-by-participant inquiries into exactly what was said in each call, what the caller agreed to use as the "primary basis" for his investment decisions, and other individualized issues.

If anything, the analysis of whether Principal Life ever gave "investment advice" to a participant is broader and more complex than the "control of plan assets" inquiry. Did the caller receive advice about "the advisability of investing in" Principal products, or was she merely given factual information? *See* 61 Fed. Reg. at 29589. Were recommendations given on a "regular basis" or just sporadically (or, as in most cases, just once or not at all)? *Id.* Was there an agreement that the advice would serve as a "primary basis" for the participant's investment decision, or did the caller intend to rely on other sources? *Id.* None of these questions can be answered without listening to each of the calls and, in appropriate circumstances, eliciting testimony from the class member and the Principal Connection counselor about their state of mind. *See generally Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 626 (8th Cir. 1992) (noting that the "primary basis" issue under definition of investment advice "'is comparable to the

corresponding "meeting of the minds" component of contract cases'" and is "'an issue for the

trier of fact'") (quoting *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 293

(7th Cir. 1989)).

>3.    **Individualized inquiries to determine fiduciary status cannot be
>       avoided**

Whether Principal Life served as a fiduciary in connection with any particular rollover

cannot be resolved without (a) listening to the tapes of every phone call made by every class

member to Principal Connection, and (b) in some cases, listening to the testimony of class

members and Principal Connection counselors.  The critical issues of control over plan assets

and rendering of investment advice depend on the extent and manner of Principal Life's

involvement in participants' decision-making process, the language used to describe investment

options, the degree to which information from Principal Life served as a "primary basis" for a

participant's decision, and multiple other issues.  All of that information varies from class

member to class member.

Even Plaintiff's putative experts have acknowledged the importance and relevance of the

taped phone calls.  Robert Klonoff, in his expert report, conceded that the tapes must be

examined but opined that listening to them should not be a terrible burden.  Klonoff Report at 33

(Pl. Ex. 148).  In fact, however, even if each call were only ten minutes long, it would take a

team of ten people nearly nine years – listening 40 hours per week, every week of the year – to

listen to the calls recorded during the relevant time.  *See* Schmitz Decl. ¶ 8 (Ex. D).  Moreover,

Klonoff conceded in his deposition that Defendants would also have the right to cross-examine

class members about the conversations.  Klonoff Dep. at 37 (Ex. F).  Plaintiff's other putative

expert, Mark Johnson, also conceded the relevance of the taped conversations.  The phone calls,

he said, are "an important step in the process."  Johnson Dep. at 123 (Ex. E).  *See also id.* at 125

("So the phone call is very important.  A very important item here.").

> **4.     Plaintiff's legal arguments attempting to establish fiduciary status as a matter of law are red herrings**

Plaintiff contends that she can show fiduciary status on a classwide basis in other ways,

but these theories are untethered to ERISA's definition of "fiduciary."  First, Plaintiff contends

that Principal Life became a fiduciary because its activities "were not 'for an employee benefit

plan[]'" and because Principal Life was not acting "within a framework made by the plans."

Instead, she says, Principal Life was promoting the sale of Principal products.  Pl. Br. at 7-11.

This makes no sense under ERISA.  True, a service provider cannot be an ERISA fiduciary if it

is performing purely ministerial functions in accordance with plan directions, *see, e.g.* 29 C.F.R.

§ 2509.75-8 at D-2, but the converse is *not* true – it is *not* the law that any non-ministerial

activity (or any activity not performed on behalf of a plan) is fiduciary in nature.  Fiduciary

status depends on whether the challenged actions fall within the statutory definition of that term,

but the definition includes nothing to the effect that any activity that is not performed "'for' any

plan," Pl. Br. at 8, is somehow fiduciary.  *See* 29 U.S.C. § 1002(21)(A).

Relatedly, Plaintiff asserts that Principal Life was exercising discretion in the

management of 401(k) plans (a theory nominally tied to ERISA's definition of fiduciary) when it

sent benefit event letters and helped participants with rollovers.  Pl. Br. at 9.  But Plaintiff admits

that these activities were *not* plan functions, *see id.* at 8, so they cannot qualify as "management

of [a] plan."  *See* 29 U.S.C. § 1002(21)(A).  Plaintiff tries to bolster her theory by quoting an e-

mail from a Principal Life lawyer, but the e-mail actually confirms that Plaintiff's theory is a

non-starter.  In the e-mail, the author notes that Principal Life's asset retention efforts "fall

*outside* our range of duties," which means they cannot be considered fiduciary.  *See* Pl. Br. at 9

16

(emphasis added) (quoting Pl. Ex. 55 at 4).  Plaintiff latches on to the word "discretion" in the e-mail because the statutory definition of fiduciary refers to "discretionary authority or discretionary control respecting management of such plan" and "discretionary authority or discretionary responsibility in the administration of such plan."  *See id.*; 29 U.S.C. § 1002(21)(A).  But Plaintiff overlooks the fact that the word is being used in the e-mail to describe what Principal Life *may properly do* consistent with the law.  The e-mail does not suggest that Principal Life's asset retention efforts somehow involve the exercise of discretion in the management or administration of a 401(k) plan.  *See id.*

Finally, Plaintiff claims that Principal Life became a fiduciary by exercising control over plan management – a classic means of becoming a fiduciary – because it "sent official notifications from the plans," *i.e.*, benefit event letters.  Pl. Br. at 12.  Unfortunately, this theory makes no more sense than those addressed above.  As Plaintiff admits elsewhere in her brief, the benefit event letters "are 'not an official notification of the plan.'"  Pl. Br. at 8 (emphasis in original) (quoting Schmitz Dep. at 67-68 (Ex. H)).  Thus, it makes no sense to claim that Principal Life became a fiduciary by sending benefit event letters.  As Plaintiff has admitted – and even emphasized – these letters are sent by Principal Life, not by the plans.[5]

**B.    Individual Questions of Causation Also Make Each Class Member's Claim a Fact-Intensive Inquiry**

The individualized inquiry into fiduciary status is enough to defeat class certification.  In this case, though, a second individualized inquiry, looking to different and additional evidence,

---

[5] In the Introduction to her brief, Plaintiff also asserts that "Defendants became functional fiduciaries because they unilaterally accessed confidential plan information; authored and sent deceptive 'Forced Call Letters' to each Class member; the letters all contained the same omissions and misrepresentations; no call in response to the letters corrected those deceptions; and all Class members bought Defendants' financial products with assets from their ERISA-protected retirement plan accounts."  Pl. Br. at 3.  Even if these assertions are true (and they are not), and even if Plaintiff had developed these theories in her brief (she did not), none of them can be tied to ERISA's definition of "fiduciary."  *See supra* at 11 n.3.

would be necessary to determine whether class members can satisfy their burden of proving causation.  Plaintiff claims that Principal Life's benefit event letter, along with class members' telephone calls with Principal Connection, caused class members to move their funds from their employers' 401(k) plan into Principal IRAs.  But a material percentage of the putative class members would have moved their money in any event, letter or no letter.  Separating class members who transferred their funds as a result of an alleged breach of fiduciary duty from those who would have transferred their funds in any event would require a highly individualized, time-consuming inquiry.

As in other tort-like claims, causation is an essential element of a claim for breach of fiduciary duty under ERISA.  *See, e.g., Kesco v. Meredith Corp.*, 480 F.3d 849, 852 (8th Cir. 2007); *Holdeman v. Devine*, 572 F.3d 1190, 1193 (10th Cir. 2009).  Indeed, in finding that Plaintiff had standing to pursue her claim, this Court noted Plaintiff had met her burden of pleading that Defendants' breach of fiduciary duty "caused [Plaintiff] to leave the plan."  Order on Mot. to Dismiss at 18 (Dkt. 42); *see also id.* at 14.

To meet her burden of proving causation on a classwide basis, Plaintiff would have to demonstrate a uniform causal connection between the letters and telephone calls and each class member's decision to take money out of their employers' plans.  But Plaintiff cannot show such a uniform connection; empirical data and evidence from taped conversations explain why. Nationally, between 60 and 75 percent of all plan participants take their money out of their 401(k) plans when they retire or changes jobs.  *See* Panis Report at 6 (Ex. M); *see also* Attachment C thereto.  And a significant percentage of those participants then roll over those funds into an IRA with the same service provider that worked with their former employer's plan.

*See* Attachment C to Panis Report (Opportunities in the Rollover Market – Employee

Perspective, Technical Supplement) at 26-27 (Ex. M).

These data show that a material percentage of plan participants, upon retirement or job

change, will – no matter what – move their 401(k) money out of their former employer's plan

and into an IRA with the service provider that serves that plan.  This makes it impossible for

Plaintiff to show causation on a classwide basis.  If class members would have done the same

thing regardless of any alleged breach (and Defendants deny that there was any breach), then the

causal chain is broken.  Because causation would have to be examined class member by class

member, class certification should be denied.  *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 457

(11th Cir. 1996) (class certification denied on ERISA fiduciary duty claim because causation was

individualized); *Owen v. Regence Bluecross Blueshield*, 388 F. Supp. 2d 1335, 1341 (D. Utah

2005) (same); *see also McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 226 (2d Cir. 2008)

(class certification denied on RICO claim based on individualized issues of causation).

The conversations between putative class members and Principal Connection confirm the

need for individualized inquiries into causation.  For one thing, participants regularly call

Principal Connection without having even received a benefit event letter, a fact that cuts off any

chain of causation in its infancy.  John is one example.  A sophisticated investor with years of

experience handling his own investments, John was planning his retirement and called Principal

Connection to learn about his options – a step he took before he retired and thus before he

received a benefit event letter.  *See* John (Track 2).  After discussing his options, John decided

that upon retirement he would roll his funds into a Principal IRA.  *Id*.

Robert's call to Principal Connection illustrates the lack of influence that counselors had

over some participants' decisions to purchase a particular product.  Robert (Track 18).  Robert

19

was planning to leave his job and called Principal Connection because he had already decided to purchase a Principal IRA with money from his employer's retirement plan. *Id.* Like John, he called without having received a benefit event letter. Other conversations similarly demonstrate participants' predisposition to move money out of their employers' 401(k) and into a Principal IRA. *See* Sharon (Track 3); Robert (Track 8).

These examples illustrate why causation cannot be presumed and why individualized causation hearings cannot be avoided. Plaintiff's testimony that (a) she construed the benefit event letter as telling her that she had to move her money out of her employer's plan (even though a Principal Connection counselor told her that she did not), and (b) she was tricked into moving her money into a Principal IRA proves nothing with respect to any other class member regarding causation.

Demonstrating a "causal connection between breach and loss, like breach itself, is a fact-intensive inquiry." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994). Together with the individualized inquiry into fiduciary status, this individualized, fact-intensive causation inquiry precludes Plaintiff from meeting her Rule 23(b)(3) burden of showing that common issues "predominate" over individualized issues.

### C.     Whether and the Extent to Which Principal Life Was "Unjustly Enriched" Cannot Be Determined Without Individual Hearings

A third set of individualized hearings, requiring the examination of still more differing evidence, would have to be held to determine whether Defendants were unjustly enriched with respect to any particular rollover and, if so, by how much. Central to this complex determination is the fact that the disgorgement remedy sought by Plaintiff focuses on the profits earned as a result of the alleged misconduct – not profits that would have been earned in the ordinary course. Here, that means that the fees that Principal Life was earning while putative class members were

participants in their employers' 401(k) plans would have to be netted out against the fees

Defendants earned after any particular rollover.

Plaintiff claims that determining the amount of any ill-gotten gains is a "mechanical" act

of push-button simplicity.  Pl. Br. at 15.  And it is true that when remedy determinations are

formulaic, differences in the amount of awards do not prevent class certification.  But "where the

issue of damages does not lend itself to . . . mechanical calculation, but requires separate mini-

trial[s] of an overwhelmingly large number of individual claims, the need to calculate individual

damages will defeat predominance."  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir.

2003) (citations and internal quotations omitted).  The Eighth Circuit has consistently held that

where a class member's right to recover is "based on individual, not common, questions of fact,"

class certification should be denied.  *Owner-Operator Indep. Drivers Ass'n v. New Prime Inc.*,

339 F.3d 1001, 1012 (8th Cir. 2003); *see also Blades*, 400 F.3d at 570.

### 1.        The legal standard for disgorgement

In its dismissal ruling, this Court noted that "Plaintiffs may be entitled to the traditional

equitable remedy of a disgorgement of Principal's profits."  Order on Mot. to Dismiss at 24.

ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), the sole remaining basis for relief in this case,

limits recovery to "defendant's wrongfully obtained gain."  *Kerr v. Charles F. Vatterott & Co.*,

184 F.3d 938, 944 (8th Cir. 1999).  Where a particular transaction results in "'zero gain' as a

result of [defendant's] alleged wrongdoing, [there is] nothing to disgorge, and thus, no damage

subject to restitution."  *Id.* at 945.

In this case, the disgorgement analysis cannot be conducted without considering what

profits Principal Life would have earned if the rollover not occurred.  "[I]f no losses are incurred

or profits obtained that differ from what they would have been had there been no breach of

fiduciary duty, there is no remedy."  *Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 658

(7th Cir. 2001).  For example, in *Leigh v. Engle*, the court considered a disgorgement request

that, like Plaintiff's, presented "an extraordinarily difficult damages issue" replete with factual

considerations.  727 F.2d 113, 138 (7th Cir. 1984).  The district court was directed to distinguish

between profits resulting from the defendant's legitimate efforts and profits resulting from

wrongdoing.  *Id*. at 137-38.  The court responded by offsetting defendants' profits by the amount

the defendant would have earned absent the challenged conduct.  *See* 619 F. Supp. 154, 161-62

(N.D. Ill. 1985), *aff'd* 858 F.2d 361 (7th Cir. 1988).  A similar analysis would have to occur in

this case, one class member at a time.[6]

**2.      Determining whether there is any unjust enrichment subject to
disgorgement and, if so, how much would require complex
individualized inquiries**

Plaintiff claims that putative class members always pay more – and that Defendants

always earn more – when people move their money from their 401(k) plan to a Principal IRA.

But that is not the case.  *See* Schmitz Dep. at 173-74, 198-99 (Ex. H).  A sampling of the fees

associated with 17 participants' investments in their employers' plans and in their Principal IRAs

shows that in most cases, Principal companies received lower fees after the rollover.  Bollin

Decl. ¶¶ 11-12 (Ex. A).

The same holds true regarding the expenses paid by putative class members.  The

sampling shows that 8 of the 17 people paid lower fees when they purchased Principal J-shares

than when their money was in their 401(k) plan.  Bollin Decl. ¶ 10 (Ex. A).  Take Laura's

situation.  Her investments were subject to an expense ratio of 2.62 percent when her money was

invested in her employer's 401(k) plan.  Ex. A to Bollin Decl. at 1 (Ex. B).  After she rolled her

_____

[6] This Court has suggested that Plaintiff may be entitled to seek reinstatement in her former employer's
plan – a rescission remedy.  Order on Mot. to Dismiss, at 24.  But "the personal character of the
[rescission] remedy makes it procedurally and substantively unsuited to deployment in a class action."
*Andrews v. Chevy Chase Bank*, 545 F.3d 570, 574 (7th Cir. 2008).

money into a Principal IRA, the expense ratio dropped by more than half, to 1.22 percent.  *Id*.

Similarly, Michael's expense ratio dropped from 2.37 percent to 1.09 percent. *Id*. at 2.  Robert's

dropped from 1.45 percent to 1.3 percent.  *Id*. at 3.  Steven's stayed about the same (increasing

from 1.5 percent to 1.53 percent).  *Id*. at 4.  And, to be sure, in approximately half of the sample,

the expense ratio increased.  *Id*.

      This evidence confirms that whether any particular class member might be entitled to

disgorgement of profits would have to be analyzed one transaction at a time.  Bollin Decl. ¶¶ 5,

7-8, 11 (Ex. A).  Similarly, the *amount* of any potential disgorgement varies from transaction to

transaction because it depends on the unique investment choices of each participant – choices

that in turn affect how much Defendants earn both while the participant is invested in a 401(k)

plan and while invested in a Principal IRA.  *Id*. ¶¶ 5, 7-8, 11, 13.

      These individualized analyses defeat class certification because they depend on evidence

unique to each plan participant.  There are at least four reasons why this is so.  First, there is no

easy way to determine how much Principal Life would have earned if the participant had kept his

money in a 401(k) plan.  *See* Bollin Decl. ¶¶ 7, 11 (Ex. A).  Second, investors often purchase a

portfolio of investments with different expense ratios, rather than paying a single fee for a single

investment.  Third, participants and plans regularly change their investment line-ups, and these

changes would have to be taken into account in any analysis of profits.  *Id*. ¶13.  Fourth, as

explained above, it is not always the case that Defendants earn more when participants roll over

their money from a 401(k) plan served by the Principal Life to a Principal IRA.  *See* Schmitz

Dep. at 198-99 (Ex. H); Bollin Decl. ¶¶ 11-12 (Ex. A).

      Seen against this backdrop, Plaintiff's argument that the computation of her proposed

classwide remedy "can readily be accomplished through formulaic calculations" is wrong.  *See*

Pl. Br. at 15.  Plaintiff has offered no expert evidence on her requested remedy, and she offers

nary a hint as to how such a remedy could be fairly determined on a classwide basis.  Rather than

pointing to evidence, Plaintiff cites *Grove v. Principal Mutual Life Insurance Co.*, 200 F.R.D.

434, 441 (S.D. Iowa 2001), which she claims is analogous.  Pl. Br. at 15.  It is not.  *Grove*

involved a proposed settlement class whose members would opt for one of two types of relief –

either free life insurance or another remedy determined through a simplified scoring of claims.

200 F.R.D. at 437-39.  But this case does not involve a settlement class, and Plaintiff has

proposed no equitable approach to any classwide remedy.  Determining the scope of relief in this

case would require this Court to examine Defendants' profits with respect to each particular class

member both before and after their rollovers.  The complexity of these inquiries makes class

certification hopelessly unmanageable.  As the Eighth Circuit has explained:

> To make such determinations, a court would be required to examine each
> individual class member's account, including offsets, advances, and other items.
> Recovery for any plaintiff would be based on individual, not common questions
> of fact.  Therefore, we affirm the district court's denial of class certification, as
> we agree that questions affecting individual class members would predominate
> over common questions of law or fact.

*Owner-Operator Indep. Drivers*, 339 F.3d at 1012.

### D.      Plaintiff Has Also Failed to Satisfy the "Typicality" Requirement of Rule 23.

The foregoing analysis has focused on the "predominance" and "superiority"

requirements of Rule 23(b)(3) because they are the clearest and easiest reasons to deny class

certification.  But Plaintiff's request to certify a class fails for another reason as well:  She has

failed to satisfy the "typicality" requirement of Rule 23(a)(3).  Like the predominance

requirement of Rule 23(b)(3), typicality depends in part on whether "the facts of the individual

case" vary in a meaningful way from class member to class member.  *Parke v. First Reliance*

*Standard Life Ins. Co.*, 368 F.3d 999, 1004 (8th Cir. 2004) (upholding denial of class

certification on typicality grounds where "the question of whether a breach occurred remains a case-by-case determination"); *see also Duchardt*, 2009 WL 3824332, at *7.

Here, Plaintiff has failed to satisfy the threshold requirement of typicality for all of the reasons described above. Whether Principal Life engaged in any relevant fiduciary activity requires a case-by-case determination; whether any alleged breach caused any harm requires a case-by-case determination; and whether any disgorgement of profits is appropriate is likewise a case-by-case determination. For this reason as well, Plaintiff's motion should be denied.

WHEREFORE, Defendants respectfully request that this Court (a) set this matter for oral argument, (b) deny Plaintiff's motion for class certification, and (c) award Defendants any other appropriate relief.

Respectfully submitted,

PRINCIPAL LIFE INSURANCE COMPANY and
PRINCOR FINANCIAL SERVICES CORPORATION

By:    /s/ Eric S. Mattson
       One of their attorneys

Brian L. Campbell
Whitfield & Eddy, PLC
317 Sixth Ave., #1200
Des Moines, IA 50309
Email: campbell@whitfieldlaw.com
Phone: (515) 246-5503

Joel S. Feldman
Mark B. Blocker
Eric S. Mattson
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Email: jfeldman@sidley.com
       mblocker@sidley.com
       emattson@sidley.com
Phone: (312) 853-7000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Defendants' Response In

Opposition To Motion For Class Certification was served upon the attorneys listed below

through the Court's CM/ECF electronic filing system on December 7, 2009.

Brian P. Galligan
Timm W. Reid
James A. Albert
Galligan & Reid, P.C.
300 Walnut Street, Suite 5
Des Moines, IA 50309-2239

C. Thomas Mason III
5000 E. Calle Chueca
Tucson, AZ  85718

/s/ Eric S. Mattson