IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| PATRICIA A. WALSH, on behalf of herself and all others similarly situated, | * * * * | 4:07-cv-00386 |
| Plaintiff, | * * | |
| v. | * * | |
| PRINCIPAL LIFE INSURANCE COMPANY and PRINCOR FINANCIAL SERVICES CORPORATION, | * * * * | MEMORANDUM OPINION AND ORDER |
| Defendants. | * * | |

Before the Court are two motions:  Plaintiff's Motion for Class Certification, and
Defendants' Motion to Strike Reports and Testimony of Robert H. Klonoff and Mark Johnson.
The Motion for Class Certification was filed by Patricia A. Walsh ("Walsh" or "Plaintiff") on
October 13, 2009.  Clerk's No. 85.  Principal Life Insurance Company ("Principal") and Princor
Financial Services Corporation ("Princor") (collectively "Defendants") filed a Response on
December 7, 2009.[1]  Clerk's No. 93.  Plaintiff filed a Reply on January 5, 2010.  Clerk's No.
105.  Defendants sought and received leave to file a Surreply in opposition to class certification
(Clerk's Nos. 108-109); the Surreply was filed on January 15, 2010 (Clerk's No. 110).
Defendants' Motion to Strike Reports and Testimony of Robert H. Klonoff and Mark Johnson
(hereinafter "Motion to Strike") was filed on December 7, 2009.  Clerk's No. 91.  Plaintiff filed a
Response on December 23, 2009.  Clerk's No. 102.  Defendants filed a Reply on January 4,
2010.  Clerk's No. 103.  The Court heard arguments on Plaintiff's Motion for Class Certification

---

[1]  Defendants filed an identical Brief in Opposition to Motion for Class Certification on
December 10, 2009.  Clerk's No. 97.

and Defendants' Motion to Strike on January 19, 2010.  Clerk's No. 111.  Each of these matters

is fully submitted.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In this putative class action, Plaintiff alleges that Defendants violated the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3), when she and

unnamed class members were persuaded by Defendants to roll over the funds in their 401(k)

retirement accounts and purchase Defendants' proprietary investment products.[2]  Clerk's No. 80

(Third Am. Compl.).  Principal provides retirement plan services, including recordkeeping and

other ministerial services, to employers that sponsor retirement plans.  *See* Defs.' Ex. D ¶ 2.

Princor is a division within Principal that is licensed to sell securities.  Tr.[3] at 26.  Plaintiff was a

participant in her employer's 401(k) plan, which was administered by Principal.  *Id.* ¶¶ 1-2.

After Plaintiff's employment was terminated, Principal sent Plaintiff a letter encouraging

her to call Principal to consult with a benefit counselor about her options (hereinafter "the

Letter").  *Id.* ¶¶ 25, 98-99.  The letter was printed on Principal Life Insurance Company

letterhead, dated February 28, 2006, and identified Plaintiff's account information.  Pl.'s App.

Ex. 2.  The body of the letter states:

> Re: C AND J MANAGEMENT CORP
> **-- Official Notification--**
> Immediate Action Requested
>
> Dear PATRICIA A WALSH

---

[2]  The Third Amended Complaint signaled former Plaintiff Jerri E. Young's withdrawal
as a named plaintiff.  *See* Clerk's No. 80.

[3]  All references to the transcript are to the unedited RealTime transcript of the January
19, 2010 hearing provided to the Court by the Court Reporter.

Your change in employment requires an adjustment to your retirement account status.

**Please call 1-800-247-8000, ext. 2005 to discuss these changes and how they might impact you.**

We are available to take your call Monday through Friday, 7 a.m. to 9 p.m. Central Time. Most issues concerning your account can be resolved in a few minutes time.

We are committed to providing you with accurate, timely information so you can make informed decisions regarding your retirement savings following your change in employment. Please make this call at your earliest convenience.

Sincerely

D. N. Schmitz
Retirement Planning Division

*Id.* (emphasis in original). At the bottom of the Letter, in smaller italicized font, was the following disclaimer: "Financial professionals are sales representatives for the members of the Principal Financial Group®. Except under certain circumstances they do not represent, offer, or compare products and services of other financial services organizations." *Id.* Principal Connection, an office within Principal, generated the Letter and sends similar letters whenever a 401(k) plan participant leaves his or her job, though the content of the letters has varied over time. *See* Pl.'s Br. in Supp. of Mot. for Class Certification (hereinafter "Pl.'s Class Cert. Br.") at 21; *see also* Pl.'s App., Exs. 92, 127, 129-32. These letters were referred internally to by Principal employees as both "benefit event" and "forced call" letters (hereinafter "Letters"). *See* Pl.'s App., Exs. 5, 92, 127, 129-32.

As prompted in the Letter, Plaintiff called the Principal Connection call center (hereinafter "Principal call center") on March 22, 2006, and spoke with a Principal employee about her 401(k) account. Defs.' App., Ex. K at 2. During the phone call, Plaintiff was told that

she could leave the funds "as is" under her employer's plan or she could set up an Individual

Retirement Account ("IRA").  *Id.* at 3-4.  Plaintiff did not make a decision regarding any

changes to her 401(k) account during the phone call and expressed her intention to talk to her

accountant.  *Id.* at 3.  On July 26, 2006, Plaintiff again called the Principal call center and

expressed her desire to transfer the funds in her 401(k) account to another business that offers

IRA products.  Defs.' App., Ex. L at 1.  During the course of the phone call, Plaintiff changed

her mind and purchased a Principal IRA.  *Id.* at 4-11.

Plaintiff alleges that the Letter and the Principal Connection office are part of a deliberate

scheme by Principal to retain ERISA plan participants' retirement assets at Principal by rolling

over exiting retirement plan accounts into Principal's proprietary retail products.  Third Am.

Compl. ¶ 28.  Plaintiff asserts that the Defendants "failed to provide complete and accurate

information to participants, deceived and misled them, and failed to act solely in the interests of

the participants and their plans, but instead engaged in blatant and massive self-dealing–all in

violation of ERISA."  *Id.* ¶ 17.  Plaintiff claims that Defendants' failure to fulfill their fiduciary

obligations caused her to lose money when she transferred her retirement savings into the

Defendants' financial products.  *Id.* ¶ 3.

Plaintiff now seeks to certify the following class under Rule 23(b)(3):

(i) all persons who were participants in retirement plans that were serviced by
Principal Financial Life Insurance Company or Princor Financial Services
Corporation (ii) who were sent letters in the forms of Exhibits 92, 127, 129, 130, 131
or 132 (attached) (iii) which were not returned undelivered by the U.S. Postal
Service (iv) who called Defendants in response thereto, (v) who purchased Principal
Individual Retirement Accounts comprised of Principal Investor Funds J-shares class
mutual funds, Principal Bank Certificates of Deposit, Principal Bank savings
accounts, Principal brokerage accounts, Principal WRAP brokerage accounts, and/or
purchased Principal income accounts, Principal variable fixed or indexed annuities
or Personal retirement accounts with money from their retirement plan from October

31, 2001 to October 31, 2007 (the "Class Period").

*See* Clerk's No. 86.

In response to Plaintiff's Motion for Class Certification, Defendants have presented the Court with transcripts from phone calls to the Principal call center by twenty-four 401(k) plan participants, the majority of whom would qualify as class members under Plaintiff's proposed class. *See* Defs.' Ex. N. The length and content of the phone calls varies extensively; the degree of participation by each of the 401(k) plan participants varies from very active, such as where a plan participant articulates specific ideas regarding his or her preferred investment option, to passive, such as where the plan participant listens to options provided by the Principal employee and opts for the employee's recommendation. *See generally id.* From the transcripts, it is evident that several of the plan participants had gathered investment information from multiple sources to make a decision whether to roll over the funds from their 401(k) accounts into IRAs. *See generally id.*

## II.   MOTION TO STRIKE EXPERT OPINION

In support of her motion for class certification, Plaintiff offers expert testimony from Robert H. Klonoff ("Klonoff"), a law school dean who purports to be an expert in class action law and practice. Clerk's No. 91, Ex. A (Klonoff Decl.) ¶¶ 1, 3-6. Klonoff was asked to opine on the suitability of the instant case for aggregate treatment, and if he found that it was, the various forms that the aggregation might take. *Id.* ¶ 12. Klonoff concludes after examining the evidence presented to him that, in his opinion, class certification would be appropriate under Rule 23(b)(3). *Id.* ¶¶ 13-16, 67. Klonoff's deposition testimony addresses the same subjects. *See* Clerk's No. 91, Ex. C.

Plaintiff also offers Mark Johnson ("Johnson") as an ERISA expert.  Johnson is a consultant who previously worked as an attorney and as a corporate director.  Clerk's No. 91, Ex. A (Johnson Decl.) at 2-4.  In his work as a managing director, Johnson supervised employee benefit plans, including pension and 401(k) plans.  *Id.*  Johnson's expert report reviews portions of Plaintiff's evidence and law regarding ERISA fiduciary status and duties.  *Id.* at 5-11. Johnson concludes that Principal is a functional fiduciary because it admitted to an exercise of discretion; that Principal might also be a fiduciary by virtue of providing investment advice; that Principal violated its fiduciary duty when it engaged in certain activities; and that Principal operated in its own interest, rather than in the best interest of its participants.  *Id.* at 12.  In his deposition, Johnson asserts that his opinion regarding Principal's fiduciary status was not a legal opinion, but rather a professional opinion.  Clerk's No. 91, Ex. D at 9-10.

Defendants object to Klonoff's and Johnson's expert reports and testimony because each purports to offer expert opinions on purely legal issues.  In a situation such as this, where the parties rely on expert testimony to support their class certification arguments, a court may be required to resolve disputes regarding the import of expert testimony in demonstrating that a plaintiff's claims can be established through common proof.  *See Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005).  In considering Defendant's Motion to Strike at the class certification stage of litigation, the Court is mindful that "testimony should be judged on the basis of whether it supports class certification–not whether it meets the standards of admission at trial."  *Bennett v. Nucor Corp.*, No. 3:04-cv-00291, 2006 WL 2473015, at *11 (E.D. Ark. Aug. 25, 2006) (citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 579 (1993)). Therefore, a district court need only "ensure that the basis of the expert opinion is not so flawed

that it would be inadmissible as a matter of law." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 134-35 (2d Cir. 2001).

Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

However, "expert testimony on legal matters is not admissible. Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citing *United States v. Klaphake*, 64 F.3d 435, 438-39 (8th Cir. 1995)); *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert' called a judge."). In distinguishing admissible testimony from inadmissible testimony, the task for the Court is to ask whether the expert's opinions bear on some factual inquiry or whether they bear solely on the legal conclusions that are urged. In other words, "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Woodard v. Andrus*, Civ. No. 03-2098, 2009 WL 140527, at * 2 (W.D. La. Jan. 20, 2009) (citing *Burkhart*, 112 F.3d at 1212-13). "[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir. 1990) (internal quotations and citations omitted).

Both of Plaintiff's expert reports are riddled with legal conclusions. Each considers

selected portions of the factual record, then applies what the expert purports is the correct legal standard, to arrive at a legal conclusion. Because the whole of Klonoff's expert report and deposition testimony opine on the legal issue of whether the proposed class satisfies Rule 23 requirements, the Court concludes that they are inadmissible and will exclude both the report and testimony.

Johnson's report, on the other hand, is not entirely improper, at least to the extent that it is based on his professional experience as an ERISA administrator, and applies his experience to the facts presented to him by Plaintiff. Though the substantive information in Johnson's report and testimony is sparse, the Court does not find that they are so inherently flawed that they should be stricken at this stage of the litigation. Accordingly, the Court will parse Johnson's expert report and his deposition testimony, disregarding all conclusory legal statements while considering the underlying observations and reasoning. For the purposes of the present motion, Defendants' motion to strike Johnson's opinion is denied.

### III.  MOTION FOR CLASS CERTIFICATION

#### A.  *Class Certification Standard*

"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). The requirements for certification of a class action are set forth in Federal Rule of Civil Procedure 23 (a) and (b). Section (a) provides the prerequisites for any class action:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Section (b) then lays out additional requirements that must be satisfied, depending on the type of class action.  Here, Plaintiff seeks class certification under Rule 23(b)(3),[4] which requires a finding by the Court:

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The party seeking to certify an action as a class action bears the burden of proof on all certification issues.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Blades*, 400 F.3d at 568; *Bishop v. Comm'n on Prof'l Ethics*, 686 F.2d 1278, 1288 (8th Cir. 1982).  A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Falcon*, 457 U.S. at 161.  A district court has broad discretion in determining whether a particular action complies with the requirements of Rule 23.  *See Sperry Rand Corp. v. Larson*, 554 F.2d 868, 873 (8th Cir. 1977) ("The trial court is, of necessity, clothed with a good deal of discretion in determining the appropriateness of a class action.").

---

[4] Plaintiff's Brief in support of Class Certification makes one reference to certification under Rule 23(b)(2).  Pl.'s Class Cert. Br. at 6 ("Plaintiff seeks certification under Rule 23(b)(2) and (b)(3).").  However, Plaintiff never develops this argument in her brief or at oral argument.  Nor has Plaintiff replied to Defendants' assertion that she has waived the Rule 23(b)(2) argument by failing to develop the argument. Defs.' Resp. Br. at 9 n.9.  Since Plaintiff's Motion for Class Certification does not request certification under Rule 23(b)(2), and Plaintiff has never presented any argument in favor of certification under Rule 23(b)(2), the Court presumes that this reference was in error, and that Plaintiff does not actually seek Rule 23(b)(2) certification.  Accordingly, the Court restricts the scope of its discussion of class certification to Rule 23(b)(3) certification.  Nonetheless, the Court notes that the same individualized inquiries that preclude Rule 23(b)(3) certification would also impede class certification under (b)(2).  *See In re St. Jude Med. Inc.*, 425 F.3d 1116, 1121-22 (8th Cir. 2005) (noting that Rule 23(b)(2) classes "generally require[] even greater cohesiveness than [Rule 23(b)(2) classes]").

"[I]n determining the propriety of a class action, the question is not whether the . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). "In making the Rule 23 analysis, the substantive allegations in the plaintiff's complaint are accepted as true." *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 573 (D. Minn. 1995) (citing *Jackson v. Rapps*, 132 F.R.D. 226, 230 (W.D. Mo. 1990)). Nonetheless, the district court's review of the evidence under Rule 23 may require it to "resolve disputes going to the factual setting of the case and such disputes may overlap the merits of the case." *See Blades*, 400 F.3d at 567 (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001)). "Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove." *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006).

Plaintiff asserts that she can prove that Defendants[5] are liable for a breach of ERISA fiduciary duty on a classwide basis. Pl.'s Class Cert. Br. at 3. Defendants counter that class certification would be improper because Plaintiff's claims will require individualized inquiries into three separate elements of Plaintiff's claim: (1) whether Defendant Principal acted as an ERISA fiduciary when taking the actions that Plaintiff is challenging; (2) whether Principal's alleged breach of fiduciary duty caused class members to take their money out of their 401(k)

---

[5] Plaintiff's Briefs often reference only Principal, but occasionally she widens her arguments to encompass both Defendants. The Court is uncertain whether Plaintiff intended to argue that Princor should also be held liable under every theory she argues. Since the Court concludes that Plaintiff has not met her burden to demonstrate a prima facie showing of her claims, by a preponderance of the evidence common to each putative class member, this lack of clarity does not impair the Court's analysis.

plans; and (3) whether Defendants should be required to disgorge any profits (and if so, how much) they earned from the investments of any particular class member.  Defs.' Resp. Br. at 1. The parties primarily dispute these issues in reference to the Rule 23(b)(3) predominance and superiority requirements.[6]

### B.  Rule 23(b)(3) Requirements

Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members" and that resolution of the matter as a class action must be "superior to other available methods for the fair and efficient adjudication of the controversy."  *Amchem*, 521 U.S. at 615.  "The requirement of Rule 23(b)(3) that common questions predominate over individual questions 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Blades*, 400 F.3d at 566 (quoting *Amchem*, 521 U.S. at 591).

---

[6] Defendants also argue that Plaintiff has failed to satisfy the Rule 23(a) requirement for typicality.  Defendants do not dispute that the Class meets the Rule 23(a) prerequisites of numerosity, commonality, or adequacy of representation.  Indeed, Plaintiffs have offered evidence that the proposed class is quite large, the asserted claims contain questions of law and fact common to the class, and it appears that Plaintiff would provide adequate representation for the class.  *See* Pl.'s Class Cert. Br. at 4-6.  However, Defendants assert that Plaintiff has failed to establish the typicality prerequisite for the same reasons the Rule 23(b) requirements are not met–namely the need for case-by-case determination into fiduciary status, causation, and the existence of ill-gotten profits.  The Court addresses each of these arguments with regard to the Rule 23(b)(3) predominance and superiority requirements and concludes that the need for individualized inquiry precludes certification under Rule 23(b).  With regard to Rule 23(a) typicality, while minor differences, or differences in damages, will not impede the typicality of class claims, *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996), "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M.*, 458 F.3d at 787 (citing *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1004-05 (8th Cir. 2004)).  Because it is clear that the inquiry necessary to resolve each individual class member's claim will differ significantly, the Court concludes that Plaintiff has also failed to establish the Rule 23(a) typicality prerequisite.

> The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

*Id.* (citing *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d at 136-40); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003) (affirming the district court's denial of class certification on the basis that the required showing of injury would require individual determinations and that questions affecting individual class members would predominate over common questions of law or fact). The Court must examine all of the relevant evidence admitted at the class certification stage to ascertain if the party seeking class certification has made a prima facie showing with common evidence of his or her claims with respect to each member of the proposed classes.[7] *Blades*, 400 F.3d at 571; *see also In re St. Jude Med. Inc.*, 522 F.3d 836, 838 (8th Cir. 2005) (considering evidence presented by the defendants regarding the elements of the plaintiffs' claims and concluding that individual

---

[7] Defendants propose that Plaintiffs, as the party seeking certification, must satisfy her burden with respect to each requirement by a preponderance of the evidence. Defs.' Resp. Br. at 11 (citing *Teamsters Local 445 Freight Div, Pension Fund*, 546 F.3d at 202 and *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)). Plaintiff does not object to this standard. The Eighth Circuit has yet to consider the standard of proof applicable to evidence proffered to meet the class certification requirements. *See Whitaker v. 3M Co.*, 764 N.W.2d 631, 636 (Minn. Ct. App. 2009) (noting the lack of Eighth Circuit precedent and adopting the proposed standard absent the parties' objections). However, some guidance can be ascertained from the approach the Eighth Circuit adopted in *Blades*, when it considered all evidence in the record in conducting "a limited preliminary inquiry" to determine whether common questions predominate. *Blades*, 400 F.3d at 566-67, 571. Given *Blades*' direction that a district court should only resolve factual disputes in the context of "a prima facie showing," the Court believes that, when a motion for class certification requires resolution of disputes regarding the facts of the case, the moving party is required to established by a preponderance of the evidence that she can make a prima facie showing of each element of the claim with common evidence.

issues predominated); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (re-iterating that it had directed district courts "to assess all of the relevant evidence admitted at the class certification stage" and holding "that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").

      1.    *Do individual issues regarding fiduciary status predominate?*

"[T]he threshold question [for breach of ERISA fiduciary duty] is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function). . . ." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  Thus, to succeed in her claim that Defendants breached a fiduciary duty on a classwide basis, Plaintiff must show that Defendants were fiduciaries with respect to each of the class members.

Fiduciary status under ERISA is a functional concept, and if Defendants have acted like a fiduciary, they may have incurred derivative fiduciary obligations.  *See Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."); *Olson v. E.F. Hutton & Co. Inc.*, 957 F.2d 622, 625 (8th Cir. 1992) ("[ERISA] imposes fiduciary status upon those who act like fiduciaries as well as those who actually are fiduciaries.").  Plaintiff asserts that the Court can conclude Defendants were functional fiduciaries without individualized inquiries based primarily on Defendants' decision to engage in its asset retention strategy through the Principal Connection office.[8]  Specifically, Plaintiff sets forth five alternative

---

[8] At no point in her briefs or oral argument does Plaintiff suggest that Defendants are named as fiduciaries or given fiduciary responsibilities under any applicable ERISA plan.

theories by which she asserts Defendants are functional fiduciaries on a classwide basis under

ERISA:

> (1) they exercised discretionary authority or discretionary control managing the plans because their actions . . . were not "for an employee benefit plan;" (2) they exercised the same discretion because their actions were not "within a framework . . . made by other persons;" (3) the discretion [set forth in (1) and (2)] was with respect to management of the plan; (4) they exercised authority and control respecting management or disposition of plan assets; and (5) they rendered investment advice respecting plan assets.

Pl.'s Class Cert. Br. at 7-8.  Defendants dispute the viability of Plaintiff's first three theories in

light of existing ERISA law and argue that the last two theories would require specific legal and

factual inquiries in the litigation proceeded as a class action.

The ERISA statute provides, in relevant part, that a person is subject to fiduciary duties

with respect to an ERISA plan:

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so . . . .

29 U.S.C. § 1002(21)(A)(i)-(ii) (2006).  The Eighth Circuit has stated that courts should

construe the term "fiduciary" broadly under ERISA, and in favor of finding that a fiduciary duty

exists.  *Olson*, 957 F.2d at 625 (citing *Consol. Beef Indus. v. N.Y. Life Ins. Co.*, 949 F.2d 960,

964 (8th Cir. 1991)).  However, by the terms of the statute, "the extent" of a functional

fiduciary's liability is limited to circumstances where the entity functions in a way that accords

with one of the standards set forth in 29 U.S.C. § 1002(21)(A).  *See Martin v. Feilen*, 965 F.2d

660, 669 (8th Cir. 1992) ("One who is an ERISA fiduciary only by reason of § 1002(21)(A) is

liable only 'to the extent' he exercises discretionary control, renders investment advice, or has

discretionary administration responsibility."); *see also Trustees of the Graphic Comm'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 732 (8th Cir. 2008) ("The fiduciary status applies, however, only when the individual is performing a fiduciary duty; it 'is not an all-or-nothing concept.'") (quoting *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 192 (4th Cir. 2002)); *Maniace v. Commerce Bank of Kansas City, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994) ("A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control.") (quoting *Am. Fed'n of Unions Local 102 v. Equitable Life Assurance Soc.*, 841 F.2d 658, 662 (5th Cir. 1988)).

    a. *Discretionary authority or discretionary control respecting plan management*.

Of Plaintiffs' five theories regarding how Defendants acted as functional fiduciaries on a classwide basis, the first three are each premised in the first clause of § 1002(21)(A)(i) [9]: "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan." Pl.'s Class Cert. Br. at 7-8. Plaintiff's first and second theories are derived from a selective reading of language in a

---

[9] Section 1002(21)(A)(i) contains two clauses: the first considers whether a person "exercises any discretionary authority or discretionary control respecting management of such plan," and the second asks whether a person "exercises any authority or control respecting management or disposition of its assets." Each clause provides independent grounds to conclude that a person is a fiduciary under § 1002(21)(A), and each requires separate analysis. *See FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) ("Note that § 1002(21)(A)(i) imposes fiduciary duties only if one exercises discretionary authority or control over plan management, but imposes those duties whenever one deals with plan assets."). Accordingly, the Court first considers Plaintiff's arguments that are putatively based in the first clause of § 1002(21)(A)(i), regarding exercises of "discretionary authority or discretionary control respecting management of [the] plan[s]," before proceeding to address the theory under the second clause, that Defendants exercised "authority or control respecting management or disposition of [the plans'] assets."

Department of Labor ("DOL") interpretative bulletin, 29 C.F.R. § 2509.75-8 at D-2, which addresses the fiduciary status of persons who have only perform ministerial, administrative functions for an employee benefit plan; the third theory incorporates the first two theories, as well as the standard set forth in clause one of § 1002(21)(A)(i).  The core of Plaintiff's argument under each of these theories is that Defendants crossed over the line from service provider to plan management when they sent out the Letters that purported to be official notifications from the 401(k) plans, but were, in fact, engineered by Defendants as part of an asset retention scheme.  Plaintiff contends that the Letters were not sent for plan purposes and because they were not part of a framework made by the plans, Defendants exercised discretion over the management of the various pension plans and became fiduciaries for the purposes of ERISA.  Pl.'s Class Cert. Br. at 8-12; Tr. at 103.  Defendants counter that these theories are untethered from ERISA's definition of fiduciary.  Defs.' Resp. Br. at 16.

      i.  *Does fiduciary status arise when the alleged conduct is not "for" any plan?*

Plaintiff's first theory, which asserts that Defendants function as fiduciaries when they send communications, such as the Letters, for their own purposes, rather than for the employee benefit plans, defies logic.  The lynchpin of this argument is that the Letters were not sent on behalf of the ERISA plans.  The self-contradictory character of the theory is evidenced when it is compared to the language of the statute, and its interpreting regulations.  The relevant portion of ERISA states that "a person is a fiduciary *with respect to a plan* to the extent (i) he exercises any discretionary authority or discretionary control *respecting management of such plan . . . .*" 29 U.S.C. § 1002(21)(A) (emphasis added).  Similarly, the DOL interpretation on which Plaintiff relies provides that "[o]nly persons who perform one or more of the functions

described in [§ 1002(21)(A)] *with respect to an employee benefit plan* are fiduciaries."[10]  29

C.F.R. § 2509.75-8 at D-2 (emphasis added).  Plaintiff's construction contravenes what is the

clear meaning of the statute and the regulation– that a person does not become a fiduciary with

respect to an ERISA plan unless he or she exercises discretionary authority or discretionary

control with respect to the management of an ERISA plan.  *See Pegram*, 530 U.S. at 223

(interpreting § 1002(21)(A) and concluding that "fiduciary obligations can apply to managing,

advising, or administering an ERISA plan," but that they do not arise when a third-party service

provider merely "administrates or exercises discretionary authority over its own [] business");

*see also Guardsmark, Inc. v. Blue Cross & Blue Shield of Tenn.*, 313 F. Supp. 2d 739, 748

(W.D. Tenn. 2004) ("If the conduct at issue is merely a business decision that affects an ERISA

_____

[10]  The Department of Labor's Interpretive Bulletin, first, asks the question:

> Are persons who have no power to make decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan, [including the preparation of employees communications material,] within a framework of policies, interpretations, rules, practices and procedures made by other persons, fiduciaries with respect to the plan . . . ?

29 C.F.R. § 2509.75-8 at D-2.  Then, it explains:

> Only persons who perform one or more of the functions described in [§ 1002(21)(A)(i)] with respect to an employee benefit plan are fiduciaries.  Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

29 C.F.R. § 2509.75-8 at D-2(A).

plan, without constituting management or administration of the plan, the person's actions are not subject to fiduciary standards with respect to that conduct.") (citing *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 617 (6th Cir. 2003)).  Indeed, Eighth Circuit case law has held that when a third party service provider acts as a salesperson, only making recommendations regarding the purchase of investment products, and is not involved in plan administration or investments, she or he is not a fiduciary under ERISA.  *Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 493 (8th Cir. 1996); *see also Consol. Beef Indust.*, 949 F.2d at 965 (concluding that the defendant was not a fiduciary because it was not providing investment advice or acting as an agent for the plan administrator, but was simply selling its own financial products).  Accordingly, the Court finds that Plaintiff's first proposed theory of fiduciary status conflicts with ERISA's fiduciary definition, and thus, cannot provide a basis for a prima facie showing that Defendants are subject to fiduciary obligations.

ii.  *Does fiduciary status arise simply because a service provider acts outside a framework made by the ERISA plans?*

Plaintiff's second theory also does not align with ERISA law.  Plaintiff focuses on the phrase, "within a framework of policies," in the DOL interpretive bulletin, 29 C.F.R. § 2509.75-8 at D-2, and asserts that any action by Defendants outside a "framework of policies" made by others would make Defendants ERISA fiduciaries for the plans.  Once again, Plaintiff's proposed interpretation of the DOL interpretive bulletin turns the actual meaning on its head.

Professional service providers, such as Defendants,[11] "become liable for damages [under

---

[11]  Plaintiff does not dispute Defendants' characterization of themselves as ERISA service providers.  Pl's Reply Br. at 19-20; Tr. at 6, 35.  Indeed, Plaintiff frames her argument toward Defendants' role as a service provider.  *Id.*; *see also* Pl.'s Class Cert. Br. at 7-12.

ERISA] when they cross the line from advisor to fiduciary." *See Mertens*, 508 U.S. at 262. A service provider does not become "an ERISA fiduciary merely because it administers or exercises discretionary authority over its own [] business." *Pegram*, 530 U.S. at 223. Only if the service provider transcends its normal role and undertakes discretionary tasks related to the plan's management or administration does the possibility of fiduciary status arise. *See id.*; *see also Kerns v. Benefit Trust Life Ins. Co.*, 992 F.2d 214, 217-18 (8th Cir. 1993) ("[Persons] who render professional services are not ERISA fiduciaries unless they 'transcend the normal role' and exercise discretionary authority.") (quoting *Martin*, 965 F.2d at 669 and citing *Anoka Orthopaedic Assoc., P.A. v. Lechner*, 910 F.2d 514, 517 (8th Cir. 1990)); *Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008) ("[A] party not identified as a plan fiduciary can become one if, but only to the extent that, he or she undertakes discretionary tasks related to the plan's management or administration."); *Painters of Philadelphia Dist. Council v. Price Waterhouse*, 879 F.2d 1146, 1150 (3d Cir. 1989) ("Since an auditor is without direct or indirect decision-making authority with respect to the affairs of the plan, it cannot be said that it exercises discretionary authority or responsibility in the administration of a plan."); *Yeseta v. Baima*, 837 F.2d 380, 385 (9th Cir. 1988) (holding that neither an attorney nor an accountant qualified as a fiduciary absent a showing that "he controlled the Plan in a manner other than by usual professional functions"). Thus, a service provider who performs "ministerial duties," such as preparing "employee communications material" "within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary." 29 C.F.R. § 2509.75-8 D-2; *see also Kerns*, 992 F.2d at 218 (affirming the district court's conclusion that an independent broker, who sent a letter that notified employees about the

termination of insurance coverage, was not an ERISA fiduciary); *Anoka Orthopaedic Assocs.*, 910 F.2d at 517-18 (holding that the performance of ministerial duties by a business manager or lawyer, such as the preparation of end of the year reports for an ERISA plan, are not discretionary acts within the meaning of § 1002(21)(A)).

While it is well established that a person who prepares "employee communications material . . . within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary," *Kerns*, 992 F.2d at 218, it does not follow that any act by a third-party service provider, made outside a framework of policies of an ERISA plan, makes the service provider a fiduciary with respect to that ERISA plan.  The DOL, in providing its interpretations of § 1002(21)(A) in 29 C.F.R. § 2509.75-8 at D-2, was specifically addressing situations in which a service provider has been hired to perform duties on behalf of an ERISA plan.  In addressing this question, the DOL was noting that there is a subset of situations in which a service provider, performing functions on behalf of an ERISA plan, *will not* become a fiduciary to the plan for purposes of ERISA.  It is only necessary to consider whether a service provider should not be a fiduciary after it is established that the service provider's actions would otherwise qualify it as a fiduciary.  In other words, the question of whether a service provider's decision was within a framework of policies only arises after it has been established that the act at issue can be characterized as a function described in § 1002(21)(A)–that is–an exercise of plan management or administration respecting the ERISA plan or its assets.  29 C.F.R. § 2509.75-8 at D-2 ("Only persons who perform one or more of the functions described in § 1002(21)(A) with respect to an employee benefit plan are fiduciaries."); *see also Johnston v. Paul Revere Life. Ins. Co.*, 241 F.3d 623, 632-33 (8th Cir. 2001) (noting that "discretion" is

-20-

the "benchmark for fiduciary status under ERISA" and holding that the defendants, who

performed ministerial duties, were not fiduciaries because they neither possessed nor exercised

the requisite discretion over the plan).  In sum, Plaintiff's second proposed theory cannot

provide an independent basis of establishing that Defendants are subject to fiduciary obligations

under ERISA.

<blockquote>iii.  <em>Is there common evidence that Defendants exercised discretion over management of the plans?</em></blockquote>

Plaintiff's third theory, that Defendants became fiduciaries through exercises of

discretionary authority or discretionary control respecting management of the various ERISA

plans, is based on the plain text of the first clause of § 1002(21)(A)(i) and is a viable

interpretation of ERISA law.  However, after reviewing the evidence adduced by Plaintiff, the

Court concludes that Plaintiff has failed to produce evidence common to the class that would

show Defendants exercised discretionary authority or discretionary control respecting

management of the 401(k) plans.

Plaintiff argues that she will be able to show that Defendants exercised discretionary

authority or discretionary control respecting the management of the ERISA plans through the

common evidence of the Letters and the other aspects of the asset retention scheme.  Tr. at 103

("Plaintiff's Counsel:  It's with the Letter that Principal became a functional fiduciary on all

three prongs.").  Plaintiff's theory of the case is that, even though the caption on the Letter reads

"Official Notification," the Letter was "not an official notification of the plan."  Pl.'s Class Cert.

Br. at 8-9.  However, Plaintiff asserts that "sending 'official' plan notifications expressly

concerning 'your retirement account' are functions in managing plans."  Pl.'s Reply at 20

-21-

(footnotes omitted).  Plaintiff argues that since the Letters were understood as official plan communications, they should qualify as plan management for the purposes of establishing that Defendants acted as fiduciaries for the various employer sponsored ERISA plans.  *See id.*   In effect, Plaintiff is arguing that because Defendants took actions that were in their own interest, rather than "for" the plan or the plan participants, the Court should conclude that Defendants functioned as fiduciaries for the ERISA plans even when the actions did not actually involve management of the underlying plans.  *See* Pl.'s Class Cert. Br. at 9 ("Principal was not at liberty to take those liberties, if it was just a ministerial service provider.  With its [asset retention] campaign Principal deliberately took a bold step across the ministerial/discretionary line into the cement of ERISA functional fiduciary status.").  Further, Plaintiff argues that it is evident that Defendants acted with the requisite "discretion" since Defendants developed the Letters, as a part of the asset retention plan, without direction from the plan sponsors.  Pl.'s Class Cert. Br. at 9-10.

The Court is not persuaded that Defendants' use of the Letters implicates Defendants in the management of the ERISA plans, as is required by the plain language of § 1002(21)(A)(i).  As an initial matter, Plaintiff's theory that the Letters were not official actions under the various plans contradicts her assertion that sending the Letters demonstrated some level of authority or control respecting the management of the various ERISA plans.  Plaintiff alleges that Defendants sent the misleading Letters and that the Letters "tricked" the plan participants into making decisions that affected their participation in the 401(k) plans.  If these allegations are true, Defendants may have taken advantage of their association with the ERISA plans; however, it does not logically follow that Defendants' actions constituted management of the ERISA

plans.  Indeed, according to Plaintiff's theory, Defendants had no control or authority over the

actual ERISA plans.  Yet, the plain language of the statutory provision that Plaintiff invokes

provides that an entity is a fiduciary only "to the extent [the entity] exercises any discretionary

authority or discretionary control respecting management of such plan."  29 U.S.C. §

1002(21)(A)(i).  Given the language of the statute, and aforementioned case law interpreting it,

*see*, *e.g.*, *Bjorkedal*, 516 F.3d at 732,  *Johnston*, 241 F.3d at 632-33, the Court does not believe

it would be appropriate to conclude that an entity that does not exercise any authority or control

over the management of a plan, still becomes a plan fiduciary under this provision.

Even leaving aside Plaintiff's self-contradictory assertions regarding whether the Letters

implicated plan management, evidence that a service provider sent a notice to certain plan

participants, alerting them to a change in their status, is not alone sufficient to establish that the

service provider undertook discretionary acts related to plan management.  In accordance with

the plain language of the statute, courts have imposed fiduciary status on a service provider

under the first clause of § 1002(21)(A)(i) only in circumstances where the service provider has

evidenced actual discretionary control or authority over the management of the ERISA plan,

i.e., instances when the service provider has made independent decisions regarding plan

coverage or the allocation of the plan's investments.[12]  *See*, *e.g.*, *Harold Ives Trucking Co. v.*

---

[12]  The transmission of information about the likely future of plan benefits to plan
participants may be included in the scope of fiduciary duties of a named fiduciary.  *See Varity
Corp. v. Howe*, 516 U.S. 489, 502-03 (1996) (holding that a named fiduciary has "such powers
as are necessary or appropriate for the carrying out of the purposes of the [plan]") (quoting 3 A.
Scott & W. Fratcher, *Law of Trusts* § 186 (4th ed. 1988)).  However, the existence of such
communications alone is not a basis on which a court could conclude that a service provider
functioned as a fiduciary.  Where it is the actions of a service provider, rather than a named
fiduciary, that are at issue, it must also be established that the service provider undertook actions
that involved discretionary authority or control that is related to the management of the plan.

*Spradley & Coker, Inc.*, 178 F.3d 523, 526 (8th Cir. 1999) (holding that a third-party administrator exercised discretionary authority and became an ERISA fiduciary when it made benefit determinations and interpreted the ERISA plan); *Martin*, 965 F.2d at 669 (finding that accountants who recommended transactions, structured financial deals, and gave investment advice for an ERISA plan were ERISA fiduciaries).  Here, the Letters themselves do not communicate information regarding benefits under the various ERISA plans, but merely provide notice that the status of the plan participants' accounts must be adjusted because of their change in employment.  To ascertain if Defendants were communicating with the plan participants regarding their future benefits under the plan participant's particular plan, the Court would be required to investigate each of the phone conversations between the plan participants and the Principal employees–a task which presents a daunting number of individualized inquires.

Moreover, even in situations where a service provider asserts that it has sent communications on behalf of a plan, the Court must inquire whether the communications were ministerial, rather than discretionary–that is–whether the communications were "within a framework of policies, interpretations, rules, practices and procedures made by other persons." *Kerns*, 992 F.2d at 218.  Despite deposition testimony from one Principal employee that the Letters were not "official notifications," Defendants assert that the Letters were part of the framework of some of the ERISA plans.  Tr. at 94 (Defendants' counsel: "I would point out that in many instances, although I concede again this [isn't] in the record, we can put it in if you want, in many instances it's in cooperation with the employer that the letters are sent out.  There is that level of knowledge and consent by the plan trustee.").  Indeed, there is evidence in the

record suggesting that at least one of the employer plan sponsors viewed the Letters as a part of

the services they expected Defendants to provide.[13]  *See* Pl.'s App., Ex. 121 at 2 (Letter from

ERISA plan sponsor/employer, stating:  "One of the main reasons Principal was chosen as the

new service provider was because of the automatic notification Principal provides to terminated

participants.").  Hence, to evaluate whether the Letters were indeed discretionary, rather than

communications within a framework of policies, the Court would have to assess Principal's

contractual arrangements with the various employers/plan participants to assess whether the use

of the Letter was, in fact, outside of the Principal's duties under any particular plan.  *See*

*Ruppert v. Principal Life Ins. Co.*, 252 F.R.D. 488, 499 (S.D. Iowa 2008) (noting that

"[plaintiff's] argument that [defendant's] use of templates as part of its business model is

insufficient, from an evidentiary standpoint" and finding that "defendant's fiduciary status, to

the extent it exists, 'entails a functional, and thus subjective, analysis' and would have to be

determined on a plan-by-plan basis, as would any breach of that status") (quoting *In re Express*

*Scripts, Inc. PBM Litig.*, No. 4:05-MD-01672, 2008 WL 2952787, at *18 (E.D. Mo. July 30,

2008)).  The relevant service agreements are not in the record, making a preliminary analysis

impossible.  However, the number of relevant ERISA plans the Court would be required review

is likely in the thousands, and this intensive individualized analysis would provide an additional

---

[13]   The Court does not construe Defendants' negative answer to an interrogatory during
discovery, which asked whether any plan document or service agreement gave them the
authority to send false or misleading communications to plan participants, as an admission.  *See*
Pl.'s App., Ex. 162.  Given the vague and accusatory framing of the question, it is unsurprising
that Defendants replied that they did not send false or misleading communications to plan
participants.  This response hardly forecloses the possibility that at least some of the service
agreements envisioned that Defendants would send plan participants letters regarding the status
of their accounts, including letters notifying them of changes to their account upon separation
from their employer.

impediment to class certification. *See* Pl.'s App., Ex. 89 at 6 (Defendants' response to

interrogatory No. 4, which states: "Principal Life Insurance Company provided services to

more than 52,000 plans during the relevant time period."); *see also Ruppert*, 252 F.R.D. at 499

(holding that class certification was inappropriate because the proposed class involved

thousands of plans and "[t]o address the fiduciary duty owed to each plan, the Court must

conduct an individualized review of each contract and interpret, as a matter of law, the parties'

*entire* agreement").

The Court is not persuaded by Plaintiff's argument that a 2000 e-mail from a Principal

in-house attorney demonstrates that Defendants exercised discretionary control respecting the

management of the ERISA plans. Pl.'s App., Ex. 55 at 4. In that e-mail, the Principal attorney

wrote:

> I haven't had time to research this at all but, based solely on the description you've
> provided, it appears to me that this may boil down to a differential in how we're
> treating certain participants leaving plans for which we provide services that may
> or may not obligate certain participants leaving plans for which we provide services
> that may or may not obligate us as a fiduciary, even for limited purposes, and so the
> question is whether that differential amounts to an actionable discrimination (or
> raises any other legal issues, not only under ERISA but also other applicable law).
> My preliminary conclusion would be that, so long as we have fulfilled completely
> all of our contractual obligations to these participants and the plans in which they've
> participated, *the asset retention efforts you're asking about would fall outside our
> range of duties, and thus would be within our range of discretion with regard to the
> kinds of efforts we might take to retain assets.* In summary, we cannot short change
> plans or participants on services they've contracted with us to provide, but we
> should be at liberty to tailor our other contacts with those same participants with
> regard to asset retention as we see fit.

*Id.* (emphasis added).

Plaintiff places great emphasis on the use of the word "discretion" in the 2000 internal e-

mail. Pl.'s Class Cert. Br. at 9 ("Principal itself understood in 2000 that it would be exercising

discretion with respect to plan management in its asset retention campaign."); Tr. at 23-25. But the Court does not agree with Plaintiff's contention that the e-mail shows that Defendants were exercising discretion with respect to the management of the employer-sponsored ERISA plans. The e-mail is one communication amongst a string of e-mails between employees within Principal Connection and other Principal employees, including members of Principal's legal department. *See generally* Pl.'s Ex. 55. In reading the e-mail string in its entirety, it is evident that the Principal Connection employees sought advice regarding the legality of developing different approaches in Principal's asset retention efforts with respect to 401(k) accounts with less than $5,000.00, as compared to similar accounts containing more than $5,000.00. *Id.* Neither the specific e-mail highlighted by Plaintiff, nor the e-mail string as a whole, suggest that any of the Principal employees believed that Principal was stepping into the shoes of an ERISA fiduciary by sending out the notice Letters, or by employing an asset retention scheme in general. Instead, the discussed concern was the scope of options that Defendants were required to provide to account holders who were considering a rollover when their 401(k) accounts contained less than $5,000.00. *Id.* at 5. The question which prompted the use of the term "discretion" in the highlighted e-mail was not whether Defendants were undertaking decisions respecting the management of the employer sponsored ERISA plans, but rather, whether the differential treatment of accounts within an ERISA plan was permissible under the terms of Principal's contractual arrangement with the various employer/plan administrators. Indeed, other e-mails in the string highlight the fact that the options available to the 401(k) plan participants would depend on the elections made by the plan sponsors. *Id.* at 2-3. As a whole, the e-mails indicate that Principal believed that the asset retention efforts were not an act of

discretionary ERISA plan management.

The Court is also unpersuaded by Plaintiff's expert testimony.  Johnson concludes that Defendants were functional fiduciaries because they were "not engaged in providing administrative services under a framework of policies developed outside of Principal."  Johnson Decl. at 9.  Johnson also relies on the 2000 e-mail, highlighting the use of the word "discretion," and stating that "[t]his is a classic case of a party acting as a functional fiduciary." *Id.* at 10.  The Court has considered these arguments and found them unpersuasive for the reasons articulated above.  The Court finds that Johnson's discussion of ERISA fiduciary status was cursory at best, misleading at worst, and adds nothing substantive to Plaintiff's arguments.

Finally, contrary to Plaintiff's suggestion, the fact that Principal had access to and used plan confidential information in its mailings does not support a conclusion that Principal exercised discretionary authority or control respecting management of the plans when it used that information.  While it may be improper under certain circumstances for a service provider to use confidential information for its own benefit, such an act is not a basis to conclude that the service provider is a fiduciary for the purposes of ERISA.[14]

---

[14]  In the introduction to Plaintiff's Brief in Support of her Motion for Class Certification, she briefly suggests that several other factors support a conclusion that Defendants are functional fiduciaries.  Pl.'s Class Cert. Br. at 3 ("Defendants became functional fiduciaries because they unilaterally accessed confidential plan information; authored and sent deceptive "Forced Call Letters" to each Class member; the letters all contained the same omissions and misrepresentations; no call in response to the letters corrected those deceptions; and all Class members bought Defendants' financial products with assets from their ERISA-protected retirement plan accounts." (footnotes omitted)).  Plaintiff does not provide any argument in support of her suggestion that omissions or misrepresentations and the class members' subsequent reliance on those omissions or misrepresentations bear on fiduciary status.  In addition, she fails to refute Defendants' argument that the assertions are not tied to ERISA's definition of "fiduciary."  *See* Defs.' Resp. Br. at 17 n.5.  The Court agrees that none of the additional facts asserted in the introduction to Plaintiff's Brief, but not expounded upon in

In conclusion, the evidence before the Court in the present motion for class certification suggests that Defendants undertook efforts to persuade plan participants who had left employment with the ERISA plan sponsors to retain their funds under Defendants' administration.  While such efforts may have had an effect on the employers' 401(k) plans, the evidence does not show that the efforts involved exercises of discretionary control or discretionary authority respecting the management of the ERISA plans.  The Court concludes that Plaintiff has failed to make a prime facie showing that Defendants exercised discretionary authority or discretionary control respecting management of the ERISA plans.

      b.   *Authority or control respecting management or disposition of a plan's assets.*

Plaintiff's fourth theory regarding ERISA fiduciary status is premised on the second clause of § 1002(21)(A)(i):  "a person is a fiduciary with respect to a plan to the extent (i) he . . . exercises any authority or control respecting management or disposition of its assets."  Plaintiff suggests that the Court could conclude that Defendants are functional fiduciaries through common evidence based on Plaintiff's contention that Defendants "took control of [the participants'] assets by misleading them and inducing them to call [Principal's call center]."  Pl.'s Class Cert. Br. at 12.

--------------------------------------------------

Plaintiff's argument, provide a basis to conclude that a service provider is a fiduciary.  The Court further notes that all of the listed assertions seem directed at the question of whether Defendants breached a fiduciary duty, rather than at the issue of fiduciary status.  In constructing her argument in this manner, Plaintiff essentially asks the Court to omit the threshold inquiry into fiduciary status before proceeding to consider if circumstances supporting a breach of fiduciary duty are present.  As the Supreme Court has made clear, such an analytical approach would be incorrect:  "[T]he threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) . . . ."  *Pegram*, 530 U.S. at 226.

Defendants again dispute Plaintiff's interpretation of ERISA law and counter that any inquiry into whether Defendants acted as functional fiduciaries would require individualized inquiries.  Defendants argue that "control" of the disposition of plan assets under § 1002(21)(A)(i) must be literal control and that "the mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status."  Defs.' Resp. Br. at 12 (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) and quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998)). Defendants assert that an assessment of whether a service provider had "control" over plan assets on a classwide basis will require individualized inquiries into whether each participant had the "final say" in their decision to roll over the funds in his or her 401(k) accounts into a Principal IRA.

In reply, Plaintiff disputes Defendants' characterization of the law and argues that she is not required to show that Defendants had the "final say" regarding the disposition of plan assets, but rather, that she need only show that Defendants influenced plan participants' decisions regarding the disposition of the plan assets.  Plaintiff also argues that because plan participants' decisions were not informed of Defendants' interest/motive, the plan participants were not in "control" of their decisions.

With respect to the second clause of § 1002(21)(A)(i), the Eighth Circuit has stated that it "imposes fiduciary duties . . .  whenever one deals with plan assets," noting that this "reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another."  *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994).  However, after a review of the specific facts of that case and subsequent decisions by the Eighth Circuit,

the Court does not believe that this statement can be read as broadly as Plaintiff suggests.

In *FirsTier*, the bank that was held to be a fiduciary, was a named trustee with significant responsibilities under the trustee agreement, including the authority and direction "to hold, manage, invest, and account for all plan assets." *Id.* at 911. The *FirsTier* bank held the plan's assets on behalf of the plan, managed the disputed loans, and transferred the plan assets at issue to the company's president. *Id.* While the language of *FirsTier* could be read quite broadly, in a decision later that same year, the Eighth Circuit revisited its analysis in *FirsTier* and observed that the basis of the *FirsTier* holding turned on the scope of the bank's trustee responsibilities under the plan. *Maniace*, 40 F.3d at 268 ("Trustee responsibilities in that case were significant, with the bank being 'authorized and directed to hold, manage, invest, and account for all plan assets.' Under those circumstances we concluded that the ERISA section defining duties of directed trustees 'modifies, but . . . does not eliminate the trustee's fiduciary duty when handling plan assets.'" (quoting *FirsTier*, 16 F.3d at 911)). The Eighth Circuit distinguished the facts in *Maniace,* on the ground that the defendant bank in *Maniace* had "no discretion nor control over the plan assets" at issue, and held that the defendant bank "d[id] not fit within the ERISA definition of a fiduciary." *Id.* Thus, an entity must have some discretion or control over the plan assets at issue in order to qualify as a fiduciary under the second clause of § 1002(21)(A)(i). Indeed, other Circuits have reached similar conclusions that fiduciary liability does not attach whenever third party service providers come into contact with ERISA plan assets. *See*, *e.g.*, *Bd. of Trustees of Bricklayers & Allied Craftsmen Local 6 of NJ Welfare Fund v. Wettlin Assoc., Inc.*, 237 F.3d 270, 275 (3d Cir. 2001) ("We are inclined to agree that ERISA does not consider as a fiduciary an entity such as a bank when it does no more than

receive deposits from a benefit fund on which the fund can draw checks."); *CSA 401(k) Plan v. Pension Prof'ls, Inc.*, 195 F.3d 1135, 1138-40 (9th Cir. 1999) (holding that because there was no showing that the defendant 401(k) administrator exercised actual control or discretionary authority over the Plan itself, it could not be deemed a fiduciary with respect to funds embezzled from the plan); *Beddall*, 137 F.3d at 20 ("[M]echanical administrative responsibilities (such as retaining the assets and keeping a record of their value) are insufficient to ground a claim of fiduciary status.") (citations omitted); *Reich v. Lancaster*, 55 F.3d 1034, 1047 (5th Cir. 1995) ("We recognize, of course, that '[a]n entity which assumes discretionary authority or control over plan assets will not be considered a fiduciary if that discretion is sufficiently limited by a pre-existing framework of policies, practices and procedures.'" (quoting *Useden v. Acker*, 947 F.2d 1563, 1575 (11th Cir. 1991)).

Nonetheless, Plaintiff asks the Court to conclude that Defendants' actions as service providers give rise to fiduciary responsibilities because they used their influence to persuade plan participants to make certain investment decisions with their portions of the plan assets. The Court does not believe such a broad application of the second clause of § 1002(21)(A)(i) is warranted.  Plaintiff has failed to identify a single case in which a defendant, who did not have actual control over the plan assets at issue, was held to be a fiduciary under the "plan asset" clause of 1002(21)(A)(i).  Indeed, the cases in which the Eighth Circuit has found fiduciary obligations arising from a third party service provider's control over plan assets has involved a situation in which the entity had actual control over the assets at issue.  *See FirsTier*, 16 F.3d at 911 (holding that a bank that held the plan's funds and made loans from the plan's assets functioned as a fiduciary when handling plan assets); *Olson*, 957 F.2d at 624 (holding that an

account broker exercised discretionary control over the pension plans when he sold portions of the plan's investments without permission from the trustees).  Other circuits have, likewise, only imposed fiduciary status under the "plan asset" clause when the defendant had actual control over the assets.  *See*, *e.g.*, *Srein v. Frankford Trust Co.*, 323 F.3d at 221 (holding that the defendant, who had possession of the assets, exercised "'control' (if not 'authority') respecting the 'disposition of [the plaintiff's] assets'"); *Yeseta*, 837 F.2d at 386 (holding that a corporate officer who withdrew plan funds for the company's benefit was a fiduciary).  Thus, the Court concludes that functional fiduciary status pursuant to § 1002(21)(A)'s "plan assets" clause must involve actual control over the assets at issue, and therefore, cannot be based solely on an ambiguous degree of influence over another person who retains control over the assets.[15]

Plaintiff does not offer any evidence that Defendants ever had actual control over the decision to roll over the 401(k) assets.  Indeed, Plaintiff's own deposition testimony describes how her assets remained within her employer's 401(k) plan until she elected to roll over the

---

[15]  This conclusion is bolstered by the Eighth Circuit's most recent discussion of the scope of the second clause of § 1002(21)(A)(i).  In *Bjorkedal*, in which the Circuit considered whether the defendant exercised "authority over plan assets," it stated:

> ERISA imposes a fiduciary duty under subsection (i) only "to the extent [the fiduciary] exercises any *discretionary* authority," § 1002(21)(A)(i).  As noted, subsection (i) imposes fiduciary obligations on individuals who are not named as fiduciaries but nonetheless *exercise actual authority over plan assets*.  Because this subsection imposes a fiduciary duty on those not named as a fiduciary, *its reach is limited to circumstances where the individual actually exercises some authority*.

*Id.* at 733 (emphasis added).  Thus, to be a fiduciary under the second clause of § 1002(21)(A)(i) with regard to "authority over plan assets," a defendant must have both actual and discretionary authority over plan assets.  Application of a similar analysis with regard to "control over plan assets," the theory asserted by Plaintiff in the present case, would suggest that a service provider must have actual and discretionary control over plan assets to become an ERISA fiduciary under the second clause of § 1002(21)(A)(i)

assets into an IRA.  *See* Defs.' App., Ex. I at 57; *see also* Defs.' App., Exs. L, K.  Thus, upon

initial evaluation, the common evidence suggests that the individual plan participants, rather

than Defendants, maintained actual control over the disposition of the plan assets.  Plaintiff

suggests, however, that the Court can infer from the following facts that Defendants were

exercising "control" over the plan assets on a classwide basis:  the Defendants' use of the

Letters, the fact that on numerous occasions rollovers occurred after a follow-up phone call,

Defendants' putative success in its asset retention efforts, and the fact that the plan participants

were not informed of Defendants' interest in encouraging rollovers.  The Court disagrees that

such an inference is justified.  None of this evidence, alone or in combination, indicates that

Defendants took away the plan participants' control over their portion of the plan assets.

Instead, the Court agrees with Defendants that a more nuanced examination of the facts of each

plan participant's particular situation would be required to prove Plaintiff's allegation.  To

determine if Defendants did indeed coopt the decision-making process to the extent they had

"control" over the funds, it would be necessary to examine the specifics of the interactions

between each putative class member and Defendants' representatives to determine how the

individual decisions regarding the disposition of the assets were made.  These numerous

individualized inquiries would significantly impede classwide treatment of this case.

  c.  *Rendering investment advice*.

   Plaintiff's fifth, and final, theory regarding Defendants' status as functional fiduciaries is

that she can show through common evidence that Defendants rendered investment advice to

plan participants who called in response to the Letters, i.e., the class members.  Plaintiff asserts

that "Principal undeniably sought to retain control of those assets when they retired or

separated, and positioned itself through its Forced Call Letter scheme to become the primary

source of investment advice for those participants who called them in response to the letters."

Pl.'s Class Cert. Br. at 13.  Defendants counter that the facts as argued by Plaintiff would

require participant-by-participant inquiries into what was said in each phone call, as well as

what other information each participant used for his or her investment decision.

Section 1002(21)(A)(ii) provides that "a person is a fiduciary with respect to a plan to

the extent . . . he renders investment advice for a fee or other compensation, direct or indirect,

with respect to any moneys or other property of such plan, or has any authority or responsibility

to do so."  The DOL has promulgated 29 C.F.R. § 2510.3-21(c) defining "fiduciary" with

respect to "investment advice" for the purposes of § 1002(21)(A)(ii) in the following terms:

> A person shall be deemed to be rendering "investment advice" to an employee
> benefit plan, . . . only if:
>
> (i) Such person renders advice to the plan as to the value of securities or other
> property, or makes recommendation as to the advisability of investing in, purchasing,
> or selling securities or other property; and
>
> (ii) Such person either directly or indirectly . . .
>
> (A) Has discretionary authority or control, whether or not pursuant to agreement,
> arrangement or understanding, with respect to purchasing or selling securities or
> other property for the plan; or
>
> (B) Renders any advice . . . on a regular basis to the plan pursuant to a mutual
> agreement, arrangement or understanding, written or otherwise, between such person
> and the plan or a fiduciary with respect to the plan, that such services will serve as
> a primary basis for investment decisions with respect to plan assets, and that such
> person will render individualized investment advice to the plan based on the
> particular needs of the plan . . . .

Leaving aside the question of whether Plaintiff can demonstrate with common evidence

the 29 C.F.R. § 2510.3-21(c)(i) requirement that Defendants gave "advice to the plan as to the

value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property," the Court finds that Plaintiff has failed to adduce common evidence for a prima facie showing that she could meet the requirements of 29 C.F.R. § 2510.3-21(c)(ii).  When the Eighth Circuit considered the question of whether an account broker at an investment firm was a functional fiduciary by way of rendering investment advice in *Olson*, it provided a detailed analysis of 29 C.F.R. § 2510.3-21(c)(ii)(A) and (ii)(B).  957 F.2d at 625-26.  The Circuit found that "part (ii)(A) essentially describes all people described by part one of § 1002(21)(A) (people exercising discretionary authority) and part three of § 1002(21)(A) (people who have been granted discretionary authority)," despite the clear redundancy with "subsections one or three of the statute even if they did not render investment advice."  *Id*. at 626, 626 n.4.  The Court has already extensively discussed § 1002(21)(A)(i), concluding that Plaintiff has failed to offer common evidence that demonstrates a prima facie case that Defendants exercised discretionary authority or control respecting the management of the plan or its assets, and Plaintiff does not assert that § 1002(21)(A)(iii) applies to Defendants.  Accordingly, Plaintiff has failed to make a showing that Defendants qualify as fiduciaries for rendering investment advice under 29 C.F.R. § 2510.3-21(c)(ii)(A).  This leaves 29 C.F.R. § 2510.3-21(c)(ii)(B) as the sole basis for establishing a prima facie showing of Defendants' fiduciary status.

The *Olson* court held that "[p]art (ii)(B) is to be applied by first determining 'whether under the regulation there existed a mutual agreement or understanding between the parties that [the defendant's] advice would be the primary basis for the [plan participants'] investment decisions.'"  957 F.2d at 626 (quoting *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884

F.2d 288, 293 (7th Cir. 1989)).  The Eighth Circuit agreed with the Seventh Circuit's

assessment that "this issue 'is comparable to the corresponding 'meeting of the minds'

component of contract cases'" and that "'[w]hether a meeting of minds exists is an issue for the

trier of fact.'"  *Id.* (quoting *Farm King Supply*, 884 F.2d at 293 n.6).

 Plaintiff asserts that the mutual agreement is evidenced by the language in the Letters:

"we are committed to providing you with accurate, timely information so you can make

informed decisions regarding your retirement savings following your change in employment."

Tr. at 20.  Plaintiff construes this statement as a promise on Defendants' part and asserts that the

plan participants' acceptance was their call to the Principal call center.  *Id.*  In addition, Plaintiff

argues that Defendants positioned themselves as the "primary basis" of any putative class

member's investment decision by sending the Letters.  Tr. at 104.

 The Court does not agree that these facts, standing alone, evidence a mutual agreement

that any advice given by Principal employee's would be the primary basis for each of the plan

participants who responded to the Letters by calling the Principal call center.  Instead, the Court

believes that if the case proceeded under this theory as a class action, it would have to inquire

further into the individual interactions between the plan participants and the employees at the

Principal call center to determine:  (1) whether a mutual agreement was formed between each of

the plan participants and Defendants that the plan participants would use any investment advice

delivered during the phone calls, and (2) whether any investment advice delivered during the

phone calls was the primary basis for any one of the plan participant's investment decisions.  In

addition, the Court would also have to investigate all interactions between the plan participants

and Defendants to determine if any investment advice that may have been given was made "on

a regular basis."

Because Plaintiff has not provided the Court with evidence common to the class that makes a prima facie showing that Defendants became fiduciaries, the Court finds that individual issues predominate over common questions of fiduciary status.  On this basis alone, the Court concludes that class certification is precluded under Rule 23(b)(3).

2.   *Do individualized issues regarding ill-gotten profits and causation predominate?*

In addition to the issue of fiduciary status, the parties dispute whether any inquiry into causation and damages will require individualized inquiries that would preclude class certification.  Plaintiff seeks monetary damages in the form of disgorgement of Defendants' "ill-gotten gains."  Pl.'s Class Cert. Br. at 15.  The Eighth Circuit has set forth a three-step analysis for evaluating ERISA breach of fiduciary duty claims which seek monetary damages, regardless of whether the damages are compensatory or restitutionary.  *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) (citing *Martin*, 965 F.2d at 971).  "[O]nce the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty."  *Martin*, 965 F.2d at 971; *cf. Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 905 (8th Cir. 2002) ("To recover, plaintiffs must prove a breach of this fiduciary duty and loss to the Plan.").  In accordance with the framework set forth by the Eighth Circuit, the Court first addresses whether Plaintiff has made a prima facie showing of "ill-gotten gains" with evidence common to the class.

a.   *Is there common evidence regarding ill-gotten profits?*

-38-

Plaintiff's only remaining ERISA claim proceeds under § 1132(a)(3), the "catchall" provision that "authorizes lawsuits for individualized equitable relief for breach of fiduciary obligations.[16] *Varity Corp.*, 516 U.S. at 490.  Plaintiff seeks "disgorgement to the Plaintiff and Class members of the profits Defendants made by their breaches of fiduciary duties . . . ." Am. Compl. at 32, ¶ F.  Plaintiff's Amended Complaint suggests that Defendants increased their profits by persuading Plaintiff and other putative class members to purchase Principal's J-shares mutual fund because the expenses for J-shares were greater than the expenses attached to the 401(k) plans.  *Id.* ¶¶ 38, 51, 56.  Plaintiff's Brief in Support of her Motion for Class Certification does not lay forth how the disgorgement would be calculated, asserting only that all the information exists in Defendants' databases and that computations could be readily

_____

[16]  Plaintiff's Amended Complaint also sought "restitution to compensate Plaintiff and Class members for the benefits of which they have been deprived," *id.* at 32, ¶ D, and "restitution to the Plaintiff and Class members of the fees, costs, and expenses Defendant charged them after Plaintiff and Class members rolled over their retirement accounts . . . minus the amount Defendants would have charged them as fees, costs, and expenses for administering their plan accounts had they stayed in those plans," *id.* at 32, ¶ E.  As set forth in the Court's April 21, 2008 Order on Motion to Dismiss, Plaintiff is not entitled to compensation for legal remedies under § 1132(a)(3). Clerk's No. 42 at 22-24 (citing *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 943 (8th Cir. 1999) (noting that § 1132(a)(3) remedies are "limited to classic equitable remedies such as injunctive, restitutionary, or mandamus relief and [do] not extend to compensatory damages").  Since the requested restitution is a legal remedy, instead of an equitable remedy, it is unavailable in this case.  *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002) ("Whether restitution is legal or equitable depends upon the basis for the plaintiff's claim and the nature of the remedies sought. . . . [F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."); *Halbach v. Great-West Life & Annuity Ins. Co.*, 561 F.3d 872, 883 (8th Cir. 2009) (holding that the plaintiffs' sought-after remedy, including the recovery of "ill-gotten gains" in the form of the difference between the premium rate paid by certain employees and the higher rate paid by the plaintiffs, was precluded because it was legal relief rather than equitable).  Additionally, since Plaintiff does not argue for other equitable remedies, the Court does not speculate about the appropriateness of class certification with respect to other equitable remedies.

accomplished through formulaic calculations.  Pl.'s Class Cert. Br. at 15-16.

Defendants dispute Plaintiff's conclusory assertion regarding disgorgement, arguing that the Court would have to engage in individualized inquires to determine whether Defendants were unjustly enriched with respect to any particular rollover, and if so, by how much. Defendants dispute Plaintiff's claims that Defendants consistently made more profits when plan participants moved their funds from a 401(k) account to a Principal IRA, pointing to deposition testimony from Dean Schmitz ("Schmitz"), an Assistant Director of Sales in the Principal Connection office, and a declaration by Tracy Bollin ("Bollin"), a Financial Controller for Principal Funds.  *See* Defs.' Br. at 22- 23 (citing Defs.' App., Exs. A, H); *see also* Defs.' App., Ex. D.

In reply, Plaintiff asserts that "[s]ince the rollovers are the culmination of the breaches in this case, all fees and revenues received by Principal subsequent to the rollovers are . . . the ill-gotten profits the Plaintiff seeks to have Principal disgorge."  Pl.'s Reply at 12; *see also id.* at 14 (suggesting that disgorgement can be calculated by tabulating the fees charged by Defendants to each class member for the seven years of the class period).  She argues that "[t]he profits Defendants would have made absent the breach are wholly irrelevant and no individualized inquiry is required to determine what they would have been."  *Id.*

In Defendants' Surreply, they assert that the "plaintiff's approach improperly includes as part of a theoretical disgorgement remedy even gains that defendants would have realized had none of the challenged conduct occurred."  Defs.' Surreply at 1.  Defendants distinguishes between agency and ERISA law, arguing that legitimate profits should be offset against any disgorgement award under § 1132(a)(3).  *Id.* at 2-4.

-40-

The Court finds that neither party's theory of disgorgement of profits fully aligns with Eighth Circuit precedent.  In *Parke v. First Reliance Standard Life Insurance Co.*, the Eighth Circuit discussed in detail the meaning of disgorgement of profits under ERISA § 1132(a)(3):

> It is undisputed that an accounting for profits–the remedy that allows for the disgorgement of profits awarded by the district court–is a type of relief that was typically available in equity and therefore is appropriate under § 1132(a)(3)(B).  *See Knudson*, 534 U.S. at 214 n.2 [] (describing accounting for profits as "a form of equitable restitution").
>
> . . .
>
> An accounting for profits is one of a category of traditionally restitutionary remedies in equity, and is often invoked in conjunction with a constructive trust.  A constructive trust is imposed when a defendant has possession of particular funds or property that in good conscience belong to the plaintiff.  1 Dan B. Dobbs, *Law of Remedies* § 4.3(1), at 587 (2d ed. 1993).  The plaintiff must specifically identify the particular funds or property in order to obtain the constructive trust; it is not enough that the defendant merely owes the plaintiff some money.  *Id.* § 4.3(2), at 589-91; *Knudson*, 534 U.S. at 214 & n.2 [].  An accounting is imposed when the property subject to the constructive trust produces profits while in the defendant's possession.  The defendant is forced to disgorge those profits, although it is not necessary for the plaintiff to identify any particular *res* or fund of money holding the profits.  *See* 1 Dobbs § 4.3(1), at 588 ("Unlike the [constructive] trust, however, accounting does not seek any particular *res* or fund of money; the defendant will be forced to yield up profits, but the defendant can pay from any monies he might have, not some special account.").
>
> . . .
>
> Under traditional rules of equity, a defendant who owes a fiduciary duty to a plaintiff may be forced to disgorge any profits made by breaching that duty, even if the defendant's breach was simply a failure to perform its obligations under a contract.  *See* 1 Dobbs § 4.3(5), at 611 n.16 ("If the 'breacher' [of a contract] also breaches a fiduciary duty, . . . the breacher-fiduciary may be made to disgorge his profits from the wrong. . . .  The important ingredient added by the fiduciary status, however, is not that status in itself; what is added is wrongdoing as distinct from contract breach."); *see also Valdes v. Larrinaga*, 233 U.S. 705, 709 [] (1914) (holding that a "proper case for equitable relief" existed where the defendant breached a fiduciary duty to the plaintiff by failing to pay money owing under the contract).

368 F.3d 999, 1008-09 (8th Cir. 2004).

In *Parke*, the Circuit held that in the particular context of withheld benefits under ERISA, interest was an appropriate measure of profits because a defendant "'gains' from the

wrongful withholding of [a] plaintiff's benefits even if the plaintiff does not prove specific

financial profit.  In particular, the defendant receives a benefit from having control over the

money." *Id.* at 1009.  However, *Parke* is distinguishable from other cases in which there was

no gain to the fiduciary for a breach of fiduciary duty.  For example, in *Kerr v. Charles F.*

*Vatterott & Co.*, the Circuit held that when there was a delay in transferring 401(k) funds,

monetary relief such as prejudgement interest was not available as an equitable remedy under §

1132(a)(3) because the plan administrator did not profit by retaining possession of the funds in

the 401(k) account.  184 F.3d 938, 945 (8th Cir. 1999).  All earnings that the individual account

generated was credited to the account, and the plaintiff eventually received the account's

earnings, therefore, no one was unjustly enriched by the delay.  *Id.*  Both *Parke* and *Kerr* show

that a plaintiff seeking disgorgement of profits under § ERISA 1132(a)(3) must show that the

defendant derived a monetary benefit from its possession of the ERISA plan assets at issue.  *Id.*;

*see also Martin*, 965 F.2d at 971 (placing the burden on a plaintiff to show loss or ill-gotten

profit to the fiduciary in an ERISA breach of fiduciary duty claim); *Wsol v. Fiduciary Mgmt.*

*Assoc., Inc.*, 266 F.3d 654, 656 (7th Cir. 2001) (observing that "plaintiffs cannot prevail unless

the breach of fiduciary duty either imposed a loss on the plan or generated a profit for [the

defendant] 'through use of assets of the plan' by [the defendant]" and that "if no losses are

incurred or profits obtained that differ from what they would have been had there been no

breach of fiduciary duty, there is no remedy").  Plaintiff need not show the exact value of the

Defendants' alleged ill-gotten profits, but at this stage of litigation, she must make a prima facie

showing that Defendants profited on a classwide basis from their possession of the plan

participants' assets.  *See Parke*, 368 F.3d at 1009 (allowing interest as equitable remedy where

plaintiff showed that the defendant profited from the breach even though it was not possible to identify the particular *res* or fund of money holding the profits).

Defendants have offered evidence that counter Plaintiff's allegation of classwide profits. When asked about Defendants' profits during his deposition, Schmitz did not agree that Defendants' profits for IRAs were generally higher than 401(k) accounts. Defs.' App., Ex. H at 173-74; 198-99.  He stated that the fees charged to people who stay in their employer's 401(k) plan depended on the specific plan.  *Id.*   More importantly, in her declaration, Bollin states that she looked at a sample of plan participants who rolled over their 401(k) funds in 2009, comparing the money collected by Principal companies from the J-shares accounts versus the money that would have been collected had they left their retirement funds in their former employers' retirement plans.  Defs.' App., Ex. A ¶ 4.  She found Principal companies received less money from twelve of the seventeen persons after they rolled over the funds in their 401(k) accounts into J-shares.  *Id.* ¶ 12.  She also attested that she knows of no computer program or database that can currently make these comparisons and that the manual comparisons were time-consuming.  *Id.* ¶ 5.

Plaintiff does not provide evidence that would support her allegation that Defendants profited on a classwide basis from the asset retention scheme.  Instead, she argues that Defendants forfeit all right to compensation for services once there has been a breach of fiduciary duty.  The Court disagrees with this formulation of agency and ERISA law.  While it is true that, under agency law, an agent is liable to disgorge the full amount of a property, including profits, to a principal where the agent acts adversely to the principal, without any offset for compensation to the agent, this rule is applicable only where it has first been

established that the agent has acquired property in breach of trust.  *See* Restatement (Second) of Agency § 403 cmts. a-c (1958).  Plaintiff's proposition would side-step the fundamental inquiry for a disgorgement of profits remedy:  whether Defendants profited from the breach.  Moreover, the Supreme Court and the Eighth Circuit have held that equitable remedies under ERISA § 1132(a)(3) do not include damages that seek to impose personal liability on a defendant, but instead are restricted to remedies that would restore to the plaintiff particular funds or property in the defendant's possession and to recover profits produced by the defendant's use of a particular property.  *Id.* at 213-24; *Halbach*, 561 F.3d at 883; *cf. Parke*, 368 F.3d at 1008-09.  To allow Plaintiff and the class members to recover all fees and revenues received by Principal subsequent to the rollovers, without any consideration of whether those revenues constituted profits, would be a punitive remedy measured by the plan participant's alleged losses.  As such, it is not a remedy available under ERISA § 1132(a)(3).

Plaintiff also makes a policy argument, asserting that Defendants seek to eliminate ERISA's equitable remedies for breach of fiduciary duty.  This argument misses its mark.  As the Supreme Court clearly stated in *Knudson* when it established the bounds of equitable remedies available under ERISA § 1132(a)(3), "vague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text regarding the specific issue under consideration."  1534 U.S. at 220 (quoting *Mertens*, 508 U.S. at 261).  Moreover, the merits of Plaintiff's case is not before the Court in the present motion.  It may be that further adjudication of the facts relating to Plaintiff's claim will demonstrate that disgorgement is a proper remedy for Plaintiff.  At present, however, the question before the Court is whether common issues regarding the existence of ill-gotten profits predominate over individual questions such that the

predominance requirement of Rule 23(b) is satisfied.

In sum, there is no common evidence that Defendants have received additional profits from the rollovers.  With respect to the fees charged by Defendants, the evidence in the record does not show that Defendants generally profited from a rollover, but instead, suggests that the fees received by Defendants after the rollovers were sometimes less than the fees that Defendants received when plan participants left their funds in the employer sponsored 401(k) accounts.  Thus, to identify the existence of profits across the class, the Court would have to inquire into the workings and fee structures of the various employer sponsored ERISA plans and make comparisons to the various individual investments chosen by the plan participants after the rollovers.  Such inquiries would involve extensive individualized inquiries, presenting an additional impediment to predominance.

> b.  *Do individualized issues regarding causation/reliance predominate?*

Assuming that Plaintiff could show fiduciary status and ill-gotten profits with common evidence, Plaintiff correctly notes in her Reply Brief that "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty."  Pl.'s Class Cert. Br. at 16 (citing *Martin*, 965 F.2d at 971); *see Harley v. Minn. Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 905 (D. Minn. 1999) ("*Martin* and its progeny provide that, in an ERISA breach of fiduciary duty case, the defendant bears the burden on the issue of causation once the plaintiff proves a breach and provides evidence of a loss to the plan.").  Plaintiff argues that causation is not an impediment to class certification because it can be presumed and proven on a classwide basis.  Plaintiff asserts that causation in the present case is properly characterized as reliance since she claims that the Letters contained uniform omissions

and misrepresentations,[17] and that the class members relied on the Letters when calling

Principal's call center.  She notes that the misrepresentations and omissions continued during

the phone calls, and implies that the misrepresentations and omissions were material to the plan

participants' decisions to roll over funds from their 401(k)s to other Principal managed assets.

Pl.'s Reply at 17 ("[I]f Principal itself– not its attorneys talking today– really thought a

'significant percentage' of '60 and 75 percent' of participants in plans it serviced would have

rolled over anyway, why did it spend tens of millions of dollars and years developing and

perfecting and celebrating the success of its Forced Call Letter?").

    Defendants do not dispute Plaintiff's assertion that the Letters were intended to induce

calls from the plan participants.  However, Defendants argue that the evidence offered by

Plaintiff is not sufficient to show that each of the plan participants that called Principal's call

center relied on the alleged omissions and misrepresentations when they made their decisions to

roll over their 401(k) assets into IRAs.  Defendants assert that many participants may have

treated their 401(k) assets the same regardless of any influence from Defendants.[18]

---

[17] It is not wholly obvious that Plaintiff has made a prima facie showing that these
communications contained misrepresentations and omissions.  For example, Plaintiff's assertion
that Principal misrepresented the services provided by the Principal call center is seemingly
contradicted by the disclaimer contained in each Letter, stating "Financial professionals are sales
representatives for the members of the Principal Financial Group®.  Except under certain
circumstances they do not represent, offer, or compare products and services of other financial
services organizations."  Pl.'s App., Ex. 2.  Nonetheless, for the purposes of the discussion in
this section, the Court presumes that Plaintiff has made the requisite prima facie showing
regarding the existence of misrepresentations and omissions.

[18] Defendants' argument regarding causation focuses on Plaintiff's inability to show that
the Letters are causally connected to each class members' decision to take money out of their
employers' plans.  Defendants extend this logic in their arguments regarding disgorgement,
suggesting that Plaintiff cannot establish with evidence common to the class that Defendants
profited because of the omissions and misrepresentations.  Defs.' Response Br. at 23 ("[T]he

The Eighth Circuit has not developed a standard specific to ERISA misrepresentation and omission claims, but it is clear that causation is a necessary element of an ERISA breach of fiduciary duty action. *Roth*, 61 F.3d at 605 (finding evidence in the record that the loss was causally connected to the alleged breach of fiduciary duty); *see also Kamler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672, 681 (7th Cir. 2002) ("Finally, although not explicitly indicated by the prior caselaw, the plaintiff must allege that the breach of fiduciary duty caused some harm to him or her that can be remedied."); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir. 1999) (noting that a plaintiff alleging fiduciary breach under ERISA based on misrepresentations or omissions must prove a resulting harm)). Where a plaintiff asserts that his or her damages resulted from a defendant's misrepresentations and material omissions, reliance is generally required to demonstrate causation. *See*, *e.g.*, *In re St. Jude Med., Inc.*, 522 F.3d at 840 (noting that a defendant in a consumer protection, negligent misrepresentation case, has a right "to present evidence negating a plaintiff's direct or circumstantial showing of causation and reliance"); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 551 (8th Cir. 2008) (requiring a showing of reliance in a securities fraud claim based on misrepresentations); *Tootle v. ARINC, Inc.*, 222 F.R.D. 88, 96 (D. Md. 2004) (noting that when a plaintiff relies primarily on alleged omissions rather than misrepresentations, the ERISA breach of fiduciary claim "also should require some showing of causation or detrimental reliance . . . ." (citing *Willett v. Blue Cross & Blue Shield of*

---

amount of any potential disgorgement varies from transaction to transaction because it depends on the unique investment choices of each participant– choices that in turn affect how much Defendants earn both while the participant is invested in a 401(k) plan and while invested in a Principal IRA." (citing Bollin Decl. ¶¶ 5, 7-8, 11, 13)).

*Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992)); *see also* Restatement (Second) of Torts § 548A

(1977) ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from

action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to

result from the reliance.").  Indeed, the Eighth Circuit has recognized that an ERISA breach of

fiduciary duty claim that hinges on some representation by the defendant requires proof of

reasonable and detrimental reliance.[19]  *Brant v. Principal Life & Disability Ins. Co.*, No.

02-2036NI, 2002 WL 31477623, at *2 (8th Cir. Nov. 7, 2002) (citing *Daniels v. Thomas &

Betts Corp.*, 263 F.3d 66, 73 (3d Cir. 2001)).  A plaintiff asserting detrimental reliance must

also show that the misrepresentations or omissions were material.[20]  *See Ince v. Aetna Health*

---

[19]  Several Courts of Appeals have articulated multi-element standards for cases in which
a plaintiff seeks to recover on a duty to inform, misrepresentation or omission claim under
ERISA:  (1) an ERISA fiduciary acting as a fiduciary made a misrepresentation, (2) the
misrepresentation was material, and (3) the plaintiff reasonably relied on the misrepresentation
to his detriment.  *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. &
Research Found.*, 334 F.3d 365, 385 (3d Cir. 2003); *see also In re Unisys Corp. Retiree Med.
Ben. ERISA Litig.*, 57 F.3d 1255, 1262 (3d Cir. 1995) (quoting *Bixler v. Cent. Pa. Teamsters
Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1994) ("[T]he fiduciary's duty to inform 'entails
not only a negative duty not to misinform, but also an affirmative duty to inform when the
trustee knows that silence might be harmful.'"); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d
439, 449 (6th Cir. 2002) ("To establish a claim for breach of fiduciary duty based on alleged
misrepresentations concerning coverage under an employee benefit plan, a plaintiff must show:
(1) that the defendant was acting in a fiduciary capacity when it made the challenged
representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff
relied on those misrepresentations to [his or her] detriment.").

[20]  Plaintiff seeks to import the *Affiliated Ute* doctrine from the securities fraud context
for the purposes of imposing a presumption of reliance.  Pl.'s Class Cert. Br. at 19.  The
framework for a securities fraud claim in which the *Affiliated Ute* doctrine is applied bears
significant similarities to the existing ERISA standard, i.e., both may be applied where plaintiff
alleges reliance on a material omission, and the burden of disproving causation/reliance is placed
on a defendant in both.  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128,
153-154 (1972) (imposing a rebuttable presumption of reliance in a private action under Section
10(b) of the Securities Exchange Act of 1934, alleging the use of deceptive devices in
connection with the purchase or sale of any security, if an investor shows that there is an

*Mgmt., Inc.*, 173 F.3d 672, 676 (8th Cir. 1999) (noting that the plaintiffs failed to present

evidence of materiality, detrimental reliance, or damage to support their ERISA claim based on

allegedly fraudulent misrepresentations); *Wilson v. Sw. Bell Tele. Co.*, 55 F.3d 399, 405 (8th

Cir. 1995) ("An ERISA fiduciary has a duty to avoid making *material* misrepresentations to

plan beneficiaries, and individual plan beneficiaries have a right of action under ERISA to claim

equitable relief for a breach of that duty." (emphasis added)).

      Here, the core of Plaintiff's reliance argument is that she and other class members relied

on Defendants' misrepresentations and omissions and, as a result, rolled over the funds in their

401(k) accounts to Principal IRAs, causing damage to the class members and profits for

---

omission of a material fact by one with a duty to disclose); *see also Basic Inc. v. Levinson*, 485
U.S. 224, 247 (1988) ("Because most publicly available information is reflected in market price,
an investor's reliance on any public material misrepresentations, therefore, may be presumed for
purposes of a Rule 10b-5 action."); *Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1328-29 (8th
Cir. 1991) ("The inference [that causation will be inferred if the withheld information was
material] is not conclusive; rather, it creates a rebuttable presumption of transaction causation.").
However, there are also several aspects of the *Affiliated Ute* doctrine which differ from an
ERISA breach of fiduciary duty claim, i.e., *Martin* does not presume loss or ill-gotten profits, as
is implicit in any Rule 10b-5 action, but rather requires that plaintiff make a showing of loss or
ill-gotten profits, and the *Affiliated Ute* doctrine does not apply where the defendant made a
misrepresentation rather than a omission, whereas *Martin* is applicable to all ERISA breach of
fiduciary duty claims. *Compare Schaaf*, 517 F.3d at 552 ("[T]he courts presume transaction
causation when an investor buys or sells stock at a price set by a liquid market in reliance on the
integrity of that price.") *and Vervaecke v. Chiles, Heider & Co., Inc.*, 578 F.2d 713, 717 (8th Cir.
1978) ("[I]n affirmative misrepresentation cases there is no need to presume reliance; the lack of
barriers to proof permits the compensatory and deterrent purposes to be adequately served by
testing causation directly.") *with Martin*, 965 F.2d at 971 (establishing the burden-shifting
framework for ERISA breach of fiduciary duty claims that requires a plaintiff make an initial
showing of breach and loss or ill-gotten profits). Because the components of the *Affiliated Ute*
doctrine that Plaintiff seeks to import into this ERISA case are already present in the Eighth
Circuit's ERISA law, the Court does not further delve into the issue of *Affiliated Ute*'s
applicability to ERISA cases, but rather proceeds with its analysis under the ERISA standard as
set forth by the Eighth Circuit.

Defendants.[21] The alleged misrepresentations and omissions in the Letters were:  the

representation that the Letters were "official notifications," the represented purpose of the letter,

the represented need for the phone calls, the represented name and type of the Principal office,

the omitted information regarding the qualifications/job titles of the Principal personnel who

would be responding to the phone calls and the incentives to those personnel to sell proprietary

products.  *See* Pl.'s Class Cert. Br. at 17-18.  According to Plaintiff, these alleged

misrepresentations and omissions continued during the calls.  *Id.*

    Defendants have offered evidence suggesting that it is common for 401(k) plan

participants to roll over the funds from their former employer's 401(k) plans when they retire or

change jobs, and that the rate of rollovers at Principal aligns with rollover rates across the

industry.[22]  *See* Defs.' App., Ex. M.   In addition, the Court finds that it is important that the

information in the Letters, including the alleged material misrepresentations and omissions,

---

[21]  Plaintiff in her Reply Brief presents several attacks on Defendants' arguments regarding causation which seemingly have no relation to the substantive issue of whether there is evidence common to the class that provides a causal link between the alleged breach and ill-gotten profits.  Pl.'s Reply at 18 ("Fifth, the issue of reliance in this case is exactly why Plaintiff sought the independent analysis of one of the nation's foremost class certification experts, to forthrightly address that manageability issue.  And it was his opinion to the Court that this issue is one which will not provide any manageability issues or defeat class certification.  Sixth, since this is a 23(b)(3) suit, the Court could allow class members to opt out if they don't mind being lied to and deceived by Principal.").  The Court does not address these tangential assertions.

[22]  Plaintiff attacks the Defendants' expert report regarding the investment choices of departing employees on the ground that the expert considered data pertaining to people outside Plaintiff's proposed class, but she does not offer any evidence that contradicts the general trends described in the report.  While the Court does not place great importance on this expert report, especially in comparison to the evidence contained in the transcripts from the individual phone calls, it nonetheless thinks that the generalized phenomena of plan participants deciding to roll over their 401(k) funds, regardless of whether they receive a Letter from Defendants, carries some weight in rebutting a presumption of causation.

does not directly bear on the plan participants' investment options or other benefits under the

plan.  While the Letters certainly prompted a call by many plan participants, there was no

substantive information in the Letters regarding the 401(k) accounts except the strong

implication that the plan participant should call Principal.  Cumulatively, the common evidence

does not show that the alleged misrepresentations and omissions were uniformly material to the

plan participants' decisions to roll over the funds in their 401(k) accounts.  Most importantly,

Defendants have provided a sample of transcripts from telephone calls to the Principal call

center.  The sampled conversations varied extensively, and it appears that several of the plan

participants placed only minimal importance on the information in the Letters and on the

information provided by the Principal employees when making their investment decisions.  *See*

*generally* Defs.' App., Ex. N.  Thus, the evidence offered for each individual plan participant

regarding their reliance on the Letters and any misrepresentations and omissions that continued

through the phone calls differs, strongly suggesting that the Court would have to engage in

extensive individualized inquiries regarding causation if this case proceeded as a class action.

Indeed, courts commonly conclude that where a defendant makes a showing that it would

present evidence concerning the reliance or non-reliance of individual class members on alleged

omissions or representations, the resolution of the defendant's potential liability to each plaintiff

would be dominated by individual issues of causation and reliance.  *See*, *e.g.*, *In re St. Jude*

*Med., Inc.*, 522 F.3d at 840 (finding that individual issues of reliance dominate common issues,

precluding certification under Rule 23(b)(3), in a state consumer protection claim based on

misrepresentations); *Heffner v. Blue Cross & Blue Shield of Ala.*, 443 F.3d 1330, 1344-45 (11th

Cir. 2006) (holding that class certification was inappropriate because the ERISA breach of

fiduciary duty claim would require each class member to show that he or she relied on the "no deductible" term when purchasing their prescription drugs); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th Cir. 2004) (noting that "[t]he misrepresentations standing alone have little legal significance" and "individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis"); *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 125 (2d Cir. 1997) (determining the materiality of misrepresentations or omissions is fact-specific and will turn on a number of factors, i.e., the information that was misrepresented, the nature of the relationship of trust between the fiduciary and the beneficiary, whether the beneficiary was aware of other information tending to minimize the importance of the misrepresentation); *Owen v. Regence Bluecross Blueshield of Utah*, 388 F. Supp. 2d 1335, 1341 (D. Utah 2005) (concluding that class certification was inappropriate in an ERISA action because individualized determination of causation or reliance on the health insurer's alleged material omission would be required); *Tootle*, 222 F.R.D. at 96 (denying class certification because the element of detrimental reliance required individualized proof of claims for breach of fiduciary duty based on material misrepresentations and omissions allegedly made by the defendants for the purpose of convincing employees to convert to a particular plan).

Thus, the Court is not persuaded that the evidence common to the class as offered by Plaintiff, that is, the uniform omissions and misrepresentations in the Letters and the fact that the omissions and misrepresentations were never corrected in later communications between the plan participants and the Principal employees supports a prima facie conclusion that the class members relied on Defendants' Letters and the information conveyed in the phone calls when they decided to roll over the funds in their 401(k) accounts to Principal products.  As there is no

other common evidence making a prima facie showing of a causal connection between the

alleged breaches and any alleged ill-gotten profits, but extensive individualized information

regarding detrimental reliance, the Court concludes that Plaintiff has not met her burden to

show that common issue predominate over individual ones in the requisite causation inquiry.

### C. Rule 23(b)(3) Requirement–Superiority

Rule 23(b)(3) sets forth four factors to apply in determining if a class action is the

superior method for adjudicating a controversy:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Plaintiff argues that all factors favor certification, while Defendants argue that the need

for case-by-case determinations prevents a conclusion that a class approach is superior to

individual litigation.  The Court agrees with Defendants.  As discussed above, adjudication of

Plaintiff's claim on a classwide basis would require inquiry into whether Defendants had a

fiduciary relationship with each of the class members, whether Defendants received ill-gotten

profits from each of the rollovers, and whether the alleged misrepresentations and omissions

can be causally linked to each class member's decision to roll over the funds in her or his

401(k) account.  These individualized inquiries would significantly impede management of this

case as a class action.  The Court concludes that class treatment in the present case is not

superior to individual litigation.

### IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Strike Expert Reports and

Testimony of Robert H. Klonoff and Mark Johnson (Clerk's No. 91) in GRANTED IN PART

and DENIED IN PART.  Plaintiff's Motion for Class Certification (Clerk's No. 85) in

DENIED.

IT IS SO ORDERED.

Dated this ___24th___ day of March, 2010.

ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT