# EXHIBIT 1

Sent by: 800 779 0079          8007790079;          29/11/05  5:20PM; JetFax #390; Page 4



**FIA**
Service and Expense Agreement

This Agreement is made by and between the undersigned Plan Representative ("you", "your") and the undersigned member company of the Principal Financial Group® ("we", "us", "our"). You and we are the "Parties" to this Agreement. Each of the Parties may be referred to separately as a "Party".

This Agreement consists of this page and the following pages. The following pages are incorporated in, and made a part of, this Agreement for all purposes. This Agreement also includes any subsequent Disclosure. By signing this page, the Parties agree to all the terms of this Agreement and to be bound by any and all parts of it as if the Parties had signed at the end.

Capitalized terms used in this Agreement will have the meanings set out in the "Glossary" below unless a different meaning is plainly required by context.

Each of the Parties represents and warrants that it has the authority to enter into this Agreement and will be bound by it. Each individual signing this Agreement represents and warrants that she or he has, individually or together with any other persons signing this Agreement on behalf of the same Party, the authority to sign this Agreement and make it binding on the Parties.

This Agreement sets out the entire understanding of the Parties on the matters covered in the Agreement. It supersedes and cancels any and all prior agreements, understandings, or representations between the Parties, whether written or oral, relating to these matters. Nothing in this Agreement will be taken as amending, modifying, or waiving any terms and conditions of any Investment. Nonetheless, the Parties agree that while this Agreement will serve as the basis for the relationship set out in this Agreement, that relationship will include the course of dealing between the Parties. The practices and procedures arising in that course of dealing will be considered a part of this Agreement and enforceable as if included in it.

**C and J Management Corporation**
**(Plan Representative)**

By: _____

Title: _____

Date Signed: _11- 2- 5_

**Principal Life Insurance Company**
**(Member Company of the Principal**
**Financial Group)**

By: _____

Title: Chairman, President and CEO

State in which signed by Plan
Representative ("State") _IOWA_

Please sign and return entire document

Page 1 of 22

09/04

200512051346MC1M701363$1129339-015$239-1

Sent by: 800 779 0079                    8007790079;            29/11/05  5:20PM; JetFax #390; Page 5

# DOCUMENT CONTENTS

Services - General .................................................................................. Article I

    Administrative Services  
    Government Compliance & Filing Services  
    Consulting Services  
    Optional Services  
    Asset Holding Services

Fee Payment Summary ............................................................................ Article II

General Provisions ................................................................................. Article III

Glossary ................................................................................................ Article IV

Dispute Resolution ................................................................................. Article V

09/04

FD200511291622EM7905333040732PPCOS&ED7D0918

200512051346MC1M701363$1129339-015$239-1

# ARTICLE I – SERVICES

The Services you select for the Plan may fall into the following general categories.

- Administrative Services
- Government Compliance and Filing Services
- Consulting Services
- Optional Services
- Asset Holding Services

The services outlined on the following pages are basic services. If you would like additional services, please contact us for a supplemental service agreement.

We rely on you to give us the information that we need to provide the Services. Your cooperation is important to our acting timely and accurately. We will not be obligated to perform any Services if we do not receive timely, accurate, and complete information. We will not be liable with regard to any performance, failure to perform, or partial performance of, Services when we are acting based on late, incomplete, or inaccurate information. Where possible we will Notify you via the Sponsor Service Center Internet site and Message Center. Please note that not all Services will be available to all plans.

Our goal is to provide you with outstanding service. We are so sure we can provide it promptly and accurately that we guarantee it. If you are unhappy with a specific Service we provided, just tell us. We promise to fix the problem to your satisfaction. If we are unable to do so, we will waive the Fee for that Service. This will not, however, apply to situations where the problem resulted from our receipt of late, incomplete, or inaccurate information.

09/04

FD#2005111F91622D#39#5333000732PFCDS#ETP200P18

200512051346MC1M701363$1129339-015$239-1

# ADMINISTRATIVE SERVICES

| Service We Offer | Your Role and Election |
|---|---|
| **Access to information for your financial professional(s) via the Principal eFinancial Professional™ website located on www.principal.com.**<br><br>**Basic service assumes:**<br>Access to Plan-level Information only. | Allow your financial professional(s) access to timely information regarding your Plan.<br><br>**Optional Elections\*:**<br>☐ Also grant financial professional(s) access to Participant-level Information.<br>☐ Do not grant financial professional(s) access to Plan-level Information or Participant-level Information.<br><br>Future access for your financial professional(s) can be modified via the Manage Security tab on the Principal Sponsor Service Center™. |
| *Directions,* a Guide to Retirement Plan Operations to assist with daily operation of the Plan. | Use the guide to help with the day-to-day activities of your Plan. Included are administrative forms as required by the Plan Document, the IRC and ERISA. |
| **Electronic Services** are used to facilitate the fastest, most accurate, and cost effective communication and access to information, including daily updated values for each Account.<br><br>These Services include:<br>• TeleTouch® (interactive voice response system)<br>• The Principal Retirement Service Center® (Internet)<br>• Electronic data reporting<br>• Electronic Funds Transfer (EFT) | Use electronic services provided to report and obtain Plan information. You must oblige Participants to transfer Investments or change Investment elections electronically as allowed by the Plan. |
| **Electronic Enrollment Services** are provided to employees with regard to the Plan. | Your employees can enroll in the Plan using the Internet or the phone. All you need to do is provide basic employee data electronically. |
| **Location Recordkeeping Services** provided for more than one employee group or location (if applicable). Basic service is all communication handled through <u>one</u> location. | Provide Participant location information and changes.<br><br>**Optional Election\*:**<br>☐ Provide location recordkeeping where communication is handled through multiple locations. |

\*Additional Fees may apply for Optional Elections selected.

09/04

200512051346MC1M701363$1129339-015$239-1

## ADMINISTRATIVE SERVICES (cont.)

| Service We Offer | Your Role and Election |
|---|---|
| **Monitor Plan Requirements** such as minimum required distributions, beneficiary designations and vesting records. | Complete data collection requests in a timely manner. |
| **Participant Distributions and Withdrawals** and periodic payments to inactive Participants are provided. We will act as paying agent for distributions authorized by you under the Plan, including payment of small lump sum amounts to the Participant or into an IRA for the Participant, based on Plan Document provisions and applicable law. Our responsibility includes preparing all required federal income tax reporting and withholding Services with respect to distributions from the Plan.<br><br>Basic service assumes small amounts benefits are paid without your further consent. | Timely inform us of Participant employment, termination or retirement.<br><br>**Optional Election*:**<br>☐ Your signature is required to pay any benefit. |
| **Participant Loan Recordkeeping Services** if the Plan allows loans. Plan loans are initiated through The Principal Retirement Service Center or TeleTouch. Repayments are received via payroll deduction. | **Optional Election*:**<br>Loan initiation method:<br>☐ eSignature<br>☐ Paper |
| **Personal Retirement Account (PRA)** maintains funds for inactive Participants under your Plan. We communicate directly with these Participants.<br><br>Basic service assumes that PRA is utilized and benefits are paid without your further consent. | **Optional Election*:**<br>☐ Your signature is required to pay any benefit. |
| **Plan Sponsor Communications** to help you make informed decisions on Investment and retirement plan issues. | Use to stay informed on the latest Investment and retirement plan issues. |

*Additional Fees may apply for Optional Elections selected.

Page 5 of 22

09/04

Sent by: 800 779 0079            8007790079;            29/11/05  5:21PM; JetFax_#390; Page 9/25

## ADMINISTRATIVE SERVICES  (cont.)

| Service We Offer | Your Role and Election |
|---|---|
| **Plan Sponsor and Participant Statements** summarize Plan activity for the period covered. Statements will be mailed as soon as possible. <br><br>Basic service assumes statements are prepared quarterly and mailed to Participants' homes unless otherwise requested. | Report Participant contributions, vesting, enrollment and benefit event information to use accurately and timely. <br><br>**Optional Elections\*:** Statement frequency\*\*: <br>☒ Semi-annually <br>☐ Annually <br>☐ Monthly <br><br>Send reports to: <br>☒ You in bulk <br>☐ You in individual envelopes <br><br>\*\*If Principal Investor Funds (PIF) or Access Funds are used by your Plan, statement frequency cannot be less than quarterly. |
| **Qualified Domestic Relations Order (QDRO)** provides assistance with respect to QDRO determination by providing tools such as: <br>• Checklist for determining the status of a Domestic Relations Order (DRO) <br>• Standard letters that can be used to communicate with Participants and alternative payees. | Timely inform us of the receipt of a DRO. Notify affected Participants and potential alternate payee(s) that the DRO was received and advise them of the procedures for determining the qualified status of DRO. Make determination concerning the qualified status of DRO. Notify Participant and potential alternate payee(s) of the determination. <br><br>Enhanced QDRO Services are available under Optional Services. |

\*Additional Fees may apply for Optional Elections selected.

09/04

FD200511291622Cd190533300073#FGDS#DP200P18

200512051346MC1M701363$1129339-015$239-1

Sent by: 800 779 0079          8007790079;          29/11/05  5:21PM;JetFax_#390;Page 10/25

## GOVERNMENT COMPLIANCE & FILING SERVICES

| Service We Offer | Your Role and Election |
|---|---|
| **Annual Government Report** Form 5500 and attachments, ready for your review and approval, are prepared and mailed to you with respect to the Plan, if required. Our standard Form 5500 Annual Report Package is provided to Plans with 100 or more Participants and contains the information an auditor needs to complete a comprehensive audit. Additional Plan audit services beyond our standard package can be provided for an additional charge. A supplemental agreement is required for additional services. | Complete and return a Form 5500 questionnaire each year by the date requested. File completed Form 5500 and attachments with the IRS. |
| **ERISA §404(c) Compliance** information is provided to help you control fiduciary liability. | Educate Participants on their Investment options. Give Investment control to Plan Participants. |
| **Minimum Coverage Determination** calculation is performed by an annual ratio percentage test and results are included on the Annual Form 5500. | Complete and return census questionnaire by the date requested. |
| **Qualification Package** is prepared for those clients using a custom Plan Document. After you file the forms, we will assist you in obtaining a favorable determination letter from the Internal Revenue Service with respect to the qualified status of the Plan, if applicable. | File the Application for Determination Form with your IRS key district office. Notify us of any changes needed to your Plan Document. |
| **Testing Services** performed if applicable to the Plan. Reports summarizing the results of such tests are furnished to you. Tests include: <br><br> • §401(k)/(m) Nondiscrimination Determination, if applicable. We notify you of results, and calculate and process refunds if necessary. <br> • §415 Limit Determination. If a Participant exceeds the limit, we will work with you to determine the appropriate correction method. <br> • §416 Top-Heavy Determination. This includes calculation of minimum top-heavy contribution, if necessary. | Complete and return the test data collection information by the date requested. <br><br> **401(k)/(m) Nondiscrimination Determination:** Perform test(s) at plan year end and ___ <br><br> **Optional Elections*:** <br> ☒ Perform test(s) at plan year-end only. <br> ☐ Test(s) are not applicable or no test(s) are desired. <br> ☐ Also perform test(s) on: <br> _____ and _____ |

*Additional Fees may apply for Optional Elections selected.

09/04

FD#200511291622EM19053330007132PFGDSMEXP700P18

200512051346MC1M701363$1129339-015$239-1

## CONSULTING SERVICES

| Service We Offer | Your Role and Election |
|---|---|
| **Documentation Services** are provided including a sample Plan Document and copy of a summary plan description for your review and that of your legal adviser. These samples can be provided in either paper or electronic format** for your review. Subsequent requests for changes to the documents including a customized summary plan description may result in additional charges.<br><br>**Receiving a final summary plan description for distribution to Participants is currently only available in an electronic format with Principal Life Insurance Company- sponsored 401(k) prototype Plan Documents. | Communicate the Plan provisions that meet your employees' needs.<br><br>**Optional Elections*:**<br>☐ Do not prepare Plan Document<br>☐ Prepare customized summary plan description**<br>☐ Do not prepare summary plan description<br>☐ Prepare paper summary plan description** |
| **Plan Design Consultation** is offered providing proposals and recommendations to assist you in meeting your retirement plan goals. | Communicate the retirement goals and objectives of you and your Plan Participants. |
| **Review Transfer Plan Documentation** for compliance with current legislation and regulations and make recommendations for any amendments. | Provide copies of complete prior Plan Document for review. |

*Additional Fees may apply for Optional Elections selected.

09/04

FD200511291622DM905333000732PFGDSEIF200P18

200512051346MC1M701363$1129339-015$239-1

# OPTIONAL SERVICES

These Optional Services may require a supplemental service agreement and additional Fees may apply. Fees for Optional Services are subject to the Fee Payment Summary as stated herein.

| Service We Offer | Your Election |
|---|---|
| Step Ahead is an option that allows Participants to elect to have their elective deferral contributions increased automatically. We will provide forms for Participants to elect this. If a Participant elects this Service, we will send the Participant an initial confirmation letter of that election and an annual notice reminding them of their decision. | **Optional Election\*:**<br>☐ Provide election forms to Participants and automatically increase their elective deferral contributions each year, as each Participant elects. |
| On-site Enrollment Services provided by our benefits counselors, for each location with 200 or more eligible employees. | **Optional Election\*:**<br>☐ Provide benefits counseling enrollment services |
| On-site Retirement Planning Seminars to help employees plan to reach their retirement goals. | **Optional Election\*:**<br>☐ Provide retirement planning seminars. |
| Special Compliance Testing for Internal Revenue Codes §§401(a)(4), 410(b), 414(s) and §403(b)(12) Nondiscrimination Determination, if applicable. Your Plan's design will dictate the need for this testing. | **Optional Election\*:**<br>☐ Provide special compliance testing. |
| Educational Media options are available to help promote and educate Participants on your Plan. | **Optional Election\*:**<br>☐ Provide enrollment media for Plan Participants. |
| Deposit Director provides five suggested investment mixes for new Deposits based on the Participant's risk profile. | **Optional Election\*:**<br>☐ Include the Deposit Director mixes on Participant enrollment form. |

200512051346MC1M701363$1129339-015$239-1

## OPTIONAL SERVICES (cont.)

| Service We Offer | Your Election |
|---|---|
| Enhanced QDRO Service provides consultative support following agreed upon guidelines for processing DROs. This service includes:<br>• Supported development of procedures, guidelines, and a Plan-specific checklist in order to facilitate processing and approval on behalf of the plan administrator.<br>• Model QDRO language provided<br>• Notification letters sent to affected Participant and potential alternate payee(s) upon receipt of DRO.<br>• Comprehensive review and evaluation of DRO pursuant to approved procedures and guidelines.<br>• Consultative services for Participants, and alternate payees, or their advisors, including communication to plan administrator regarding evaluation of DRO and recommended action.<br>• Required notifications to Participants and alternate payees sent by us. | Optional Election*:<br>☐ Provide the Enhanced QDRO Service. |

*Additional Fees may apply for Optional Elections selected.

09/04

FD200511291622Em90533300073PFGDSE2720910

200512051346MC1M701363$1129339-015$239-1

# ASSET HOLDING SERVICES

| Service We Offer | Your Election |
|---|---|
| **Directed Trust Services.** If the Plan utilizes a directed trust provided by Delaware Charter Guarantee & Trust Company, a Delaware corporation conducting business under the trade name of Principal Trust Company, ("Principal Trust") by signing this Agreement, you authorize and direct us to pay the Fees for such directed trust Services. | **Optional Election\*:**<br>☐ Provide Principal Trust directed trust Services.<br>☐ Other trust _____<br><br>Other trust services may be requested and agreed upon. If selected, additional charges may apply.<br><br>☐ Custodial services for company stock<br>☐ Other service _____<br><br>A $10 annual per Participant Fee for safekeeping loan documents (if applicable). |

Principal Trust may agree to perform supplemental services with regard to the Plan in addition to the Services described above under "Asset Holding Services". Principal Trust will be under no duty or obligation to perform supplemental services. No such duty is implied in this Agreement or any other agreement, nor may such be inferred. Performing supplemental services for or with regard to other plans, Participants in a plan, or any arrangement funding another plan will not obligate Principal Trust to agree to perform such Services for any Plan Entity. Any supplemental services will be set out in a written supplemental service agreement between you and Principal Trust. Fees for such services will be described in that agreement. Such Fees, if allowed by that agreement, may be paid as if they were Fees described in this Agreement.

**General.** Any service(s) provided by Principal Trust, and the Fees for such Services, may be modified or withdrawn at any time in accordance with either this Agreement or as set out under the directed trust, custodial, or supplementary service agreement(s) with Principal Trust, as applicable.

\*Additional Fees may apply for Optional Elections selected.

09/04

FDX200511291622DJT105333000132PFGDSMEIT2D0218

200512051346MC1M701363$1129339-015$239-1

Sent by: 800 779 0079                    8007790079;              29/11/05  5:23PM;JetFax_#390;Page 15/25

## ARTICLE II – FEE PAYMENT SUMMARY

This Agreement incorporates the terms of expense proposal no. 1563-86325532, which is incorporated into, and made a part of, this Agreement for all purposes.

The following describes the payment of Fees. Payment of fees or expenses set out in other agreements is not affected by this and such payments are in addition to the amounts set out below.

**Collection of Fees**

The following collection method will apply for the payment of Fees:

**Combination (Billed/Netted)** – A portion of the Fees is paid directly, as billed, and a portion will be netted from Accounts.

Amount to bill per deposit year $1,500.00 *(collected quarterly)*

*Participant Fees, if applicable, are automatically deducted from Participant Accounts unless the Optional Election is chosen.*

**Optional Elections:**

☒ Plan Forfeitures - forfeitures will be used to offset Plan expenses

  ☒ Combination (bill, remainder is net)

  ☐ Combination (net, remainder is bill)

  ☐ Combination (deduct, remainder is bill)

  ☐ Combination (bill, remainder is deducted)

☐ Participant Loans* - billed directly ($40.00 set-up Fee per loan/$8.00 per loan each quarter)

☐ Personal Retirement Account - billed directly to you ($25.00 per Participant)

*\*This does not include any Fee imposed by Principal Trust for the safekeeping of loan documents previously described.*

09/04

FD200511291622EM7905333000732PPFCDSMEXP200P18

200512051346MC1M701363$1129339-015$239-1

# ARTICLE III – GENERAL PROVISIONS

### 3.1     Engagement and Deposits

<u>Engagement</u>. You engage us to provide the Services. We accept that engagement.

<u>Making Deposits</u>. You will arrange for Deposits to be made. We will not do so. We have no obligation to collect any Deposits. We will not be required to inquire about the payment or amount of any Deposit.

<u>Treatment of Deposits</u>. All directions regarding the allocation and investment of Deposits that we receive in a Notice will be forwarded to the Funding Agent. If we receive incomplete Notice regarding the allocation or investment of all or any part of a Deposit, we will direct the Funding Agent to invest the portion of the Deposit for which we have no allocation directions in the Default Option. We will not give you or the relevant Participant a specific Announcement of any such actions taken due to incomplete Notice. The next periodic report of Account balances will serve as Notice of amounts received since the last periodic report.

### 3.2     Transfers

<u>Transfers</u>. If we receive Notice directing the liquidation of any Investment and the Transfer of the proceeds to a Successor or another Investment, we will forward that direction to the Funding Agent. This direction to liquidate an Investment and Transfer the proceeds cannot be reversed or altered. Any attempt to do so will not be considered a Notice.

*<u>Effect of Transfer</u>. We will provide a final accounting with regard to Transfers. This will show the Transfer and the effect of the Transfer on the relevant Account(s). We will not be responsible for providing any Services with regard to amounts Transferred to a Successor. The final accounting will be provided in a reasonable time period after Transfer to the Successor occurs.

### 3.3     Services

<u>Services</u>. We will provide Services in a timely manner while this Agreement is in force. This is subject to your fulfilling the role required of you with respect to each of those Services, our receipt of timely and correct data, and our receiving timely payment of Fees. If you propose timing for a Service other than our standard timing, you must give us at least 60 days prior Notice. We may, but are not obligated to, accept your proposed timing. If we do so, we will Announce our acceptance to you.

*<u>Records and Reports</u>. We will keep accurate, detailed records and make reports to the Plan or Participants and others as you direct in a Notice. Ninety days after we furnish those reports, we will be released and discharged from all liability concerning our performance with regard to this Agreement, as reflected by the reports. This will not apply to any performance as to which written objections have been filed with us within the 90-day period. The Parties agree to provide to each other, on a timely basis, such reports and records as the other may reasonably require in the performance of their respective obligations under this Agreement. This includes the orderly termination of this Agreement.

09/04

FBA20051129162200905333000732PFCOSMEIP2D0P18

200512051346MC1M701363$1129339-015$239-1

<u>Special Services</u>. From time to time, we may agree to provide services other than the Services specifically described in this document. These special services may require a supplemental agreement and additional fees, charges, or expenses, which will be paid either as set out in the supplemental agreement or will be treated as Fees.

### 3.4    Rights and Duties

*<u>Status</u>. Nothing in this Agreement, nor in the provision of Services, makes us a party to, or a fiduciary or administrator regarding, the Plan or any Plan Entity.

*<u>Limitation on Our Duties</u>. We will not be under any duty:

- to take any action with regard to any Plan Entity, unless we specifically agree in writing to do so,
- of inquiry into any Notice, communication, or other matter regarding any Plan Entity,
- to enforce any provision of the Plan or any trust or other arrangement funding the Plan,
- beyond a duty of ordinary care,
- to inquire about the status or performance of the Plan, any Plan Entity, or any Successor,
- to anticipate or initiate a compulsory distribution from the Plan, or
- to perform Services regarding any amounts that are not Deposits or their proceeds.

Our duties and performance under this Agreement do not give us knowledge of any underlying fault or problem with regard to the Plan or any Plan Entity.

*<u>Limitation on Our Liability</u>. Our performance under this Agreement is heavily dependent on information provided to us by Notice. We will not be responsible for any improper performance of, or failure to perform, any Service due, in whole or in part, to receipt of no, or incomplete or incorrect, data needed to perform that Service.

*<u>Right to Rely</u>. We may rely conclusively on any Notice we receive. We will not have any liability for any losses that may arise from the acts, omissions, delays, or inaction of any other person. We will not have any responsibility to any Plan Entity for the tax treatment of the Plan, any Participant, or any Transfer.

### 3.5    Compensation

*<u>Obligation to Pay Fees</u>. We are entitled to our Fees. Fees will be in the amount and collected as described in under "Fee Payment Summary". You represent that the method of Fee payment you elect is appropriate under the Plan Document and applicable law.

Billed Fees will be billed to the address you direct in a Notice. The billed Fees are due within 30 days of billing. If any Fee billed is not paid within 30 days of the billing for any reason, the amount of those unpaid Fees will be treated as deducted Fees and will be deducted accordingly.

Deducted Fees will be deducted pro-rata from the Accounts. The deduction within the Accounts will be pro-rata by the Investments. We are specifically authorized and directed to collect Fees in this manner.

09/04

FD200511291622DM905333000732PFGDSMITX200P18

200512051346MC1M701363$1129339-015$239-1

Fees that cannot be deducted from the Accounts under either the Plan Document or applicable law may only be billed. This includes Fees incurred in connection with what are considered to be settlor functions.

Fees include sales compensation that is payable to a duly licensed individual, as designated by you in the Acknowledgement of Compensation and Contract Information, with regard to the sale of any Investment. We are authorized and directed to pay that compensation. In the event of some change in circumstances under which payments can no longer be made to the licensed individual you agree to duly appoint another. We will assist you in this process.

Other Compensation. We may earn compensation in the form of short-term interest ("float") on things like uncashed distribution checks (from the date issued until the date cashed). We may also earn "float" on Deposits, loan payments, and other amounts awaiting investment, and on Transfers or distributions involving certain non-proprietary funds prior to processing. The "float" earns money market rates. "Float" is not directly credited to plans for which we provide Services. Deposits and Transfers are normally allocated and invested the same day or as soon as possible afterwards, however, there are certain situations where the allocation of these funds will take a longer period of time. Distribution checks are normally mailed the day they are issued. The timing of when checks are cashed is beyond our control.

*Other Fees. Our Fees may include supplemental amounts charged by us, in our sole discretion, if any part of a Service must be redone because of any incomplete or incorrect information provided to us by you or by a Participant. Any of the amounts described in this Section will be treated as Fees and paid as described above. We will pay from the Accounts, in the manner you direct in a Notice, other charges, or expenses that the Plan can pay under the Plan Document and applicable law.

## 3.6    Duration and Termination of Agreement

Duration of Agreement. This Agreement will remain in effect indefinitely. It will be fully binding on the Parties. It will also extend to their respective successors and assigns. This Agreement, may, however, be terminated by one of the Parties on at least 60 days prior written Notice to the other. If the Funding Agent is an affiliate of ours, termination of the Plan's relationship with the Funding Agent will also constitute Notice to us of termination of this Agreement. (The period between the Notice of, and the date for, termination of this Agreement will be referred to as the "termination period" below.)

Effect of Termination. During the termination period, we will:

- accept Notices regarding Transfers to the Successor, except for the last five days of the termination period,
- accept Deposits and Notices regarding the allocation of Deposits except for the last 10 days of the termination period,
- accept Notices regarding Transfers between Investments except for the last 10 days of the termination period, and
- cease to accept Notices regarding Transfers between Investments when it is not possible for the Investments described in such Notices, due to their operation or issues of timing or other restrictions of the documents governing such Investments, to be liquidated prior to the end of the termination period.

09/04

FD0200511291622DM9053330007322FFCDSMEIP2D0P18

200512051346MC1M701363$1129339-015$239-1

Sent by: 800 779 0079                 8007790079;        29/11/05  5:24PM;JetFax_#390;Page 19/25

We will direct the Funding Agent to convey all remaining Investments to the Successor at the end of the termination period.

We will provide to you a final report with regard to all Accounts as of the end of the termination period. We will not be obligated to make any further reports regarding the Plan or any portion of the Plan, except as described under "Records and Reports" above and "Cooperation" below.

\*<u>Cooperation</u>. The Parties agree to cooperate in all actions regarding the termination of this Agreement. The actions required to terminate this Agreement are to be completed as soon as possible. This cooperation will include the continued provision of information and reports between the Parties that is reasonably needed to affect the transfer of data and Investments necessary to end this Agreement and allow the Successor to perform its duties.

<u>Final Termination</u>. Except for paragraphs with underlined headings marked with asterisks, this Agreement will terminate at the end of the termination period. Paragraphs with underlined headings marked with asterisks will survive the termination of this Agreement.

### 3.7    Miscellaneous

<u>Assignment - Assets</u>. We understand that none of the Investments are to be subject to any kind of anticipation, alienation, sale, transfer, assignment, pledge, charge, or encumbrance. We will act accordingly in providing the Services. Neither this nor anything in this Agreement may be interpreted as impairing our ability to collect Fees.

<u>Assignment - Rights</u>. Neither this Agreement, nor any right, title, interest, or performance with regard to this Agreement may be alienated, assigned, anticipated, in any manner, without the express written agreement of both Parties. We may, however, assign our rights, duties, and obligations under this Agreement to an affiliate without anyone's agreement. We will Announce any such assignment to you.

<u>Amendment</u>. No variations, modifications, or amendments of this Agreement, or any term or condition, will be binding on either Party, unless made by:

- written agreement executed by both Parties, effective as agreed on,
- Notice from you to us of a change in the name of the Plan,
- 30-day advance Announcement to you of changes required by law, or
- Announcement:
    - of changes to Disclosure by posting such changes on our website, www.principal.com, effective on such posting,
    - regarding changes to this Agreement required by a Major Business Change, effective on the sending of the Announcement,
    - of changes to Fees, effective 60 calendar days after the giving of the Announcement,
    - describing changes by us to reflect our assignment of this Agreement to an affiliate, effective on the giving of such Announcement,
    - describing the changes made under "Enforceability and Severability" below, effective as set out in the Announcement, or
    - accepting a proposed timing for a Service under "Services" above, effective as set out in the Announcement.

09/04

FD20051129162200190533300013??FC0S4CD20P18

200512051346MC1M701363$1129339-015$239-1

This Agreement may be amended in accordance with this section at any time and without the approval of, or notification to, any other entities.

<u>Waiver</u>. It is understood and agreed that no failure or delay to exercise, nor any single or partial exercise of, any right, power, or privilege given or arising under this Agreement will operate as a waiver of future rights to exercise any such right, power, or privilege.

*<u>Construction</u>. This Agreement will be construed in accordance with the laws of the State. This Agreement will be construed as though jointly drafted by the Parties and according to the fair intent of the language as a whole and not for or against any Party. The term "including" (in its various forms) will be construed as providing examples only and as being without limitation. Nothing in this Agreement will be taken as amending, modifying, or waiving any terms and conditions of any agreement. We are only obligated to provide Services and nothing more. While we may, from time to time, agree to perform other or different actions or services with regard to the Plan or other Plans, we are under no obligation to do so. No such obligation is implied in this Agreement or by our performance, nor may any be inferred.

<u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which will be considered an original, but all of those counterparts will together constitute only one Agreement.

<u>Enforceability and Severability</u>. The determination that any provision of this Agreement is not enforceable in a particular jurisdiction will not affect the validity or enforceability of the remaining provisions generally, or in any other jurisdiction or as to any other entities not involved in that judgement. Such unenforceable provisions will be stricken or deemed modified in accordance with such determination and this Agreement, as so modified, will continue to be in force and effect.

*<u>Taxes</u>. Income taxes, taxes of any other kind, or fines or penalties may be directly or indirectly levied or assessed on, or with regard to, any Investment or any Plan Entity. These amounts are to be satisfied from the affected Accounts, to the extent allowed by law. Any such amounts will be treated as Fees and either be deducted or billed as if they were Fees.

*<u>Force Majeure</u>. We will incur no liability to you or any Plan Entity and will not be responsible for delivery or non-delivery or error in transmission of reports or Notices that is caused by third parties. We will also not be responsible for any delay in performance, or non-performance, of any obligation hereunder and for any loss to the extent that such delay in performance, or non-performance or such loss is due to forces beyond our reasonable control including delays, errors, or interruptions caused by third parties, any industrial, judicial, governmental, civil or military action, acts of terrorism, insurrection, or revolution, nuclear fusion, fission or radiation, failure or fluctuation in electrical power, heat, light, air conditioning, or telecommunications equipment, or acts of God.

<u>Fiduciary Statement</u>. Principal Life Insurance Company, as an investment manager, is a fiduciary with regard to the selection, monitoring and retention of the portfolio managers for its Separate Accounts. ERISA imposes on the plan administrator ongoing accountability for the selection and monitoring of those to whom specific fiduciary responsibilities have been delegated or on whom the plan administrator is depending for help in meeting its own fiduciary obligations.

Principal Life Insurance Company will hold harmless and indemnify the appropriate named fiduciary of the plan from claims by a plan participant sustained through judgment by a court of competent jurisdiction on grounds of the negligence of Principal Life in the selection, monitoring and retention of the portfolio managers for its Separate Accounts.

Page 17 of 22

09/04

<u>Implementation</u>.  The fiduciary obligation described in the immediately preceding paragraph arises independently of this Agreement.  It does not affect or relate to this Agreement.  It does not affect or relate to any duties, performance of the obligations of ours under this Agreement, in any way.  The indemnity is effective only if we receive timely Notice of a claim with regard to which indemnity is sought and your cooperation in responding to such claim.  For the purposes of this and the preceding paragraph, "Principal Life Insurance Company" will refer to us, "plan participant" will mean a Participant, and "Plan Sponsor" will mean the entity that has established and maintained the Plan, as defined in ERISA §3(16)(B).

<u>Partial Compulsory Distributions</u>.  If with regard to any partial compulsory distribution from a Plan (including a minimum required distribution) we do not receive Notice detailing what Investments to liquidate or what to do to provide such a partial compulsory distribution to the Participant, we will, and you authorize us to, direct the Plan Funding Agent to liquidate Investments pro rata, or as close as may be possible, in the relevant Account and invest the proceeds in shares of a money market mutual fund.  If we receive no Notice providing further details from you we will use our best efforts to pay the proceeds directly to the affected Participants and will be recompensed by you for any additional costs or expenses incurred in doing so.

09/04

FD200511291622DM1905333000732PFGDSMEXF200818

200512051346MC1M701363$1129339-015$239-1

## ARTICLE IV – GLOSSARY

"**Account**" means an individual account established under the Plan for a Participant.

"**Announcement**" means a communication from us to you or a Participant. An Announcement, except as otherwise required in this Agreement, may be written or in the form of electronic transmissions, facsimiles, or photocopies. An Announcement will be sufficient in whatever form we send it. We may also make Announcements to the sponsor of the Plan. Announcement will also include the term "Announce".

"**Default Option**" means the Principal Money Market Separate Account in situations where (i) we have not received Notice containing instructions regarding which Account(s) amounts such as Deposits are to be allocated and (ii) we are not able to determine what amounts are to be allocated to what Account.

If we have received Notice that allows us to determine what Account amounts such as Deposits are to allocated to, but we have not received Notice that allows us to determine what Investments to these amounts are to be allocated to, then the Default Option will be the Principal LifeTime Funds (either as an investment company or a separate account) established for use by people with a range of normal retirement dates that include Participant's normal retirement date.

If a Default Option is not available to the Plan or becomes unavailable, then the Default Option will be the money market option available to the Plan or, if there is no money market option, the most conservative option based on Morningstar stylebox factors.

"**Deposits**" means amounts forwarded by, or with regard to, the Plan to the Funding Agent as described in this Agreement and must be an electronic transfer of immediately available funds.

"**Disclosure**" means information regarding certain Investments. It is set out in "Disclosures".

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Fee**" means any amount due and payable to us under this Agreement.

"**Funding Agent**" means the trustee or other entity that can receive and hold plan assets, which has been retained to do so with regard to the Plan, and through which the Plan is funded. The Funding Agent either holds, or has made arrangements with others to hold, Investments on behalf of the Plan. The Funding Agent may be either Delaware Charter Guarantee & Trust Company, a Delaware corporation conducting business under the trade name of Principal Trust Company, or another entity, which we agree to treat as Funding Agent under this Agreement.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**Investment**" means (i) anything an Account may hold under the Plan Document and applicable law (ii) with respect to which we agree to provide Services.

"**Major Business Change**" means:

- a change in the structure or operations of either the Plan or an entity either that sponsors the Plan or employs Participants, if we determine the change would have a material impact on the structure, nature, or operations of the Plan, including changes to cash flow or investment operations or options, or

Page 19 of 22

09/04

FD2700511291622D0905333000732PFGDSAEIP700918

- our discovery of meaningful differences with regard to
  - o data related to the Plan that was provided to us prior to the end of the transition period and data that we receive following the end of the transition period or
  - o the amount of Plan assets we expected to be transferred into Investments before the end of the transition period and the amount of Plan assets actually transferred into Investments at the end of the transition period.

For the purposes of this Agreement, the transition period ends on the later of

- our receipt of all data that we need to begin to perform Services without need for additional data or
- you give us Notice that there are no more Plan assets to be transferred into Investments.

Major Business Changes may include; a change of Plan type, Plan or annuity contract termination or spin-off; Plan mergers/spin-offs, a greater than 25% change in the value of the Plan assets or the number of Participants, a change in Acknowledgement of Compensation and Contract Information; and adding or removing investment options

"Notice," "Notify' and "Notification" means a written communication, facsimile transmission, telephone, or electronic transmission in a form, and to any address, e-mail address, or fax or telephone number that the Parties agree to in advance. Notice may be between the Parties or between us and a Participant (as allowed under the Plan Document). A communication to us must be sufficiently clear and complete so that we can use it without requesting further data or instruction in order to be a Notice. We may not, and are forbidden to, take any action based on any form of communication other than either a Notice or a form of legal compulsion, including a subpoena.

The Parties may agree to security procedures for Notices and will treat such procedures as strictly confidential, making them known only to their employees that need to know.

"Participant" means a person who is, or may become by the operation of the Plan, entitled to benefits under the Plan. Participant will also include the term "Member".

"Participant-level Information" means specific and confidential information relating to individual Participants and/or beneficiaries such as, but not limited to, personal investment account balances, dates of birth, dates of employment, social security numbers, and Participant compensation amounts.

"Plan" means the C and J Management Corporation 401(k) Plan.

"Plan-level Information" means general information relating to the overall Plan such as, but not limited to, aggregate account or fund balances, employer data, Plan provisions, and other documents not containing confidential Participant data.

"Plan Document" means the document(s) under which the Plan is established and maintained.

"Plan Entity" means the Plan, any trust, contact, or custodial arrangement funding the Plan (or the trustee of custodian in connection with those arrangements) either singly or in any combination.

09/04

FD20051129162201905333004732PFC0SMED2D0910

200512051346MC1M701363$1129339-015$239-1

Sent by: 800 779 0079          8007790079;          29/11/05  5:26PM;JetFax_#390;Page 24/25

"**Successor**" means any trustee, custodian, or insurance company (other than us, an affiliated company, or any entity retained by the Funding Agent in furtherance of its services) to whom a Transfer is to be made and who may lawfully receive such Transfer.

"**Services**" means the services specifically set out and described in this Agreement.

"**Transfer**" means a transfer of, or the act of transferring, cash described in "Transfers" under "General Provisions.

09/04

FDR200511291622DM190533300093?PFCDSME1?2D4P10

200512051346MC1M701363$1129339-015$239-1

## ARTICLE V – DISPUTE RESOLUTION

*Procedures*. If the Parties have a dispute regarding this Agreement, any rights, duties, or obligations granted or arising under this Agreement, or any transaction made under this Agreement, they will try in good faith to resolve all such disputes through negotiation or mediation. If the Parties do not resolve their differences that way, they will do so through arbitration. Arbitration will be handled under the following rules and procedures.

Any dispute that does not involve activities regulated by securities laws will be submitted to arbitration conducted before the American Arbitration Association. The arbitration will be in accordance with that organization's rules and subject to the points below.

If, however, the dispute involves activities regulated by securities laws, the dispute will be submitted to arbitration conducted before the National Association of Securities Dealers, Inc. The arbitration will be in accordance with that organization's rules and subject to the first two points below.

- The results of an arbitration are final and binding.
- Any and all right to seek remedies in court, including the right to a jury trial, are expressly waived. It is specifically agreed that if negotiation and mediation are not successful, arbitration done in accordance with this Agreement will be the exclusive method to resolve disputes described above and provide appropriate remedies.
- The arbitrators' decision is not required to include factual findings or legal reasoning. The arbitrators may consider, in reaching their decision, the course of dealings between the Parties.
- The site of the arbitration will be in the capital city of the State, unless the Parties agree to another location.
- The rules of procedure not expressly provided for by the rules of the State will be augmented by the rules of the American Arbitration Association or a similar organization to the extent necessary.
- Any dispute arising regarding procedures or rules of an arbitration will be settled exclusively by the arbitrators.
- Any award rendered in any arbitration will be binding and enforceable. Judgment on any award or other remedy given by the arbitrators may be rendered in any court of the State or any court of the United States sitting in the State. The Parties agree to accept the jurisdiction of such courts and service of process. Any objection to the jurisdiction of any such court is expressly waived.

09/04

FD:200511291622DM905333000732PFCDSMEIP2D4P10